UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| PAUL GAGLIARDI, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:17-cv-00857-VAB |
| v. | : | |
| | : | |
| SACRED HEART UNIVERSITY, | : | |
| INCORPORATED, | : | |
| Defendant. | : | SEPTEMBER 14, 2018 |
| | : | |

## LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule 56(a)(1), the Defendant, Sacred Heart University, Incorporated ("SHU"), submits the following statement of material facts to which there are no genuine issues to be tried:[1]

1) SHU's Men's Tennis Team competes at the NCAA Division I level, within the Northeast Conference ("NEC"). (Transcript of Plaintiff's March 16, 2018 deposition, "Pl. Dep.," attached as Exhibit A, p. 27.)

2) In 2006, SHU hired Plaintiff to be the Head Coach of its Men's Tennis Team. (Pl. Dep. at 18.)

3) Plaintiff had not previously served as a collegiate head tennis coach. (Pl. Dep. at 14 and Exhibit 1, attached as Exhibit B.)

4) From 1999 until 2005, Michael J. Guastelle had coached both the Men's and Women's Tennis Teams at SHU. (Transcript of Mr. Guastelle's June 21, 2018 deposition, "MG Dep.," attached as Exhibit C, at 7-8.)

---

[1] Referenced exhibits are attached to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment filed herewith, and certain defined terms are set forth in that Memorandum.

5)  Mr. Guastelle is male.  (Pl. Dep. at 131.)

6)  The decision to hire Plaintiff was made by Mr. Guastelle, who at the time was also SHU's Senior Associate Athletic Director and retained his duties as Women's Tennis Coach.  (Pl. Dep. at 19; MG Dep. at 8, 10, 33.)

7)  Plaintiff agreed to an annual salary of $5,000, which was "part time pay" for what he claims was "full-time hours." (Pl. Dep. at 19.)

8)  Throughout his employment with SHU, Plaintiff reported to Mr. Guastelle.  (Pl. Dep. at 20; MG Dep. at 33.)

9)  Mr. Guastelle's duties as Senior Associate Athletic Director, a position he held along with Women's Tennis Coach throughout Plaintiff's employment, included internal operations and sport administration, which entailed working with SHU's coaches to develop budgets, create schedules, draft contracts and make travel arrangements.  (MG Dep. at 11-12, 33.)

10) Mr. Guastelle was a full-time employee.  (MG Dep. at 36.)

11) Mr. Guastelle's duties as Senior Associate Athletic Director took up approximately seventy percent (70%) of his time and his tennis duties took up approximately thirty percent (30%) of his time.  (MG Dep. at 36-37.)

12) Mr. Guastelle worked approximately 50-60 hours per week during the academic year and approximately 40 hours per week during the summer.  (MG Dep. at 37-38.)

13) Mr. Guastelle has been employed by SHU for approximately twenty-four (24) years. (MG Dep. at 6.)

14) During Plaintiff's time at SHU, Mr. Guastelle also served as the Director of Tennis with responsibility over SHU's entire tennis program, which entailed significant additional

administrative roles for both the Men's and Women's teams such as travel and scheduling.  (Pl. Dep. at 20; MG Dep. at 34-35.)

15) Other sports at SHU do not have an analogous "director" position, but Tennis did because Mr. Guastelle's full-time position allowed him to help Plaintiff by freeing up Plaintiff to focus more on recruiting and his team.  (MG Dep. at 35-36.)

16) From 2011 to 2016, the Men's Tennis Team at SHU shared equally with the Women's Team an assistant coach, Matt Cook.  (Pl. Dep. at 33-34.)

17) During Plaintiff's employment at SHU, the Men's and Women's Golf Teams shared a part-time assistant.  (RH Dep. at 55; Pl. Dep. at 111.)

18) During Plaintiff's employment at SHU, Women's Rowing, Bowling, and Rugby had no assistant coach.  (MG Dep. at 104-106.)

19) In the 2007-2008 academic year, in addition to coaching at SHU, Plaintiff held a full-time teaching position in the Branford Public School District.  (Pl. Dep. at 30.)

20) For the 2011-2012 academic year, Plaintiff held a ".8" teaching position with the Fairfield Public School District, meaning that it was 80% of a full-time position.  (Pl. Dep. at 30-31.)

21) Plaintiff also held, for some time, a full-time position with the United States Tennis Association ("USTA") while employed at SHU.  (Pl. Dep. at 30.)

22) Plaintiff's teaching contract with Branford was non-renewed, in part, because he was not able to perform his full-time teaching duties due to his coaching responsibilities at SHU. (Pl. Dep. at 31-32.)

23) Plaintiff assumes that his non-renewal by Fairfield was also for this reason.  (Pl. Dep. at 56-57.)

24) At SHU full-time employment is considered 35 hours per week or more, for 40 or more weeks per year.  (Transcript of Mr. Hardy's June 25, 2018 deposition, "RH Dep." attached as Exhibit D, at 38; Employee Handbook, relevant pages attached as Exhibit E, p. 82.)

25) SHU's part-time with benefits classification requires working 20 or more hours per week. (RH Dep. at 39; Exhibit E, p. 82.)

26) Decisions at SHU about whether coaches are part-time or full-time are based upon financial considerations, benchmarking against other institutions, as well as Title IX compliance.  (MG Dep. at 42; Transcript of Mr. Valentine's June 22, 2018 deposition, "RV Dep.," attached as Exhibit F, at 98.)

27) SHU's primary benchmarking focus is to make sure that SHU is treating positions similar to other NEC schools.  (MG Dep. at 66.)

28) During Plaintiff's employment at SHU, SHU employed several full time male head coaches, for the sports of Men's: Football, Lacrosse, Ice Hockey, Wrestling, Cross Country, and Track and Field.  (MG Dep. at 77-78.)

29) SHU had a single coach for both the men's and women's teams for the following sports: Golf, Fencing, and, currently, Tennis.  (MG Dep. at 43, 44.)

30) Shortly after his employment with SHU began in 2006, Plaintiff began asking for raises and that his job be changed to full-time.  (Pl. Dep. at 62-63.)

31) Sometime between 2013 and 2014, Plaintiff wrote a "proposal" in which he asked to be moved to full-time status and estimated that he was "currently logging 1400 total hours a year."  (Pl. Dep. at 63-65, Exhibit 7 attached as Exhibit G.)

32) In May 2014, Plaintiff e-mailed Julia Nofri, SHU's Human Resources Director, stating

4

that he had recently spoken to Mr. Guastelle about increasing his position to full-time, but there was "no resolution." (Pl. Dep. at 67-68, Exhibit 9 attached as Exhibit H.)

33) In that e-mail, Plaintiff estimated his annual hours worked to "1,450 hours plus." *Id.*

34) At his deposition, Plaintiff estimated that he worked between 1,400 and 1,600 hours a year at SHU. (Pl. Dep. at 133.)

35) In Plaintiff's June 2014 evaluation, Mr. Guastelle rated Plaintiff's performance as either "solid performance" or "above expectation" in each category rated. (Pl. Dep. at 65-66, Exhibit 8 attached as Exhibit I.)

36) In the "employee comments" section of his June 2014 evaluation, Plaintiff raised a concern about being a part-time employee evaluated "on the same scale as a full time employee." (Exhibit I, p. 4.)

37) Plaintiff's July 2015 evaluation, performed by Mr. Guastelle, rated Plaintiff's performance lower. (Pl. Dep. at 72, Exhibit 10 attached as Exhibit J.)

38) Mr. Guastelle wrote the following comment on the evaluation:

As the program's administrator, my main concern with Paul is his overall attitude towards the head coaching position being a part-time position. Being a part-time head coach is difficult and definitely has its challenges, however, this cannot be the reason for a lack of enthusiasm and commitment needed in order for the program to improve from its current state. He is an excellent coach and teacher of the game and I look forward to helping him any way so I can to make the program better competitively, administratively, etc. this upcoming year.

(Exhibit J.)

39) Plaintiff's employee comments on the 2015 evaluation again made a request for full-time employment. *Id.*

40) Brad Hurlbut, SHU's Deputy Director of Athletics, reviewed and signed the evaluation as the "next level supervisor" and included the following comments:

I agree with Mike's assessment of Paul being a part-time coach has its drawbacks….Paul needs to embrace the program and be more positive as the position will not be made full-time in the near future. We do not have the resources at this time to do so unfortunately.

(Pl. Dep. at 40, 72-73, Exhibit J.)

41) On October 20, 2015, Plaintiff submitted a letter to SHU's Human Resources Department in which he claimed that he had been denied full-time status and "ancillary resources" as a result of "discrimination" based on his gender.  (Pl. Dep. at 74-75, Exhibit 11, attached as Exhibit K.)

42) On or about November 10, 2015, SHU's Vice President for Human Resources, Robert Hardy, met with Plaintiff to address his concerns.  (Pl. Dep. at 76, 77.)

43) During their discussion, Mr. Hardy asked Plaintiff to clarify whether his claim was that he was being discriminated against because of his own gender or because of the gender of the athletes he coached, and Plaintiff clarified it was because of his own gender.  (Pl. Dep. at 78.)

44) Thereafter, Mr. Hardy spoke with Messrs. Hurlbut and Guastelle, who both stated that the position did not merit full-time status.  (RH Dep. at 42-43.)

45) Mr. Hardy set-up another meeting to discuss the issues in late December 2015 with Plaintiff and Robert Valentine, SHU's Director of Athletics.  (Pl. Dep. at 78-79.)

46) On January 19, 2016, Mr. Hurlbut wrote to Messrs. Hardy and Valentine and Ms. Nofri explaining that he had received a draft of the NEC's annual salary survey and that it contained information from all schools in the conference, especially the salaries of the coaches of the men's tennis teams of the seven (7) schools.  (E-mail attached as Exhibit L; *see* RH Dep. at 46.)

47) Comparative analyses were commonly used by SHU in evaluating how to compensate positions within the athletic department.  (RV Dep. at 98.)

48) Mr. Hurlbut's January 19, 2016 e-mail reported that:

Of 7 teams in NEC, 4 are reporting as full-time. The highest that has no additional duties is $27,377. There is one at $43k and another at $30k, but both have duties as head women's coach as well.

Other 3 in NEC are: $18K for a full-time, 10K for a PT, and 2K for a GA.

I feel strongly we stick with what we are paying other PT Head Coaches: $20k.

(Exhibit L; *see also* relevant portions of 2015-15 NEC Athletic Department Survey – SHU, attached as Exhibit M; MG Dep. at 67-69.)

49) As a result of Plaintiff's complaint, SHU's internal discussions and assessment, effective January 1, 2016, Plaintiff's annual salary was increased to $20,000 (from $13,800), and he became eligible to receive standard fringe benefits from SHU.  (Pl. Dep. at 79-81, Exhibit 12, attached  as Exhibit N; RH Dep. at 53.)

50) Plaintiff told Mr. Hardy that he was satisfied with this outcome.  (RH Dep. at 54.)

51) Plaintiff was told not to exceed working 25 hours per week.  (RH Dep. at 59.)

52) On July 30, 2016, Plaintiff wrote to Mr. Hardy, copying James M. Barquinero, Vice President for Enrollment Planning and Student Affairs.  (Pl. Dep. at 86, Exhibit 14, attached as Exhibit O.)

53) In the letter, Plaintiff made claims that he was being discriminated against because of his gender due to his part-time status "because of a Title IX issue."  (Exhibit O.)

54) Plaintiff stated that he would "strictly adhere to" a 25 hours per week schedule, under which "the team may not function in a way it has in the past."  (Exhibit O.)

55) He continued: "[s]o there may not be a coach to take the players to most matches or

7

tournaments, practice appropriately, fundraise and recruit…." (Exhibit O.)

56) For the 2016-17 academic year, Plaintiff took a full-time public high school teaching job in Ansonia. (Pl. Dep. at 103-04.)

57) Plaintiff understood that, as had been the case with his past full-time teaching jobs, there would be conflicts with his coaching job. (Pl. Dep. at 105.)

58) In summer 2016, Plaintiff refused to sign his 2015-2016 performance review. (MG Dep. at 214-15, Exhibit 19, attached as Exhibit P.)

59) The review had noted that Plaintiff had become disengaged from the Athletic Department and that his attitude needed to change to promote a positive environment for student athletes in the Tennis Program. (Exhibit P; MG Dep. at 225-30.)

60) On September 7, 2016, Plaintiff met with Mr. Hardy to discuss his part-time status and hours worked, as well as his annual evaluation. (Pl. Dep. at 101-02.)

61) On September 16, 2016, Plaintiff wrote an e-mail to Messrs. Valentine, Guastelle and Hurlbut stating that he had met with Mr. Hardy and that Mr. Hardy:

places blame on the athletic department admin for all his Hr [sic] problems. In response and in your defense I stated all this baton passing seems inappropriate. Despite all these reindeer games on a macroscopic scale, I appreciate all the positive changes in the athletic department.

(Pl. Dep. at 101, Exhibit 15, attached as Exhibit Q.)

62) Mr. Hardy considered, based upon this content, that Plaintiff had become disruptive. (RH Dep. at 67.)

63) Mr. Hardy responded to Plaintiff's September 16, 2016 email:

I was disappointed to see this e-mail as I thought when we met on September 7 you wanted to have me /HR address your concerns. I am uncertain how you drew these conclusions when I hadn't even met with [Messrs. Valentine, Hurlbut or Guastelle] to address your concerns. Nonetheless, I am meeting with Mike Guastelle tomorrow morning to get his perspective on your issues.

(Exhibit Q.)

64) Mr. Hardy discussed with Mr. Guastelle the hours that Plaintiff had entered into SHU's Kronos timekeeping system.  (RH Dep. at 33-34, 57, Exhibit 8, attached as Exhibit R, p. 2.).

65) Mr. Guastelle believed that Plaintiff was fabricating his hours to exceed 25 per week. (MG Dep. at 171.)

66) In summer 2016, Plaintiff ran a youth tennis camp at SHU that was sponsored by Nike. (Pl. Dep. at 96-97.)

67) Plaintiff was not paid by SHU for this private camp.  (Pl. Dep. at 100.)

68) That summer, he went on vacation to Cape Cod for a week in July and went on a Caribbean cruise in August.  (Pl. Dep. At 99.)

69) Mr. Guastelle disputed the hours that Plaintiff had entered when he was on vacation and working at the private camp.  (MG Dep. at 113, 115-118, Exhibit 7, attached as Exhibit S.)

70) Mr. Guastelle also took issue with time that Plaintiff attributed to his work at SHU based on his claim that he attended a professional tennis tournament "representing" SHU. (MG. Dep. at 165.)

71) Plaintiff "commingled" hours in Kronos between his SHU work and his non-SHU work, such as for private tournaments he organized.  (Pl. Dep. at 152-53.)

72) As the Fall 2016 season began, Plaintiff had been arriving late to practice, and Mr. Guastelle received complaints from players that they were forced to start running the practices themselves.  (MG Dep. at 127, 184.)

73) Players also mentioned to Mr. Valentine that Plaintiff was missing time from practices. (RV Dep. at 61-62.)

74) Plaintiff was late to every practice by at least a half hour because of conflicts with his teaching job. (Pl. Dep. at 127.)

75) Plaintiff also missed between two and five practices. (Pl. Dep. at 126.)

76) In Fall 2016, Plaintiff was late to a tournament at Yale University, arriving at 3:00 PM on a Friday while the matches began at 10:00 AM. (Pl. Dep. at 126.)

77) On Sunday, September 11, 2016, Mr. Guastelle met with Plaintiff and Coach Cook and discussed a tournament at the University of Connecticut that was beginning the following Friday, September 16, 2016. (MG Dep. at 123-24.)

78) The reason for the meeting was because Mr. Guastelle wanted to make sure that all the matches at the tournament had a coach covering them, given that Mr. Guastelle would be away with the Women's Team and Coach Cook was unavailable. (MG Dep. at 123-24.)

79) Plaintiff assured Mr. Guastelle that he would be at the tournament on Friday. (MG Dep. at 124.)

80) Mid-way through the week, Plaintiff called Mr. Guastelle and stated he would not be at the Friday matches because of a conflict with his new full-time teaching job. (MG Dep. at 124; Pl. Dep. at 125.)

81) Plaintiff did not attend the first day of the tournament. (Pl. Dep. at 124.)

82) Plaintiff "waited until the last minute" to provide Mr. Guastelle with notice. (Pl. Dep. at 153.)

83) As a result of Plaintiff's absence, the team was unable to compete in the doubles portion of the tournament. (MG Dep. at 124.)

84) In a meeting on September 28, 2016, Plaintiff was informed that his employment was being terminated.  (Pl. Dep;. at 107.)

85) Plaintiff's employment was terminated because he had become disengaged from his job, including being late to practices and unavailable to coach at matches.  (MG Dep. at 29; RV Dep. at 63, 65-66.)

86) Plaintiff's promised attendance at, and subsequent absence from, the UCONN tournament, was the "last straw" that led Mr. Guastelle to recommend that Plaintiff's employment be terminated.  (MG Dep. at 123; RV Dep. at 63.)

87) Mr. Hurlbut brought that recommendation to Mr. Valentine, who made the final decision, which was approved by Mr. Barquinero.  (RV Dep. at 30, 41, 69.)

88) Mr. Hardy was also involved in the termination decision.  (RH Dep. at 19; RV Dep. at 61, 68.)

89) Each of the decision-makers in Plaintiff's termination are males.  (Pl. Dep. at 131.)

90) After plaintiff's termination, for the remainder of the 2016-2017 academic year, Mr. Guastelle assumed coaching duties for the Men's Tennis Team, in addition to his duties as Women's Tennis Coach, Senior Associate Athletic Director, and Tennis Director.  (Pl. Dep. at 130.)

91) Beginning in September 2017, Men's and Women's Tennis teams are now coached by William Boe-Wiegaard, a male.  (MG Dep. at 26-27; Pl. Dep. at 130-31.)

92) The combined position is a full-time position.  (MG Dep. at 27, 44.)

93) Mr. Boe-Wiegaard's salary is approximately $50,000.  (MG Dep. at 176.)

94) Plaintiff does not know who at SHU discriminated against him.  (Pl. Dep. at 75.)

95) Plaintiff has no evidence of any anti-male comments being made against him.  (Pl. Dep.

at 76.)

96) Plaintiff testified that he does not have any evidence that Messrs. Hurlbut, Valentine or Hardy or Ms. Nofri are prejudiced against men.  (Pl. Dep. at 150.)

97) The soccer teams at SHU have full-time coaches for both the men's and women's teams, which are coached by a male and a female.  (See MG Dep. at 78.)

98) There are only Women's teams, and not Men's teams, for Equestrian, Rowing, Bowling, Field Hockey and Rugby.  (*See* Affidavit of Mr. Hurlbut and attachments, attached as Exhibit T.)

99) The Equestrian, Rowing and Bowling head coach positions were previously part-time but became full-time.  (MG Dep. at 61-62.)

100)     Equestrian is an "emerging" sport, and SHU has been attempting to have its program recognized as a full-time NCAA Division I sport, which was based in part upon concerns about complying with the gender equity requirements of Title IX.  (MG Dep. at 62; RV Dep. at 80, 112-13.)

101)     In order to make the Equestrian program successful, SHU needed to have a full-time head coach so it could devote resources to recruiting.  (RV Dep. at 80.)

102)     The Equestrian team is large, comprised of between 25 and 30 athletes.  (MG Dep. at 108.)

103)     With respect to Rowing, Title IX gender equity was also a consideration in converting the position, to full-time, to allow more intense recruiting efforts.  (MG Dep. at 62; RV Dep. at 115-16.)

104)     Recruiting is particularly important for Rowing, because the team has a large roster that must be filled: between 40 and 50 athletes.  (MG Dep. at 62.)

105)     With respect to Bowling, SHU's program has been nationally recognized for its success and SHU has been in the process of building a facility to showcase that sport. (MG Dep. at 18; RV Dep. at 116.)

106)     Plaintiff did not lead SHU's team to two NCAA Division I team championships; rather the team qualified for the NCAA tournament twice.  (Pl. Dep. at 120.)

107)     Plaintiff's overall record as head coach was 89 wins and 126 losses.  (Pl. Dep. at 128.)

108)     Title IX gender equity compliance also had a role in devoting resources to SHU's Bowling program.  (MG Dep. at 62; RV Dep. at 116.)

109)     SHU's Bowling Team has a significantly larger roster, between 20-25 athletes, as compared with the Men's Tennis Team.  (MG Dep. at 108.)

110)     Due to benchmarking of similar institutions, Men's Wrestling was converted from part-time to full-time.  (MG Dep. at 65-66.)

111)     SHU sets annual budgets for each of its teams for recruiting, equipment and fundraising.  (Affidavit of Mr. Hurlbut and attachments, attached as Exhibit T.)

112)      For the 2016 fiscal year, Men's and Women's Tennis had equivalent recruiting budgets, which exceed the recruiting budgets of the Women's Equestrian and Women's Rowing teams and equaled the budgets of the Women's Swimming and Men's and Women's Golf teams.  (Exhibit T.)

113)     Mr. Guastelle set the recruiting budgets based on benchmarking with other NEC schools, and comparing overall budgets between men's and women's programs to ensure equity, and also considered the costs associated with the geographic areas where the recruiting is taking place.  (MG Dep. at 151-53, 157.)

114)    The 2016 equipment budgets for the Men's and Women's Tennis Teams were equivalent, and exceeded the equipment budgets of several other sports on a per student athlete basis.  (Exhibit T.)

115)    With respect to fundraising budgets, the Men's and Women's Tennis teams had nearly the same amount for the five years preceding 2016, which was near the median of the amounts raised by other teams.  (Exhibit T.)

116)    Other schools within SHU's conference, the NEC, either classify their Men's Tennis Coach as a part-time position, or have a single coach for both the Men's and Women's program (which SHU now does as well).  (Exhibits L, M.)

THE DEFENDANT,
SACRED HEART UNIVERSITY,
INCORPORATED

By: _/s/ Jonathan C. Sterling_____
    James M. Sconzo (ct04571)
    Jonathan C. Sterling (ct24576)
    Jillian R. Orticelli (ct28591)
    CARLTON FIELDS JORDEN BURT, P.A.
    One State Street, Suite 1800
    Hartford, CT  06103
    Tel.: 860-392-5000 / Fax: 860-392-5058
    Email: jscsonzo@carltonfields.com
          jsterling@carltonfields.com
          jorticelli@carltonfields.com
    Its Attorneys

14

## CERTIFICATION OF SERVICE

I hereby certify that on September 14, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jonathan C. Sterling*
Jonathan C. Sterling