UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAUL GAGLIARDI,<br>　　　　　Plaintiff, | : <br> : <br> : | CIVIL CASE NO.<br>3:17-cv-00857-VAB |
| v. | : <br> : | |
| SACRED HEART UNIVERSITY,<br>INCORPORATED,<br>　　　　　Defendant. | : <br> : <br> : | SEPTEMBER 14, 2018 |

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THE DEFENDANT,
SACRED HEART UNIVERSITY,
INCORPORATED


By: /s/ Jonathan C. Sterling
James M. Sconzo (ct04571)
Jonathan C. Sterling (ct24576)
Jillian R. Orticelli (ct28591)
CARLTON FIELDS JORDEN BURT, P.A.
One State Street, Suite 1800
Hartford CT 06103
Phone: 860-392-5000
Fax: 860-392-5058
jsconzo@carltonfields.com
jsterling@carltonfields.com
jorticelli@carltonfields.com
*Its attorneys*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

I.    PRELIMINARY STATEMENT ......................................................................................... 1

II.   FACTS ................................................................................................................................. 1

    A.    Plaintiff's Hiring and Early Employment History ................................................... 2

    B.    Plaintiff's Complaints And Requests For A Raise .................................................... 4

    C.    The 2016-17 Academic Year ................................................................................... 7

    D.    Other Sports At SHU .............................................................................................. 11

    E.    Plaintiff's Lawsuit .................................................................................................. 13

III.  LAW AND ARGUMENT .................................................................................................. 13

    A.    Legal Standard For A Motion For Summary Judgment .......................................... 13

    B.    Plaintiff's Sex Discrimination Claims Fail. ........................................................... 14

        1.    Plaintiff Has No Viable Cause Of Action Under Title IX ....................... 15

        2.    Plaintiff's Claims About Team, Resources Are Not Actionable. ............ 16

        3.    The Statute of Limitations Precludes, At Least In Part, Plaintiff's
            Claims ...................................................................................................... 17

        4.    There Is No Evidence To Support Plaintiff's Sex Discrimination
            Claims, And Ample Evidence Refute Them............................................ 19

            a.    The Legal Framework .................................................................. 19

            b.    There Were No "Equal Work" Comparators. ............................... 20

            c.    Any Pay Differences Were Based On Factors Other Than
                Sex............................................................................................... 23

    C.    Plaintiff's Retaliation Claims Fail. ......................................................................... 24

    D.    Punitive Damages Claim Fails................................................................................. 27

IV.   CONCLUSION................................................................................................................... 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001)..............................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................13

*Atkins v. Coca Cola Enters., Inc.*, No. 07 C 1038, 2007 WL 4219196
(N.D.Ill. Nov. 28, 2007)..............................................................................................18

*Aucoin v. Kennedy, 355 F.Supp.2d 830 (E.D.La. 2004)*............................................27

*Baldwin v. New York,* 690 Fed.Appx. 694 (2d Cir. 2017)..........................................25

*Belfi v. Prendergast*, 191 F.3d 129 (2d Cir. 1999) ....................................19, 20, 23

*Betterson v. HSBC Bank USA*, 661 Fed.Appx. 87 (2d Cir. 2016) ..............................15

*Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d Cir. 1999)..............................13

*Bogle-Assegai v. Connecticut,* 470 F.3d 498 (2d Cir. 2006) ......................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................14

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)..............................................19

*Deli v. University of Minn.*, 863 F.Supp. 958 (D.Minn. 1994)..............................17, 21

*Downes v. JP Morgan Chase & Co.*, No. 03 Civ.8991(GEL), 2004 WL 1277991
(S.D.N.Y. June 8, 2004)..............................................................................................18

*EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249 (6th Cir. 1988) ..................................23

*EEOC v. Madison Comm. Unit. School Dist. No. 12,* 818 F.2d 577 (7th Cir. 1987) ..............21, 22

*Eisenhauer v. Great Lakes Plastics,* 99-CV-0129E(F), 2001 WL 209904
(W.D.N.Y. Feb. 23, 2001) ..........................................................................................25

*Ford v. Veterinary Centers of America, Inc.*, No. 00-4604, 2001 WL 1152948
(E.D.Pa. Sep. 14, 2001)..............................................................................................27

*Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118 (W.D.N.Y. 2001)..................15

*Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962 JFB AKT, 2007 WL 1174891
(E.D.N.Y. Apr. 19, 2007)............................................................................................26

*Hoffman v. Rubin,* 193 F.3d 959 (8th Cir. 1999) ......................................................16

*Horn v. Univ. of Minn.,* 362 F.3d 1042 (8th Cir. 2004)..............................................22

*Housel v. Rochester Inst. of Tech.,* 6 F. Supp. 3d 294 (W.D.N.Y. 2014)......................26

*Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151 (7th Cir. 1997)..........................................20

*Jacobs v. College of William and Mary,* 517 F.Supp. 791 (E.D.Va.1980), aff'd mem.,
661 F.2d 922 (4th Cir.), cert. denied, 454 U.S. 1033 (1981)......................................22

*Jones v. Onondaga Cnty. Res. Recovery Agency,* 973 F.Supp.2d 159 (N.D.N.Y. 2013)..............26

*Jones v. City of Philadelphia,* No. Civ.A.04-85, 2006 WL 851224 (E.D.Pa. March 28, 2006)....27

*Lowrey v. Texas A & M University System,* 117 F.3d 242 (5th Cir. 1997)...................................17

*Martin v. Town of Westport,* 329 F.Supp.2d 318 (D.Conn. 2004)..............................................13

*Martinez v. Davis Polk & Wardwell LLP,* 713 Fed.Appx. 53 (2d Cir. 2017) ..............................20

*Maxwell v. City of Tucson,* 803 F.2d 444 (9th Cir. 1986)..........................................................20

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).........................................................16

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988)...........................................................18

*Mercer v. Duke Univ.,* 50 Fed. App. 643 (4th Cir. 2002)..........................................................27

*Moody v. Aircastle Advisor, LLC,* No. 3:13-cv-00575 (VAB), 2016 WL 1257805
(D. Conn. Mar. 30, 2016)........................................................................................................16

*Nieves v. AvalonBay Communities,* No. 3:06CV00198 (DJS), 2007 WL 2422281
(D. Conn. Aug. 23, 2007) ........................................................................................................15

*Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81 (2d Cir. 2011)....................24

*Pollis v. New Sch. for Soc. Research,* 132 F.3d 115 (2d Cir. 1997).............................................18

*Robinson v. Concentra Health Servs., Inc.,* 781 F.3d 42 (2d Cir. 2015).....................................16

*Rogers v. Bank of New York Mellon,* 09 Civ. 8551 (HBP), 2016 WL 4362204
(S.D.N.Y. Aug. 15, 2016)........................................................................................................20

*Scott v. City of Sioux City,* 68 F.Supp.3d 1022 (N.D. Iowa 2014)..............................................17

*Stanely v. Univ. of S. Cal.,* 13 F.3d 1313 (9th Cir. 1994)..........................................................23

*Summa v. Hofstra Univ.,* 708 F.3d 115 (2d Cir. 2013)..............................................................20

*Terry v. Ashcroft,* 336 F.3d 128 (2d Cir. 2003) .......................................................................16

*Timbie v. Eli Lilly & Co.,* 429 Fed. Appx. 20 (2d Cir. 2011).....................................................14

*Toliver v. Cmty. Action Comm'n to Help the Econ., Inc.,* 613 F. Supp. 1070 (S.D.N.Y 1985)....14

*Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir. 1995)...........................................................19, 20

*Torres v. School District of Manatee County, Florida,* No. 8:14-cv-1021-T-33TBM,
2014 WL 4185364 (M.D. Fla. Aug. 22, 2014).........................................................................24

*Towers v. State Univ. of New York at Stony Brook,* No. CV-04-5243 GB TML,
2007 WL 1470152 (E.D.N.Y. May 21, 2007) ...........................................................................15

*University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338 (2013)....................25

*Urie v. Yale Univ.,* 331 F. Supp. 2d 94 (D. Conn. 2004)...........................................................15

*Uyar v. Seli,* No. 16-186, 2017 WL 886934 (D. Conn. Mar. 6, 2017).........................................15

iv

*Vega v. State Univ. of New York Bd. of Trustees,* No. 97 CIV. 5767 (DLC),
2000 WL 381430 (S.D.N.Y. Apr. 13, 2000)............................................................15

*Weaver v. Ohio State University,* 71 F.Supp.2d 789 (S.D. Ohio 1998)........................................21

*Weichman v. Chubb & Son,* 552 F.Supp.2d 271 (2008).................................................25

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 56 (c) ............................................................................................13

42 U.S.C. § 2000e-5............................................................................................17, 18

29 U.S.C. § 206(d)(1) ............................................................................................16, 19, 23

The Defendant, Sacred Heart University, Incorporated ("SHU"), has moved for summary judgment on all counts in Plaintiff's Amended Complaint filed June 15, 2017 (the "Complaint"). There are no genuine issues of material fact in dispute, and SHU's Motion for Summary Judgment should be granted.

## I.   PRELIMINARY STATEMENT

Plaintiff was the Men's Tennis Coach at SHU. He has admitted he has no evidence of gender discrimination. He was a part-time employee and was appropriately classified and paid as such. His employment ended because he was not doing his job, in large part because he accepted a full-time job as a high school teacher and that conflicted with his Division I coaching responsibilities. Plaintiff has admitted being late to each of the SHU team practices in Fall 2016 and missing parts of two tournaments due to conflicts with his high school work schedule. The decision to terminate his employment from SHU had nothing to do with any "protected activity" he may have engaged in. Indeed, when Plaintiff complained about his salary, SHU's response was to increase it and offer him benefits; not to retaliate against him. For these reasons, as well as a variety of legal arguments, SHU is entitled to summary judgment on all of Plaintiff's claims.

## II.   FACTS[1]

SHU is an institution of higher learning located in Fairfield, Connecticut. SHU's Men's Tennis Team competes at the NCAA Division I level, within the Northeast Conference ("NEC"). (Transcript of Plaintiff's March 16, 2018 deposition, "Pl. Dep.," attached as Exhibit A, p. 27.)

---

[1] Unless noted, these "facts" are Plaintiff's version of the facts, which SHU does not concede for purposes other than this Motion. SHU denies all of Plaintiff's claims of discrimination and retaliation.

1

### A.     Plaintiff's Hiring and Early Employment History

In 2006, SHU hired Plaintiff to be the Head Coach of its Men's Tennis Team. (Pl. Dep. at 18.) Plaintiff had not previously served as a collegiate head tennis coach. (Pl. Dep. at 14 and Exhibit 1, attached hereto as Exhibit B.) From 1999 until 2005, Michael J. Guastelle[2] had coached both the Men's and Women's Tennis Teams at SHU. (Transcript of Mr. Guastelle's June 21, 2018 deposition, "MG Dep.," attached as Exhibit C, at 7-8.) The decision to hire Plaintiff was made by Mr. Guastelle, who at the time was also SHU's Senior Associate Athletic Director and retained his duties as Women's Tennis Coach. (Pl. Dep. at 19; MG Dep. at 8, 10, 33.) Plaintiff agreed to an annual salary of $5,000, which was "part time pay" for what he claims was "full-time hours." (Pl. Dep. at 19.)

Throughout his employment with SHU, Plaintiff reported to Mr. Guastelle. (Pl. Dep. at 20; MG Dep. at 33.) Mr. Guastelle's duties as Senior Associate Athletic Director, a position he held along with Women's Tennis Coach throughout Plaintiff's employment, included internal operations and sport administration, which entailed working with SHU's coaches to develop budgets, create schedules, draft contracts and make travel arrangements. (MG Dep. at 11-12, 33.) Mr. Guastelle was a full-time employee. (MG Dep. at 36.) Mr. Guastelle's duties as Senior Associate Athletic Director took up approximately seventy percent (70%) of his time and his tennis duties took up approximately thirty percent (30%) of his time. (MG Dep. at 36-37.) Mr. Guastelle worked approximately 50-60 hours per week during the academic year and approximately 40 hours per week during the summer. (MG Dep. at 37-38.) Mr. Guastelle has been employed by SHU for approximately twenty-four (24) years. (MG Dep. at 6.) During Plaintiff's time at SHU, Mr. Guastelle also served as the Director of Tennis with responsibility over SHU's entire tennis program, which entailed significant additional administrative roles for

---

[2] Mr. Guastelle is male. (Pl. Dep. at 131.)

both the Men's and Women's teams such as travel and scheduling. (Pl. Dep. at 20; MG Dep. at 34-35.) Other sports at SHU do not have an analogous "director" position, but Tennis did because Mr. Guastelle's full-time position allowed him to help Plaintiff by freeing up Plaintiff to focus more on recruiting and his team. (MG Dep. at 35-36.)

From 2011 to 2016, the Men's Tennis Team at SHU shared equally with the Women's Team an assistant coach, Matt Cook. (Pl. Dep. at 33-34.) Whether or not assistant coaches are assigned to particular sports, and whether those assistants are full-time, are determinations made on a case-by-case basis and vary across sports. For example, the Men's and Women's Tennis Teams shared Mr. Cook as a part-time assistant during Plaintiff's employment, just as the Men's and Women's Golf Teams shared a part-time assistant. (RH Dep. at 55; Pl. Dep. at 111.) Other sports, including Women's Rowing, Bowling, and Rugby have no assistant coach. (MG Dep. at 104-106.)

In the 2007-2008 academic year, in addition to coaching at SHU, Plaintiff held a full-time teaching position in the Branford Public School District. (Pl. Dep. at 30.) For the 2011-2012 academic year, Plaintiff held a ".8" teaching position with the Fairfield Public School District, meaning that it was 80% of a full-time position. (Pl. Dep. at 30-31.) Plaintiff also held, for some time, a full-time position with the United States Tennis Association ("USTA") while employed at SHU. (Pl. Dep. at 30.) Plaintiff's teaching contract with Branford was non-renewed, in part, because he was not able to perform his full-time teaching duties due to his coaching responsibilities at SHU. (Pl. Dep. at 31-32.) Plaintiff assumes that his non-renewal by Fairfield was also for this reason. (Pl. Dep. at 56-57.)

3

### B.    Plaintiff's Complaints And Requests For A Raise

At SHU full-time employment is considered 35 hours per week or more, for 40 or more weeks per year. (Transcript of Mr. Hardy's June 25, 2018 deposition, "RH Dep.," attached as Exhibit D, at 38; Employee Handbook, relevant pages attached as Exhibit E, p. 82.) SHU's part-time with benefits classification requires working 20 or more hours per week. (RH Dep. at 39; Exhibit E, p. 82.) Decisions at SHU about whether coaches are part-time or full-time are based upon financial considerations, benchmarking against other institutions, as well as Title IX compliance. (MG Dep. at 42; Transcript of Mr. Valentine's June 22, 2018 deposition, "RV Dep.," attached as Exhibit F, at 98.) SHU's primary benchmarking focus is to make sure that SHU is treating positions similar to other NEC schools. (MG Dep. at 66.) SHU employs several full time male head coaches, for the sports of Men's: Football, Lacrosse, Ice Hockey, Wrestling, Cross Country, and Track and Field. (MG Dep. at 77-78.) Certain other sports at SHU have a single coach for both the men's and women's teams, including: Golf, Fencing, and, currently, Tennis. (MG Dep. at 43, 44.)

Shortly after his employment with SHU began in 2006, Plaintiff began asking for raises and that his job be changed to full-time. (Pl. Dep. at 62-63.) This continued throughout his employment. Sometime between 2013 and 2014, Plaintiff wrote a "proposal" in which he asked to be moved to full-time status and estimated that he was "currently logging 1400 total hours a year." (Pl. Dep. at 63-65, Exhibit 7 attached hereto as Exhibit G.) In May 2014, Plaintiff e-mailed Julia Nofri, SHU's Human Resources Director, stating that he had recently spoken to Mr. Guastelle about increasing his position to full-time, but there was "no resolution." (Pl. Dep. at 67-68, Exhibit 9 attached hereto as Exhibit H.) In that e-mail, Plaintiff increased his estimate of annual hours worked to "1,450 hours plus." *Id.* At his deposition, Plaintiff estimated that he

worked between 1,400 and 1,600 hours a year at SHU. (Pl. Dep. at 133.) In Plaintiff's June 2014 evaluation, Mr. Guastelle rated Plaintiff's performance as either "solid performance" or "above expectation" in each category rated. (Pl. Dep. at 65-66, Exhibit 8 attached hereto as Exhibit I.) However, in the "employee comments" section of that evaluation, Plaintiff raised a concern about being a part-time employee evaluated "on the same scale as a full time employee." (Exhibit I, p. 4.)

Plaintiff's July 2015 evaluation, performed by Mr. Guastelle, rated Plaintiff's performance lower. (Pl. Dep. at 72, Exhibit 10 attached hereto as Exhibit J.) Mr. Guastelle wrote the following comment on the evaluation:

> As the program's administrator, my main concern with Paul is his overall attitude towards the head coaching position being a part-time position. Being a part-time head coach is difficult and definitely has its challenges, however, this cannot be the reason for a lack of enthusiasm and commitment needed in order for the program to improve from its current state. He is an excellent coach and teacher of the game and I look forward to helping him any way so I can to make the program better competitively, administratively, etc. this upcoming year.

(Exhibit J.) Plaintiff's employee comments on the 2015 evaluation again made a request for full-time employment. *Id.* Brad Hurlbut, SHU's Deputy Director of Athletics, reviewed and signed the evaluation as the "next level supervisor" and included the following comments:

> I agree with Mike's assessment of Paul being a part-time coach has its drawbacks....Paul needs to embrace the program and be more positive as the position will not be made full-time in the near future. We do not have the resources at this time to do so unfortunately.

(Pl. Dep. at 40, 72-73, Exhibit J.)

On October 20, 2015, Plaintiff submitted a letter to SHU's Human Resources Department in which he claimed that he had been denied full-time status and "ancillary resources" as a result of "discrimination" based on his gender. (Pl. Dep. at 74-75, Exhibit 11, attached as Exhibit K hereto.) On or about November 10, 2015, SHU's Vice President for Human Resources, Robert

Hardy, met with Plaintiff to address his concerns. (Pl. Dep. at 76, 77.) During their discussion, Mr. Hardy asked Plaintiff to clarify whether his claim was that he was being discriminated against because of his own gender or because of the gender of the athletes he coached, and Plaintiff clarified it was because of his own gender. (Pl. Dep. at 78.) Mr. Hardy spoke with Messrs. Hurlbut and Guastelle, who both stated that the position did not merit full-time status. (RH Dep. at 42-43.) Mr. Hardy set-up another meeting to discuss the issues in late December 2015 with Plaintiff and Robert Valentine, SHU's Director of Athletics. (Pl. Dep. at 78-79.) On January 19, 2016, Mr. Hurlbut wrote to Messrs. Hardy and Valentine and Ms. Nofri explaining that he had received a draft of the NEC's annual salary survey and that it contained information from all schools in the conference, especially the salaries of the coaches of the men's tennis teams of the seven (7) schools. (E-mail attached as Exhibit L; *see* RH Dep. at 46.) Such a comparative analysis was commonplace in evaluating how to compensate positions within the athletic department. (RV Dep. at 98.) Mr. Hurlbut's email reported that:

> Of 7 teams in NEC, 4 are reporting as full-time. The highest that has no additional duties is $27,377. There is one at $43k and another at $30k, but both have duties as head women's coach as well.
>
> Other 3 in NEC are: $18K for a full-time, 10K for a PT, and 2K for a GA.
>
> I feel strongly we stick with what we are paying other PT Head Coaches: $20k.

(Exhibit L; *see also* relevant portions of 2015-15 NEC Athletic Department Survey – SHU, attached as Exhibit M; MG Dep. at 67-69.)

As a result of Plaintiff's complaint, SHU's internal discussions and assessment, effective January 1, 2016, Plaintiff's annual salary was increased to $20,000 (from $13,800), and he became eligible to receive standard fringe benefits from SHU. (Pl. Dep. at 79-81, Exhibit 12, attached hereto as Exhibit N; RH Dep. at 53.) Plaintiff told Mr. Hardy that he was satisfied with

6

this outcome. (RH Dep. at 54.) Because he was considered a part-time employee, Plaintiff was told not to exceed working 25 hours per week. (RH Dep. at 59.)

## C.    The 2016-17 Academic Year

By summer 2016, Plaintiff had become openly hostile towards SHU because he did not have a full-time job.

On July 30, 2016, Plaintiff wrote to Mr. Hardy, copying James M. Barquinero, Vice President for Enrollment Planning and Student Affairs. (Pl. Dep. at 86, Exhibit 14, attached as Exhibit O hereto.) In the letter, Plaintiff made claims that he was being discriminated against because of his gender due to his part-time status "because of a Title IX issue." (Exhibit O.) Plaintiff threatened that he would "strictly adhere to" a 25 hours per week schedule, under which "the team may not function in a way it has in the past." (Exhibit O.) He continued: "[s]o there may not be a coach to take the players to most matches or tournaments, practice appropriately, fundraise and recruit...." (Exhibit O.) Consistent with these threats, for the 2016-17 academic year, Plaintiff took a full-time public high school teaching job in Ansonia. (Pl. Dep. at 103-04.) Plaintiff understood that, as had been the case with his past full-time teaching jobs, there would be conflicts with his coaching job. (Pl. Dep. at 105.)

Also, in summer 2016, Plaintiff refused to sign his 2015-2016 performance review. (MG Dep. at 214-15, Exhibit 19, attached hereto as Exhibit P.) The review had noted that Plaintiff had become disengaged from the Athletic Department and that his attitude needed to change to promote a positive environment for student athletes in the Tennis Program. (Exhibit P; MG Dep. at 225-30.)

7

On September 7, 2016, Plaintiff met with Mr. Hardy to discuss his part-time status and hours worked, as well as his annual evaluation. (Pl. Dep. at 101-02.) Plaintiff's defiant attitude continued, and he even tried to pit the Athletic and Human Resources Departments against one another. On September 16, 2016, Plaintiff wrote an e-mail to Messrs. Valentine, Guastelle and Hurlbut stating that he had met with Mr. Hardy and that Mr. Hardy:

> places blame on the athletic department admin for all his Hr [sic] problems. In response and in your defense I stated all this baton passing seems inappropriate. Despite all these reindeer games on a macroscopic scale, I appreciate all the positive changes in the athletic department.

(Pl. Dep. at 101, Exhibit 15, attached hereto as Exhibit Q.) Mr. Hardy rightfully considered, based upon this content, that Plaintiff had become disruptive. (RH Dep. at 67.) Mr. Hardy responded:

> I was disappointed to see this e-mail as I thought when we met on September 7 you wanted to have me /HR address your concerns. I am uncertain how you drew these conclusions when I hadn't even met with [Messrs. Valentine, Hurlbut or Guastelle] to address your concerns. Nonetheless, I am meeting with Mike Guastelle tomorrow morning to get his  perspective on your issues.

(Exhibit Q.)

Mr. Hardy discussed with Mr. Guastelle the hours that Plaintiff had entered into SHU's Kronos timekeeping system. (RH Dep. at 33-34, 57, Exhibit 8, attached as Exhibit R hereto, p. 2.). Mr. Guastelle believed that Plaintiff was fabricating his hours to exceed 25 per week. (MG Dep. at 171.) For example, in summer 2016, Plaintiff ran a youth tennis camp at SHU that was sponsored by Nike. (Pl. Dep. at 96-97.) He was not paid by SHU for this private camp. (Pl. Dep. at 100.) That summer, he went on vacation to Cape Cod for a week in July and went on a Caribbean cruise in August. (Pl. Dep. At 99.) Mr. Guastelle disputed the hours that Plaintiff had entered when he was on vacation and working at the private camp. (MG Dep. at 113, 115-118, Exhibit 7, attached hereto as Exhibit S.) Mr. Guastelle also took issue with time that Plaintiff

8

attributed to his work at SHU based on his claim that he attended a professional tennis tournament "representing" SHU.  (MG. Dep. at 165.)  Indeed, Plaintiff has acknowledged that he "commingled" hours in Kronos between his SHU work and his non-SHU work, such as for private tournaments he organized.  (Pl. Dep. at 152-53.)

There were much larger problems than inaccurate time entries.  As the Fall 2016 season began, Plaintiff had been arriving late to practice, and Mr. Guastelle received complaints from players that they were forced to start running the practices themselves.  (MG Dep. at 127, 184.)  Players also mentioned to Mr. Valentine that Plaintiff was missing time from practices.  (RV Dep. at 61-62.)  Indeed, Plaintiff was late to every practice by at least a half hour because of conflicts with his teaching job.  (Pl. Dep. at 127.)  He also missed between two and five practices.  (Pl. Dep. at 126.)  Also in Fall 2016, Plaintiff was late to a tournament at Yale University, arriving at 3:00 PM on a Friday while the matches began at 10:00 AM.  (Pl. Dep. at 126.)

On Sunday, September 11, 2016, Mr. Guastelle met with Plaintiff and Coach Cook and discussed a tournament at the University of Connecticut that was beginning the following Friday, September 16, 2016.  (MG Dep. at 123-24.)  The reason for the meeting was because Mr. Guastelle wanted to make sure that all the matches at the tournament had a coach covering them, given that Mr. Guastelle would be away with the Women's Team and Coach Cook was unavailable.  (MG Dep. at 123-24.)  Plaintiff assured Mr. Guastelle that he would be at the tournament on Friday.  (MG Dep. at 124.)  However, mid-way through the week, Plaintiff called Mr. Guastelle and stated he would not be at the Friday matches because of a conflict with his new full-time teaching job.  (MG Dep. at 124; Pl. Dep. at 125.)  Plaintiff did not attend the first day of the tournament.  (Pl. Dep. at 124.)  Plaintiff acknowledges that he "waited until the last

9

minute" to provide Mr. Guastelle with notice. (Pl. Dep. at 153.) As a result of Plaintiff's absence, the team was unable to compete in the doubles portion of the tournament. (MG Dep. at 124.)

In a meeting on September 28, 2016, Plaintiff was informed that his employment was being terminated. (Pl. Dep;. at 107.) Plaintiff's employment was terminated because he had become disengaged from his job, including being late to practices and unavailable to coach at matches. (MG Dep. at 29; RV Dep. at 63, 65-66.) Plaintiff's promised attendance at, and subsequent absence from, the UCONN tournament, was the "last straw" that led Mr. Guastelle to recommend that Plaintiff's employment be terminated. (MG Dep. at 123; RV Dep. at 63.) Mr. Hurlbut brought that recommendation to Mr. Valentine, who made the final decision, which was approved by Mr. Barquinero. (RV Dep. at 30, 41, 69.) Mr. Hardy was also involved in the termination decision. (RH Dep. at 19; RV Dep. at 61, 68.) Each of the decision-makers are males. (Pl. Dep. at 131.)

For the remainder of the 2016-2017 academic year, Mr. Guastelle assumed coaching duties for the Men's Tennis Team, in addition to his duties as Women's Tennis Coach, Senior Associate Athletic Director, and Tennis Director. (Pl. Dep. at 130.) Beginning in September 2017, Men's and Women's Tennis teams are now coached by William Boe-Wiegaard, a male. (MG Dep. at 26-27; Pl. Dep. at 130-31.) The combined position is a full-time position. (MG Dep. at 27, 44.) Mr. Boe-Wiegaard's salary is approximately $50,000. (MG Dep. at 176.)

Although Plaintiff makes claims of anti-male discrimination, he has no evidence to support those claims. Plaintiff has admitted that he does not know who at SHU discriminated against him. (Pl. Dep. at 75.) He has no evidence of any anti-male comments being made against him. (Pl. Dep. at 76.) Indeed, he testified that he does not have any evidence that

10

Messrs. Hurlbut, Valentine or Hardy or Ms. Nofri are prejudiced against men. (Pl. Dep. at 150.)

## D.    Other Sports At SHU

In his Complaint, Plaintiff attempts to draw comparisons between Men's Tennis and certain other sports at SHU to argue he was adversely treated. Some background facts about other sports are SHU are therefore relevant.

Plaintiff points to certain other sports with full-time coaches: Rugby, Equestrian, Soccer, Bowling, Rowing and Field Hockey; to argue he too should have been a full-time employee.[3] (*See* Complaint, ¶ 44.) There are only Women's teams, and not Men's teams, for Equestrian, Rowing, Bowling, Field Hockey and Rugby. (*See* Affidavit with exhibit from Mr. Hurlbut, attached as Exhibit T.) There are the obvious inherent differences between tennis and these sports, which differentiate the nature of the coaching duties for each sport. In addition, certain other factors differentiate these programs at SHU. These differences have informed why the sports have full-time coaches. The Equestrian, Rowing and Bowling head coach positions were previously part-time but became full-time. (MG Dep. at 61-62.) Equestrian is an "emerging" sport, and SHU has been attempting to have its program recognized as a full-time NCAA Division I sport, which was based in part upon concerns about complying with the gender equity requirements of Title IX. (MG Dep. at 62; RV Dep. at 80, 112-13.) In order to make the program successful, SHU needed to have a full-time head coach so it could devote resources to recruiting. (RV Dep. at 80.) The Equestrian team is large, comprised of between 25 and 30 athletes. (MG Dep. at 108.) With respect to Rowing, Title IX gender equity was also a consideration in converting the position, to full-time, to allow more intense recruiting efforts. (MG Dep. at 62; RV Dep. at 115-16.) Recruiting is particularly important for Rowing, because

---

[3] Soccer has full-time coaches for both its men's and women's teams, which are coached by a male and a female. (*See* MG Dep. at 78.) This attempted comparison in no way evidences any male being treated less favorably.

11

the team has a large roster that must be filled: between 40 and 50 athletes.  (MG Dep. at 62.)

With respect to Bowling, SHU's program has been nationally recognized for its success[4] and

SHU has been in the process of building a facility to showcase that sport.  (MG Dep. at 18; RV

Dep. at 116.)  Title IX gender equity compliance also had a role in devoting resources to that

program.  (MG Dep. at 62; RV Dep. at 116.)  Additionally, the Bowling Team has a significantly

larger roster, between 20-25 athletes, as compared with the Men's Tennis Team.  (MG Dep. at

108.)  When appropriate, SHU has also converted Men's head coaching positions from part-time

to full-time.  For example, due to benchmarking of similar institutions, Men's Wrestling was

converted from part-time to full-time.  (MG Dep. at 65-66.)

Plaintiff also complains about the "support" given to him in his position at SHU,

including the amount of his team's budgets and asserts comparisons against other programs.

SHU sets annual budgets for each of its teams for recruiting, equipment and fundraising.

(Affidavit of Mr. Hurlbut and attachments, attached as Exhibit T.)  For the 2016 fiscal year,

Men's and Women's Tennis had equivalent recruiting budgets, which exceed the recruiting

budgets of the Women's Equestrian and Women's Rowing teams and equaled the budgets of the

Women's Swimming and Men's and Women's Golf teams.  (Exhibit T.)  Mr. Guastelle set the

recruiting budgets based on benchmarking with other NEC schools, and comparing overall

budgets between men's and women's programs to ensure equity, and also considered the costs

associated with the geographic areas where the recruiting is taking place.  (MG Dep. at 151-53,

157.)  The 2016 equipment budgets for the Men's and Women's Tennis Teams were equivalent,

and exceeded the equipment budgets of several other sports on a per student athlete basis.

(Exhibit T.)  With respect to fundraising budgets, the Men's and Women's Tennis teams had

---

[4] The Complaint alleges that Plaintiff "led SHU's team to two NCAA Division I team championships." (Complaint, ¶ 30.)  Plaintiff admitted at his deposition this is not true; rather the team qualified for the NCAA tournament. (Pl. Dep. at 120.)  Plaintiff's overall record as head coach was 89 wins and 126 losses. (Pl. Dep. at 128.)

12

nearly the same amount for the five years preceding 2016, which was near the median of the amounts raised by other teams. (Exhibit T.) Plaintiff has no evidence to dispute this data. (Pl. Dep. at 115-19, Exhibits 19-21, attached as Exhibit U.)

### E.    Plaintiff's Lawsuit

Plaintiff's Complaint asserts the following causes of action:

| Count | Cause of Action |
|---|---|
| One | Sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); |
| Two | Retaliation in violation of Title VII; |
| Three | Violation of the Equal Pay Act ("EPA"); |
| Four | Discrimination in Violation of Title IX of the Education Amendments of 1972 ("Title IX"); and |
| Five | Retaliation in violation of Title IX. |

SHU is entitled to summary judgment as to each of Plaintiff's claims.

## III.    LAW AND ARGUMENT

### A.    Legal Standard For A Motion For Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). To overcome a motion for summary judgment, a plaintiff must offer specific support for his claims, not simply conclusory allegations. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d Cir. 1999); *Martin v. Town of Westport*, 329 F.Supp.2d 318, 325 (D.Conn. 2004). To avoid summary judgment, plaintiffs "may not rest upon mere allegations or denials... [instead they] must set forth specific facts showing that there is a genuine issue for trial... [and provide] sufficient evidence supporting the claimed factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the

13

Federal Rules as a whole, which are designed to secure just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"[E]ven in the discrimination context ... a plaintiff must provide more than conclusory allegations and set forth specific facts showing that there is a genuine issue for trial ... thereby creating more than merely some metaphysical doubt ...." (Internal citations and quotation marks omitted) *Timbie v. Eli Lilly & Co.*, 429 Fed. Appx. 20, 21 (2d Cir. 2011). As the Second Circuit has summarized, it "is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases .... The salutary purposes of summary judgment — avoiding protracted, expensive, and harassing trials —apply no less to discrimination cases than to ... other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## B.   Plaintiff's Sex Discrimination Claims Fail.

Plaintiff's claim under the EPA is that he performed equal work as compared to female coaches but was deemed part-time while they were deemed full-time. Plaintiff's claims of sex discrimination under both Title VII and Title IX are based upon his allegations that he was underpaid, and that he was not provided with the same "support...in the form of recruiting, team travel, equipment, uniforms and supply budgets and provision of assistant coaches that was provided to female coaches." (Amended Complaint, ¶¶ 55, 69.) Plaintiff does not claim that the termination of his employment was due to sex discrimination, but rather asserts that it was "in retaliation for his having raised the inequity issues with the administration."[5] (Complaint, ¶ 52.)

---

[5] Even if Plaintiff had made such a claim, the evidence would quickly dispel it. Each of the five (5) decision-makers were males: Mssers. Valentine, Hurlbut, Guastelle, Barquinero and Hardy. *See Toliver v. Cmty. Action Comm'n to Help the Econ., Inc.*, 613 F. Supp. 1070, 1074 (S.D.N.Y 1985) (to infer discrimination based on sex and race where many of the decision-makers were of the same sex and race as plaintiff would be "to say the least, attenuated"). Mr. Guastelle hired Plaintiff and then recommended his termination, thereby entitling SHU to the "same actor" inference. *See Betterson v. HSBC Bank USA*, 661 Fed.Appx. 87, 89 (2d Cir. 2016) ("Betterson failed to establish that the termination occurred under circumstances giving rise to an inference of discrimination. Betterson alleges

14

SHU is entitled to summary judgment on Plaintiff's sex discrimination claims in Counts One and Four, brought under Title VII and Title IX, respectively, as well as on his claim in Count Three that he was underpaid in violation of the EPA.

### 1.    Plaintiff Has No Viable Cause Of Action Under Title IX.

"The Second Circuit has not decided whether Title VII preempts private claims for employment discrimination under Title IX.... [However,] [m]ost courts that have taken up the issue agree that Title IX was not intended to enable employees of educational institutions complaining of gender discrimination to bypass the remedial scheme Congress established in Title VII." (Citation omitted.) *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97-98 (D. Conn. 2004); *see also Uyar v. Seli*, No. 16-186, 2017 WL 886934, at *6 (D. Conn. Mar. 6, 2017) (dismissing Title IX employment discrimination claims, citing *Urie*); *Towers v. State Univ. of New York at Stony Brook*, No. CV-04-5243 GB TML, 2007 WL 1470152, at *4 (E.D.N.Y. May 21, 2007) (stating: "The Court agrees with those courts that have held that Title IX cannot be used to circumvent the remedial scheme of Title VII. Accordingly, [plaintiff's] Title IX claims are dismissed."); *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001) (holding that "no private right of action exists [under Title IX] for employees of federally funded educational institutions who are the victims of employment discrimination"); *Vega v. State Univ. of New York Bd. of Trustees*, No. 97 CIV. 5767 (DLC), 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) (concluding "that Title VII provides the exclusive remedy for individuals alleging

---

that her supervisor at the time of termination discriminated against her on the basis of age and sex. That supervisor was a woman, was (slightly) older than Betterson, and had hired Betterson. Betterson has adduced no evidence that the supervisor was motivated by age or sex discrimination."). Furthermore, Plaintiff was replaced in his position by another male. *See Nieves v. AvalonBay Communities*, No. 3:06CV00198 (DJS), 2007 WL 2422281, at *11 (D. Conn. Aug. 23, 2007) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination"). It is clear why Plaintiff does not assert this claim.

employment discrimination on the basis of sex"). Therefore, SHU is entitled to summary judgment on Plaintiff's Title IX sex discrimination claim.

### 2. Plaintiff's Claims About Team, Resources Are Not Actionable.

Plaintiff has no standing to assert his claims that his team had lower budgets and other resources than other teams at SHU, and SHU is entitled to summary judgment as to those aspects of his sex discrimination claim.

Plaintiff's sex discrimination claim under Title VII is subject to the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Moody v. Aircastle Advisor, LLC*, No. 3:13-cv-00575 (VAB), 2016 WL 1257805, at *9 (D. Conn. Mar. 30, 2016) (applying McDonnell Douglas scheme to gender discrimination claim). To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "a plaintiff must first satisfy an initial burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (internal quotation marks omitted). To satisfy his prima facie burden, Plaintiff must show, among other things, that he suffered an adverse employment action. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Decisions about team resources are not "adverse employment actions" and insofar as Plaintiff seeks to challenge those resources under Title VII, his claims fail. *See Hoffman v. Rubin*, 193 F.3d 959, 964 (8th Cir. 1999) (in order for an employment action to be adverse, the employee must suffer "some personal loss or harm with respect to a term, condition, or privilege of employment.").

Nor are those resources actionable under the EPA, because that statute prohibits only unequal wages. 29 U.S.C. § 206(d)(1). Furthermore, even if Title IX applies to employment discrimination, it is clear that Plaintiff would not have standing to assert claims that his team

16

received lesser funding. *See Lowrey v. Texas A & M University System*, 117 F.3d 242, 251 (5th Cir. 1997) ("It is aixomatic that [a former female basketball coach] cannot state a claim for discrimination [under Title IX] on behalf of her students."); *Deli v. University of Minn.*, 863 F.Supp. 958, 962 (D.Minn. 1994) (suggesting that college coaches do not have standing to assert Title IX claims on behalf of female athletes). Accordingly, Plaintiff's claims related to his team's resources all fail as a matter of law.

### 3.     The Statute of Limitations Precludes, At Least In Part, Plaintiff's Claims.

Under any of Plaintiff's theories, his unequal pay claims are at least partially untimely.

EEOC charges must be filed within 180 days of the alleged unlawful employment action, unless the claimant initially instituted proceedings with a state or local employment agency, in which case the claimant has 300 days to file his charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). In the present case, the Plaintiff filed his underlying charge of discrimination *solely with the EEOC* on February 1, 2017, and thus the limitations cut-off is 180 days prior: August 5, 2016. *See, e.g., Bogle-Assegai v. Connecticut*, 470 F.3d 498, 507 (2d Cir. 2006) (affirming district court's dismissal of Plaintiff's Title VII claims on the ground that her administrative charge was not timely filed, where Plaintiff filed with the EEOC 186 days after notice of termination, but did not also file with CHRO, and thus the court concluded that the relevant statutory period was 180 days, not 300 days). Thus, to the extent that Plaintiff is challenging his part-time classification, that classification was made well-prior to August 2016, and constituted a "discrete act" outside of the limitations period. *See, e.g., Scott v. City of Sioux City*, 68 F.Supp.3d 1022, 1034 (N.D. Iowa 2014) (part-time classification was an untimely discrete act not subject to "continuing violation" doctrine). Moreover, to the extent that Plaintiff's discriminatory pay claim is based upon his pay before he received a considerable raise in early

17

2016, that claim is untimely because the pay decision did not affect Plaintiff's paychecks within the timely period. *See* 42 U.S.C. § 2000e-5(e)(3)(A) (Lilly Ledbetter Act makes it unlawful to apply a discriminatory compensation decision to an employee and a new statute of limitations clock starts with each paycheck that reflects that decision).

Any claim under the Equal Pay Act must be brought within two years of its accrual or three years if the violation is willful. *See Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir. 1997) (citing 29 U.S.C. § 255(a)). EPA claims are not tolled by the foiling of an EEOC charge. *See Atkins v. Coca Cola Enters., Inc.*, No. 07 C 1038, 2007 WL 4219196, at *4 (N.D.Ill. Nov. 28, 2007) (rejecting equitable tolling argument where plaintiffs waited until the EEOC issued their right to sue letters before filing their Equal Pay Act claims: "[T]he filing of an EEOC charge before the statute of limitations does not save an [Equal Pay Act] claim because [the Equal Pay Act] and Title VII provide independent forms of relief and plaintiff is not required to file an EEOC charge prior to filing a complaint in federal court, or to pursue Title VII and [the Equal Pay Act] relief concurrently."). Under the EPA, "[a] new claim accrues each time an employee receives a paycheck under a discriminatory wage policy, but the policy's existence does not make the violation a 'continuing' one, such that the plaintiff can seek back pay beyond the statutory period of two or three years." *See Downes v. JP Morgan Chase & Co.*, No. 03 Civ.8991(GEL), 2004 WL 1277991, at * 7 (S.D.N.Y. June 8, 2004). An EPA violation is willful if the defendant knew or showed reckless disregard about whether its conduct violated the EPA. *Id.* at 119. Mere negligence or unreasonable conduct on the employer's part is insufficient to meet this standard. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 133 (1988) (distinguishing unreasonable action from recklessness). There is no evidence in the record suggesting that SHU willfully violated the EPA with respect to Plaintiff, and the limitations

18

period is two years. On May 23, 2017, Plaintiff filed this lawsuit. Two years prior was May 23, 2015. Thus, any claim for unequal wages prior to that date are time-barred.

### 4. There Is No Evidence To Support Plaintiff's Sex Discrimination Claims, And Ample Evidence Refute Them.

Aside from these legal arguments, each of Plaintiff's discriminatory pay claims fail because the evidence refutes any claim that he was discriminated against.

#### a. The Legal Framework

> To prove a violation of the EPA, a plaintiff must first establish a prima facie case ... by showing: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions."

*Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995), abrogated on other grounds by *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) ).

Once a plaintiff has made a prima facie showing, "the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). Those exceptions provide that the EPA is not violated if the wage differential is attributable "to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ...." 29 U.S.C. § 206(d)(1).

If the employer meets its burden, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi*, 191 F.3d at 136 (citing *Aldrich*, 963 F.2d at 526). "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer

19

has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Id.* (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) ).

"A claim for unequal pay for equal work under Title VII ... is generally analyzed under the same standards used in an [Equal Pay Act] claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312 (2d Cir. 1995), abrogated on other grounds by *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742). However, under Title VII, a plaintiff seeking to prove discrimination by unequal pay must show *intentional* discrimination. *Rogers v. Bank of New York Mellon*, 09 Civ. 8551 (HBP), 2016 WL 4362204, at *10 (S.D.N.Y. Aug. 15, 2016). To the extent that the Court does not find Plaintiff's Title IX claim preempted by Title VII, the same framework would apply to that claim as well. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("not address[ing] the barely briefed issue of whether there is a private right of action for employment discrimination under Title IX" but stating that "Title VII and Title IX are governed by the same substantive standards for reviewing claims of both harassment and retaliation.").

b.      There Were No "Equal Work" Comparators.

All of Plaintiff's sex discrimination claims fail because there is no evidence of any substantially equal jobs he can use for purposes of comparison.

To prove pay discrimination, a plaintiff must satisfy the "demanding" standard of the "equal work inquiry ... [which] requir[es] evidence that the jobs compared are substantially equal." (internal quotation marks and citation omitted) *Martinez v. Davis Polk & Wardwell LLP*, 713 Fed.Appx. 53, 55 (2d Cir. Nov. 21, 2017).

Plaintiff attempts to compare himself to full-time coaches of a variety of other dissimilar sports. However, courts have held that "full-time employees are simply not similarly situated to part-time employees." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997); *Jacobs v.*

20

*College of William and Mary*, 517 F.Supp. 791, 795–98 (E.D.Va.1980), aff'd mem., 661 F.2d 922 (4th Cir.), cert. denied, 454 U.S. 1033 (1981) (emphasizing that part-time and full-time coaching positions could not be compared). Plaintiff may dispute that he worked part-time hours, but even his own estimate of 1,400 annual hours places him within the part-time range. Regardless, Plaintiff admits that, by the end of his employment, he was limiting himself to part-time hours of 25 per week. Other NEC schools also considered Men's Tennis Coach to be a part-time position and one that could be combined with the Women's Tennis Coach position. Indeed, SHU previously and currently has combined these positions. Apart from this, the undisputed circumstances of Mr. Guastelle's employment prove that Plaintiff's was a part-time position. Mr. Guastelle's role as the Women's Tennis Coach comprised 30% of his full-time 50-60 hours per week work load; which equals 15 to 18 hours per week; showing that Tennis Coach is a part-time job at SHU. Indeed, Mr. Guastelle was even performing certain of Plaintiff's administrative tasks, decreasing Plaintiff's duties further. If SHU had granted Plaintiff's request and made his position full-time when Mr. Guastelle's Women's Tennis Coach position was part-time, it would have been discriminating against SHU's female athletes. These facts make clear that Plaintiff's job was part-time.

Moreover, courts have found that coaching positions for different sports cannot be considered substantially equal. *See, e.g., Weaver v. Ohio State University*, 71 F.Supp.2d 789, 800 (S.D. Ohio 1998) (men's hockey and women's field hockey not substantially equal for EPA purposes); *EEOC v. Madison Comm. Unit. School Dist. No. 12*, 818 F.2d 577, 584 (7th Cir. 1987) (rejecting findings of equality between boy's soccer and girl's volleyball and basketball teams and between boy's track and girl's basketball teams); *Deli*, 863 F.Supp. at 961) (women's gymnastic coach position not substantially equal to men's football, hockey and basketball

21

coaches); *Jacobs*, 517 F.Supp. at 797-98 (women's basketball coaching position not equal to men's baseball and basketball positions). This is particularly true with respect to Plaintiff's attempts to compare himself to coaches of inherently different sports like Equestrian, Bowling, Rugby, and Rowing, each of which have much larger rosters. *See Madison Comm. Unit. School Dist.*, 818 F.2d at 584 (allowing comparison of similar sports of baseball and softball for EPA purposes, but rejecting comparisons with other sports). Furthermore, the recruiting, equipment and fundraising budgets all demonstrate the vast differences between the resources allocated to the sports by SHU. (Exhibit T.)

Surprisingly, Plaintiff seems to be putting forth Mr. Guastelle as his primary putative comparator. (*See* Complaint, ¶ 33.) However, Mr. Guastelle is, like Plaintiff, male and therefore the difference in pay cannot be explained by sex discrimination and this claim immediately fails for that reason. Of course, Mr. Guastelle had significant additional duties, including both Senior Associate Athletic Director and Tennis Director, which easily differentiate him and defeat any claim that Plaintiff performed equal work. Indeed, coaching the Women's Team was only 30% of Mr. Guastelle's job. *See Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045-46 (8th Cir. 2004) (holding that university assistant coaching positions with identical contracts and job descriptions were not substantially equivalent for purposes of the Equal Pay Act and Title VII even though the coaches expended equal amounts of time and effort in fulfilling their duties, where the day-to-day responsibilities of one position involved recruiting and public-relations skills and experience but the other involved more "behind the scenes" work). The evidence demonstrates that the Women's Tennis Team was treated no more preferentially than the Men's, and neither team by itself requires a full-time coach. This is conclusively demonstrated by the fact that Mr. Guastelle previously coached the Men's Tennis Team, and that Mr. Beauregard currently

coaches both teams.  For all of these reasons, Plaintiff cannot point to any equivalent positions and SHU is entitled to summary judgment as to his discrimination claims.

> c.    Any Pay Differences Were Based On Factors Other Than Sex.

Even if Plaintiff could somehow point to a female coach whose job was equal to his, SHU would still prevail on his pay discrimination claims because any pay differential was due to a factor other than sex, and there is no evidence of intentional discrimination.

Other schools within SHU's conference, the NEC, either classify their Men's Tennis Coach as a part-time position, or have a single coach for both the Men's and Women's program (which SHU now does as well).  (Exhibits L, M.)  Aligning itself with its competitors using this comparative benchmarking information from the relevant marketplace, is plainly a "factor other than sex" under 29 U.S.C. § 206(d)(1)(iv).  *See Stanely v. Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994) (unequal wages which reflect market conditions of supply and demand not prohibited).  Moreover, as set forth above, many differences exist between SHU's unique athletic programs, and those differences have informed the decision of whether a part-time or full-time coach is appropriate.  These considerations have included the teams' budgets, recruiting needs, success, and Title IX gender equity compliance concerns.  All of these are legitimate business reasons that implicate "factors other than sex."  *Belfi*, 191 F.3d at 136 ("to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential."); *see EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988) ("[T]he 'factor other than sex' defense does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.").  Accordingly, SHU is entitled to

23

summary judgment as to all of Plaintiff's claims of sex discrimination based upon alleged unequal pay.

With respect to the additional element of intentional discrimination that must be shown to support Plaintiff's Title VII claim, ample evidence demonstrates no such intent was present. Plaintiff has admitted that he has no evidence of discriminatory animus against males. (Pl. Dep. at 76, 150.)  Moreover, SHU hired Plaintiff knowing his gender, all of his supervisors were males, and he was replaced in his job by a male. (*See* footnote 4, *supra*; Pl. Dep. at 19, 130-31.) There are simply no facts under which an inference of anti-male animus can be drawn, and summary judgment should enter for SHU.

### C.  Plaintiff's Retaliation Claims Fail.

Like Plaintiff's discrimination claim, his retaliation claims are unsupported by the evidence and summary judgment should enter for SHU.

> As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. Close temporal proximity between the plaintiff's protected activity and the ... adverse action may in itself by sufficient to establish the requisite causal connection. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual.

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011) (ellipsis in original) (internal quotation marks and citations omitted).[6]

---

[6] Courts have reached different conclusions as to whether Title IX retaliation claims are preempted by Title VII where, as here, the basis for the claimed retaliation is a complaint about employment discrimination, and not about discrimination against students.  The more well-reasoned decisions have found such Title IX claims to be preempted. *See Torres v. School District of Manatee County, Florida*, No. 8:14-cv-1021-T-33TBM, 2014 WL 4185364, at *5-*6 (M.D. Fla. Aug. 22, 2014) (citing cases and dismissing Title IX retaliation claim as preempted where basis for retaliation claim was complaint was about employment discrimination).

24

In order for Plaintiff to prevail on any of his retaliation claims, he must meet the heightened standard of proving that retaliation was the "but-for" cause of his termination. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013) (a Title VII plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Baldwin v. New York*, 690 Fed.Appx. 694, 697 (2d Cir. 2017) (a Title IX retaliation plaintiff must show that "[t]he desire to retaliate . . . [was] a 'but-for cause of the challenged employment action'").

The evidence demonstrates that Plaintiff's discharge was for legitimate, non-retaliatory reasons and he cannot make the lofty showing of "but-for" causation. Plaintiff accepted a full-time teaching job from Fall 2016, knowing that twice prior he was unable to perform both that job and coach the Men's Tennis Team. Plaintiff was late to every single practice in Fall 2016, and missed parts of two tournaments. Plaintiff has admitted to his pervasive lateness and to missing the matches, which negatively impacted the players on his team. Indeed, Plaintiff had been threatening that he would not be devoting sufficient time to his job, and he carried out that threat. Because of his demonstrated and undisputed disengagement from the Tennis Program, Mr. Guastelle recommended his dismissal, with which Messrs. Barquinero, Valentine, Hurlbut and Hardy agreed. There is no evidence that retaliation was the "but for" cause of his termination, and summary judgment should enter in favor of SHU as to Plaintiff's wrongful discharge claim. *See Weichman v. Chubb & Son*, 552 F.Supp.2d 271, 283 (2008) ("defendant has stated that, pursuant to its policies, it terminated the Plaintiff because of her repeated tardiness. This is a legitimate, non-discriminatory reason."); *Eisenhauer v. Great Lakes Plastics*, 99-CV-0129E(F), 2001 WL 209904, *7 (W.D.N.Y. Feb. 23, 2001) (plaintiff's poor attendance is a legitimate nondiscriminatory reason for termination).

25

Moreover, the prior history between the parties dispels any notion of retaliatory motivation. SHU's response to Plaintiff's October 2015 complaint about his pay was to meet with him, listen to his concerns, and then significantly increase his salary and offer him benefits. These uncontested facts show that Plaintiff was treated *better* after, and in fact because of, his complaint and therefore defeat his claim of retaliation. *See Jones v. Onondaga Cnty. Res. Recovery Agency*, 973 F.Supp.2d 159, 172 (N.D.N.Y. 2013) ("the fact that Plaintiff concedes in his complaint that Defendant OCRRA "promoted [him] to the MEO III position" approximately three months after he filed his NYSDHR complaint fatally undercuts his retaliation claim."), affirmed by *Jones v. Onondaga County*, 577 Fed.Appx. 19, 20 (2d Cir. 2014).

Additionally, the timing of Plaintiff's complaints and his termination defeats his retaliation claim. Plaintiff began raising issues about his part-time status as early as 2006, and made written complaints to Human Resources in Spring 2014 and October 2015. Yet his employment was not terminated until September 2016. The lack of temporal proximity alone refutes his claim of retaliation. *See, e.g., Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (noting "claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation" and collecting cases); *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962 JFB AKT, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."). For these many reasons, summary judgment should enter for SHU on Plaintiff's retaliation claims.

D.    **Punitive Damages Claim Fails.**

Even if Plaintiff could survive summary judgment on his claims, his claims for punitive damages would fail.

"[P]unitive damages are not available for private actions brought to enforce Title IX because Title IX is 'also modeled after Title VI and is interpreted and applied in the same manner as Title VI.'" *Mercer v. Duke Univ.*, 50 Fed. App. 643, 643-44 (4th Cir. 2002). Nor are punitive damages available under the EPA. *See Jones v. City of Philadelphia*, No. Civ.A.04-85, 2006 WL 851224 at *6 (E.D.Pa. March 28, 2006) (holding that 29 U.S.C. § 216(b) of the Equal Pay Act authorizes "liquidated" but not "punitive" damages); *Aucoin v. Kennedy*, 355 F.Supp.2d 830, 841 (E.D.La.2004) (dismissing a claim for punitive damages based on the Equal Pay Act because no punitive damages award authorized in the Act). Thus, SHU is entitled to summary judgment as to any claim for punitive damages under Title IX and the EPA.

SHU is also entitled to summary judgment as to Plaintiff's claim for punitive damages under Title VII. Courts have granted summary judgment on punitive damage claims where the elements of malice or reckless indifference are not present. *See, e.g., Ford v. Veterinary Centers of America, Inc.*, No. 00-4604, 2001 WL 1152948 (E.D.Pa. Sep. 14, 2001) (dismissing punitive damages claim where there was no evidence that defendants were aware of plaintiff's federally protected rights or that they acted with a perceived risk that their conduct violated federal law). Plaintiff was, at all times, treated fairly by SHU. He has admitted he has no evidence of discrimination. In response to Plaintiff's internal complaints, SHU increased his salary and offered him benefits. His employment was terminated only after he admittedly took a conflicting job and was late to every single practice and missed multiple matches. Accordingly, and based

on the lack of any evidence of malice or reckless indifference by SHU, summary judgment should enter for SHU as to Plaintiff's punitive damages claim.

## IV.    CONCLUSION

For the reasons set forth above, SHU requests that its Motion be granted, and that judgment enter in SHU's favor as to all of Plaintiff's claims.

THE DEFENDANT,
SACRED HEART UNIVERSITY,
INCORPORATED

By: _/s/ Jonathan C. Sterling_
    James M. Sconzo (ct04571)
    Jonathan C. Sterling (ct24576)
    Jillian R. Orticelli (ct28591)
    CARLTON FIELDS JORDEN BURT, P.A.
    One State Street, Suite 1800
    Hartford, CT  06103
    Tel.: 860-392-5000 / Fax: 860-392-5058
    Email: jscsonzo@carltonfields.com
          jsterling@carltonfields.com
          jorticelli@carltonfields.com
    Its Attorneys

## CERTIFICATION OF SERVICE

I hereby certify that on September 14, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jonathan C. Sterling*
Jonathan C. Sterling

29