# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PAUL GAGLIARDI,           ) CIVIL CASE NO.
        Plaintiff,        ) 3:17-cv-00857-VAB
                          )
VS                        )
                          )
SACRED HEART UNIVERSITY,  )
INCORPORATED,             )
        Defendant.        )

THE VIDEOGRAPHER:
Kevin Aspinwall
HAMILTON COMMUNICATIONS
1442 Essex Road
Westbrook, Connecticut

DEPOSITION OF:  PAUL GAGLIARDI
DATE:           MARCH 16, 2018
HELD AT:        CARLTON FIELDS JORDEN BURT,
                P.A.
                ONE STATE STREET
                SUITE 1800
                HARTFORD, CONNECTICUT

REPORTER:   Sheryl L. Yeske, CSR #28
            CASSIAN REPORTING, LLC
            55 Oak Street
            Suite 6
            Hartford, CT 06106
            860-595-7462

APPEARANCES:

Representing the Plaintiff PAUL GAGLIARDI:
    Sullivan Heiser
    116 East Main Street
    Clinton, CT 06413
    860-664-4440
    By:  Theodore W. Heiser, Esq.
         twh@sullivanheiser.com

Representing the Defendant SACRED HEART UNIVERSITY,
INCORPORATED:
    Carlton Fields Jorden Burt, P.A.
    One State Street
    Suite 1800
    Hartford, CT 06103
    860-392-5000
    By:  Jonathan C. Sterling, Esq.
         jsterling@carltonfields.com

Q. And which years?

A. 1996, '95-'96, my senior year.

Q. Okay. Other than a driver's license and the education certifications that you have already described, do you hold any other licenses or certifications?

A. I'm certified as a tennis professional through the United States Professional Tennis Association, the USPTA. I am certified through the, what's called the USPTR which is the Professional Tennis Registry as a tennis professional. And to the best of my recollection, that's all the professional certificates that I have.

MR. STERLING: Okay. Let's mark your resume.

(Defendant's Exhibit 1,

resume, marked for identification)

BY MR. STERLING:

Q. Okay. Mr. Gagliardi, I'm going to show you what has been marked as Defendant's Exhibit 1, and ask you whether this appears to be the resume that you submitted at the time that you were hired by Sacred Heart University?

A. To the best of my recollection, this is accurate.

3/16/2018                          Paul Gagliardi                        Page: 18

(Defendant's Exhibit 2,

letter, marked for identification)

BY MR. STERLING:

Q.   Mr. Gagliardi, I'm going to show you a letter that has been marked as Defendant's Exhibit 2, and ask you if you recognize this?

A.   I don't remember this, but it looks familiar.

Q.   Okay.  You were hired in the fall of 2006 by Sacred Heart University to be its head men's tennis coach; is that correct?

A.   Yes.

Q.   Okay.  And the salary that you were offered for the 2006 to 2007 school year was to be $5,000; is that correct?

A.   Yes.

Q.   Okay.  And did that position have benefits?

A.   No.

Q.   Was that a full-time position?

A.   Can you restate that for me?

Q.   Was it a full-time or a part-time position? What was your understanding at the time?

A.   My understanding at the time, that it was a full-time position with part-time pay.

Q.   When you say "full-time position with part-time pay," how many hours did you expect to work at the time

that you were hired?  What was your understanding?

A.  Given my experience as a tennis coach, and the understanding of the amount of matches that we would have to do, have to attend and practices, I felt as though that it would take up a significant amount of time, especially weekends.

Q.  So going into the job, you understood that even though you were only going to be earning what you called part-time pay of $5,000 for the school year, that it was a significant commitment of what you considered to be full-time hours?

A.  Yes.

Q.  Do you know who made the decision to hire you?

A.  Mike Guastelle.

Q.  Did you interview with him?

A.  Yes.

Q.  And what was his job at the time?

A.  He was senior associate athletic director and women's tennis coach.

Q.  Okay.  And the letter here says that "This letter is not a contract of employment.  Your employment at Sacred Heart University is quote, unquote 'at will.'"  Did you ever sign an employment contract with Sacred Heart?

A.  Not to my knowledge.

Q. Okay. And at the time you were hired, who was your supervisor?

A. Mike Guastelle.

Q. Is there something at Sacred Heart University called the tennis program? Have you ever heard that phrase?

A. As it relates to, there's the men's tennis program and the women's tennis program.

Q. Okay. So you're not aware of something called the tennis program that encompasses both the men's and women's team?

A. There is collaboration between the men's and women's team.

Q. Okay. Was there a person at Sacred Heart University with overall responsibility for the quote unquote "tennis program," to your knowledge?

A. There was Mike Guastelle, he was, his position was described as the director of tennis in addition to his other titles.

Q. Okay. So he, Mr. Guastelle, to your knowledge, had three job titles at the time; director of tennis, senior associate athletic director, and women's tennis coach; correct?

A. Yes.

Q. Was Mr. Guastelle a part-time or full-time

September?

A. Yes.

Q. And they might go all the way through May?

A. If we made the NCAA tournament.

Q. So there was a fall season and a spring season?

A. Yes.

Q. And your team was a Division I team; correct?

A. Yes.

Q. And there was also a women's team, a Sacred Heart University women's tennis team?

A. Yes.

Q. And they were Division I as well?

A. Yes.

Q. And what conference did you compete in?

A. We competed in the Northeast Conference.

Q. Okay. Did all of the teams, did all of the schools in the Northeast Conference have a Division I men's tennis program that competed?

A. No.

Q. What were the, are you able to list the teams that had Division I men's tennis programs within the conference?

A. During which years?

Q. It changed at some point?

A. Yes.

employed as a tennis instructor and tennis organizer. I was employed at, part-time as a teacher at Fairfield High School, Fairfield Ludlow High School. That's it.

Q. That's your recollection?

A. Yes.

Q. Okay. So you referred to being employed on a full-time basis for one year as a teacher?

A. Yes.

Q. And what school was that?

A. Branford High School.

Q. And what year was that?

A. 2007 to 2008, I believe, that school year.

Q. Okay. Did you hold any other full-time positions while you were employed at Sacred Heart University?

A. The USTA was a full-time position.

Q. And was it a year round position?

A. Yes.

Q. How many hours a week did you work for the USTA?

A. 35. Based on the time of the year.

Q. And you said you were a part-time teacher at Fairfield Ludlow High School?

A. Yes.

Q.  Okay.  You did not work for Fairfield in a full-time capacity at any point?

A.  I was an .8th instructor.

Q.  Meaning that you were .8 of full-time?

A.  Full-time.

Q.  Okay.  How many hours a week was that?

A.  It was a regular teaching schedule except I could come in late or leave early depending on the class schedule.

Q.  And what year or years were you employed by Fairfield?

A.  To the best of my recollection, it would be 2012, 2011 and '12.

Q.  Why did you leave your full-time job at Branford where you were employed during the 2007 through 2008 year?

A.  At the end of 2008, my contract was not renewed.

Q.  And do you know the reason why?

A.  There were multiple reasons, but the main reason was that there was not a position available in the next year.

Q.  And what were the other reasons?

A.  There was a question of my conflict of interest with coaching tennis.  And there was a feeling that I

wasn't relating to the kids.

Q.   When you say a conflict of interest with the teaching, are you talking about a conflict in the schedules or between your teaching responsibilities and your coaching responsibilities, or are you talking about some other sort of conflict of interest?

         MR. HEISER:  Objection.

BY MR. STERLING:

Q.   You can answer if you understand it.

A.   Maybe you could restate the question?

Q.   Sure.  What did you mean when you said "conflict of interest"?

A.   Because the Sacred Heart job was a lot of hours and full-time, I would have to balance the two positions and actually have to not be present at my high school teaching job in order to execute the Sacred Heart job.

Q.   Did you consider giving up the Sacred Heart job at that point?

A.   I don't remember what I was considering.

Q.   Did you feel you were able to do both jobs effectively?

A.   Yes.

Q.   Did you ever have an assistant coach while employed at Sacred Heart University?

A.   Yes.

Q.   And did you have an assistant coach the entire time that you worked there?

A.   I had a volunteer assistant from 2006 to 2011.

Q.   Who was that?

A.   James Biggs.  And after that, I had a part-time assistant coach named Matt Cook who, his role was also with the women's team as well.

Q.   So he was the assistant coach for both the men's and the women's team?

A.   Yes.

Q.   And when you say part-time, do you mean that he was part-time for your team and part-time for the women's team and full-time overall, if you know what I'm saying, or was he a part-time employee when combining both responsibilities?

A.   He was paid $3,000.

Q.   Okay.  So you would consider him a part-time employee?

A.   Yes.

Q.   And he worked under Mike Guastelle for the women's team?

A.   He did?

Q.   Yes.

A.   Yes.

Q.  How many hours a week did he work for your team?

A.  He would work based on his availability.  I did not give him strong guidelines of when he needed to come.  I felt given how much he was being compensated, that I would leave it up to him in terms of his availability.

Q.  Did he spend more time with the women's team or the men's team?

A.  Equal.

Q.  If you know.  Equal.  Okay.  How many athletes would there be on the women's tennis team?  Would it be a similar number as the men's?

A.  Both teams generally averaged between 10 and 14 student athletes depending on the year.

Q.  And we talked a little bit about this earlier, but could you tell me about Mr. Guastelle's responsibilities apart from coaching the women's tennis team?

A.  Mr. Guastelle was the senior associate athletic director.  And I'm not 100 percent positive what his full responsibility was.

Q.  Okay.  Do you know how long he had been working at Sacred Heart?

A.  I'm unsure.

Q.   And what was the time frame that that happened?

A.   That was the summer of, June of 2016.

Q.   And Mr. Hurlbut's job title?

A.   Deputy Director of Athletics.

Q.   Okay.  And he was one of your superiors?

A.   Yes.

Q.   Did he coach a team?

A.   No.

Q.   And you mentioned that you did receive periodic annual evaluations?

A.   Yes.

(Defendant's Exhibit 4,

supervisor's evaluation and

self evaluation for 2010 to 2011,

marked for identification)

BY MR. STERLING:

Q.   I'm going to show you a document that has been marked as Exhibit 4.  It's the athletics coaches performance appraisal for 2010 to 2011; is that correct?

A.   Yes, it's the document.

Q.   Okay.  So was this your annual performance review for 2010 to 2011?

A.   Yes.

Q.   And if you, you'll see there's numbers in the

position in that year. And that was, to the best of my knowledge, they also had, they replaced my position as well. They had one less. And they replaced my position with a football coach in the next year. And my, citing reasons for whatever they had to do to not renew my contract.

Q. Did your nonrenewal have anything to do with your, the fact that you were spending a lot of time coaching the tennis team?

A. I can't say that that, I would assume that that was the case.

Q. Why do you assume that?

A. Well, all the information that is revolving around the team is public information on the website. And they could easily access whatever is going on with the team. And in general, I just felt in general pressure when I went to interview for jobs which I needed to do outside of Sacred Heart, I felt that that was a question that people would ask, "Do you think you could teach school and coach a college tennis team?" Because their assumption was that my job was full-time at Sacred Heart. And so I had to explain to them that "No, no, you're incorrect, I actually can do that." And that was always a difficult conversation to convince somebody that that would be the case.

Q. Did anyone at Fairfield convey to you a concern about you coaching the Sacred Heart team and being employed there?

A. I can't remember that.

Q. So as far as you know, your position was eliminated, and that's the reason why you were non renewed?

A. Yes.

Q. While you were employed at Sacred Heart, did you ever apply for any other Division I coaching jobs, head coaching positions?

A. Yes.

Q. Okay. Did you ever apply for any other Division I assistant coaching jobs?

A. No.

Q. What head coaching jobs did you apply for?

A. I applied for one job at Fairfield University.

Q. And when was that?

A. 2014.

Q. Were you offered the job?

A. No.

Q. Was that a full-time job?

A. Yes.

Q. And that's the only other head coaching job you applied for while you were still employed by

A.  Yes.

MR. HEISER:  Let him continue finish his question.

THE WITNESS:  I'm sorry.

MR. HEISER:  That's fine.

BY MR. STERLING:

Q.  And do you have those time records that you assembled yourself?

A.  I don't.

Q.  You threw them away at some point?

A.  The ones that are on Kronos would be in the system.

Q.  Understood.  The other ones?

A.  They were in a calendar.

Q.  What happened to the calendar?

A.  It would be in the calendar on Outlook and/or a paper calendar which I probably wouldn't have any more.

Q.  Was there a time during your employment when you asked for a raise?

A.  Yes.

Q.  When was the first time you asked for a raise?

A.  In every year probably.

Q.  Going back to 2006?

A.  I would say.

Q.  And did you receive some raises?

A.   They were small adjustments, yes.

Q.   Okay.  Did you receive a raise every year?

A.   No.

Q.   Okay.  Do you know who made the decision whether or not to give you a raise?

A.   I am not.

Q.   Was there a time when you began asking for a status change to full-time pay?

A.   Yes.

Q.   And when did you start doing that?

A.   2006.

Q.   I think you testified earlier, and this is my words, but a concern about not rocking the boat by putting positive comments in your evaluation in 2012, I believe it was.  You didn't feel so concerned that you wouldn't ask for a raise or a transition to full-time; correct?

A.   No.

          (Defendant's Exhibit 7,

          letter, marked for identification)

BY MR. STERLING:

Q.   I'm going to show you Defendant's Exhibit 7, and ask you if you recognize that document?

A.   Is there a date on this?  I recognize it.

Q.   I don't see a date.  And that was going to be

one of my questions.

A.   Yes.

Q.   Do you have an idea of which year or?

A.   I would believe that this was in 2000 and, between 2013 and '14 possibly.

Q.   Do you remember how you presented this letter, who you sent it to at Sacred Heart?

A.   I don't.

Q.   Do you know if you gave it to Mike Guastelle?

A.   I don't remember.

Q.   Do you believe what you wrote in the letter is fair and accurate?

A.   Can you restate that question?

        MR. STERLING:   Yes.   Can you read it back? Would you mind?

            (The last question was read back by the reporter)

            THE WITNESS:   Is there a way you can ask that question a different way?   There's two pieces of it.

BY MR. STERLING:

Q.   Okay.   I can ask them separately.

A.   Okay.

Q.   Do you believe what you wrote in the letter is fair?

A.   Yes.

Q.   Okay.  Do you believe what you wrote in the letter is accurate?

A.   To best of my knowledge, yes.

Q.   Okay.

          (Defendant's Exhibit 8,

          2014 evaluation, marked for identification)

BY MR. STERLING:

Q.   I'm going to give you Defendant's Exhibit 8, which looks like it's your 2014 evaluation?

A.   Yes.

Q.   This is --

A.   Yes.

Q.   Okay.  I wasn't even sure I asked a question. This is your 2014 evaluation; correct?

A.   Yes.

Q.   And your signature appears on the last page of the document?

A.   Yes.

Q.   Okay.  And your comments appear in the box on the second to last page?  In other words, you wrote those words?

A.   Yes.

Q.   Okay.  And you're raising an issue about a part-time employee being evaluated on the same scale as

a full-time employee?

A.  Yes.

Q.  And it looks like your performance was rated by Mr. Guastelle as being either solid or above specification in each of the categories; is that accurate?

A.  I can't answer that question the way it's posed.

Q.  Okay.  There's a space for a supervisor rating in a number of categories; correct?

A.  Yes.

Q.  And in each of those categories, he either gave you an "S" or he gave you a 3 or a 4, which signifies either solid or performs above expectation; is that accurate?

A.  Accurate --

Q.  No, no, I'm not asking if you agree with what he wrote.  I'm asking if that's what he wrote?

A.  Oh, what he wrote?

Q.  Yes.

A.  Yes, I agree that that's the numbers on the page.

Q.  Okay.  What is PFP at Sacred Heart, if you know?  Have you ever heard that acronym?

A.  Partnering for performance, I believe.

Q. Is that the performance review terminology, the annual review?

A. Yes.

Q. Okay.

(Defendant's Exhibit 9,

email, marked for identification)

BY MR. STERLING:

Q. I'm showing you Exhibit 9. And it appears to be an email that you sent to Julia Nofri in May of 2014; is that right?

A. Yes.

Q. And it has some handwriting on it. Do you see that?

A. That's my handwriting.

Q. All of it is?

A. Yes.

Q. When did you write, when did you put that handwriting on the document?

A. I don't know.

Q. Okay. Was this the first time that you had raised an issue directly with human resources about your pay and classification as part-time?

A. Yes.

Q. Okay. And I see that you write at the bottom, "1,450 hours plus." Do you see that?

A. Yes.

Q. Okay. So that's a bit of an increase from the 1,400 estimate we saw in the prior document; correct?

A. Yes.

Q. Okay. Was it the case that you were working more and more hours, or was it that you had refined your estimate, or something else?

A. Can you repeat that?

Q. Sure. We looked at -- I'm going to be more explicit. We looked at your letter dated, called "proposal" which is Exhibit 7. And in there, you said, "I am currently logging 1,400 total hours a year." And you said that that was written in 2013 or 2014. Now we have this email written in the end of 2014 where you say that for the year 2013, you worked 1,450 hours plus. Do you see that?

A. Yes.

Q. And do you know which number is accurate?

A. In the, in that previous document, I was citing what was in the employee handbook, I believe.

Q. When you said "I am currently logging 1,400 total hours a year," you were referring to something in the handbook?

A. I was referring to a number that was the amount of hours that would be if you did the math for the

myself satisfactory because I felt as though I was satisfactory versus full-time employees.  If I had to rate myself as a part-time employee in 2014 -- 2015, excuse me, I would have given myself an above average rating as a self rating.

Q.  At the time that you rated yourself, did you have any anger towards anyone at the university about the way you had been treated?

A.  I felt as though things were not being moved beyond our department.  And so I was respectfully moving up the line.  But I wouldn't say I was angry as opposed to being hurt and frustrated and exhausted mentally in terms of the response that I was getting from the athletic department.

Q.  And it was Mr. Guastelle who completed this review of your performance; correct?

A.  Yes.

Q.  And I see that there's a, on the last page a space for Brad Hurlbut to sign as the next level supervisor?

A.  Yes.

Q.  And he, well, it appears to me that the handwritten comments on the last page are Mr. Hurlbut's based on the handwriting and based upon the fact that he refers to "Mike's assessment of Paul," would you

agree with me, those appear to be --

A.    That is Brad Hurlbut's writing, to the best of my knowledge.

Q.    Okay.   And you have no reason to think it's someone else other than Brad; right?

A.    No.

Q.    And can you read me what he writes?

A.    "I agree with Mike's assessment of Paul being a part-time coach has its drawbacks."   I don't know what that word is.   "Paul needs to embrace the program and be more positive as the position will not be made full-time in the near future.   We do not have the resources at this time to do so unfortunately."

Q.    Do you dispute that Mr. Hurlbut wanted to make the position full-time if he had the resources?

A.    I don't know what his, where the athletic department was going.   I can't answer that.

Q.    Okay.   Did you write anywhere in this 2015 evaluation what you had told me earlier about rating yourself as a full-time employee versus a part-time? In other words, did you in any way express that in your comments?

A.    Yes.

Q.    Okay.   Where is that?

A.    I said on page, Exhibit 10, page --

Q.   Can you refer to the lower right-hand corner?

A.   -- 46.

Q.   Okay.

A.   I said, "I'm asked to do and be evaluated as what is classified in most universities as a full-time job.  I'm not given the appropriate accommodations such as well paid assistant or enough help with administrative tasks.  I have been asked to have four key objectives in this job, all of which require a high amount of skill and require a large amount of time.  Most of my time is not compensated for."

Q.   Is there anywhere else in the evaluation where you make a statement about how you're evaluating yourself; i.e., against full-timers?

A.   No.

            (Defendant's Exhibit 11,
            letter to human resources,
            marked for identification)

BY MR. STERLING:

Q.   Defendant's Exhibit 11, do you recognize this document?

A.   Yes.

Q.   Is it a letter that you wrote to Sacred Heart?

A.   Yes.

Q.   Did you hand deliver this, or mail it, do you

remember, or was it an email, something else?

A.   I hand delivered it.

Q.   Who did you deliver it to?

A.   Human resources to the office of Rob Hardy.

Q.   And what is his, at the time, what was his job title?

A.   Director of human resources.

Q.   He wasn't vice president of human resources?

A.   That would be, that is his official title.  I'm sorry.

Q.   That's okay.  Is he senior to Julia Nofri?

A.   Yes.

Q.   So in here, you appear to be making complaints that you have been discriminated against based on your gender?

A.   Yes.

Q.   Who at Sacred Heart University do you believe discriminated against you because of your gender?

A.   I don't know the answer to that.  I don't want to, I don't know the conversations above my pay grade. So I don't want to speculate what their conversations were.

Q.   So you're not sure who discriminated against you at the university?

         MR. HEISER:  Objection.

THE WITNESS:  I wouldn't say that, but I'm not committed to pinning down who exactly was the person or department.  I'm not, I can't commit to it.

BY MR. STERLING:

Q.  Okay.  Are you aware of Sacred Heart University employees making anti male statements?

A.  Could you repeat that again?

Q.  Are you aware of any Sacred Heart University employees making anti male comments, sexist comments against males?

A.  Not that I remember.

Q.  Was any action taken in response to this complaint, Exhibit 11?

A.  I had a meeting with Rob Hardy.

Q.  I see that the letter is dated October 20, 2015.  Do you know when Mr. Hardy actually received the letter?

A.  He had mentioned to me that he had received it a few days after when I met with him.

Q.  Okay.  Do you have any reason to dispute that?  Do you think he actually got it earlier than he said?

A.  He -- I'm not sure.  He said he had received it close to when I had dated it or dropped it off.  Maybe that was a day after, but I can't recollect the timing.

Q.  Do you know if you actually delivered it on

October 20, 2015?

A.   I am not sure.

Q.   So you met with Rob after the letter?

A.   Yes.

Q.   How long after the letter was delivered did you met with him?

A.   I can't be sure about the timing, but I believe it was within a, maybe a month later.

Q.   Do you know if you met with Rob on November 10, 2015?

A.   Possibly.

Q.   Tell me about your meeting.

A.   So we had a conversation back and forth about the situation and --

Q.   The situation meaning your pay?

A.   Well, the concerns that I had.  And I don't remember all the specifics of our conversation.  But it was a chance for me to just, I didn't, wasn't aware if he knew the situation.  So it was a chance for me to just talk to him about it.

Q.   Did he hear, did he appear to be listening to you?

A.   He was there.  I suppose so.

Q.   Did he ask you any questions?

A.   Yes.

Q.   Do you remember what he asked you?

A.   I don't remember all the specific questions, but he did ask me if, if he felt as though my bringing this was the fact, because of the fact that I coached men or because I am a male?

Q.   And what did you say?

A.   I told him it was because I'm male.

Q.   Okay.  So your complaint of discrimination was that you were being mistreated because of your gender, not because of the gender of the team you taught, you coached?

A.   Yes.

Q.   Anything else you remember about that meeting?

A.   No.

Q.   Did you tell, did you -- strike that.

Did you give Mr. Hardy the names of anyone you thought was being treated better than you that you --

A.   In the packet that I had given to him, I had, I believe I had stated which ones, which ones of the coaches I thought were being treated better, although he already had that information.

Q.   Are you able to tell me who those people were?

A.   I don't remember what I put in there.

Q.   So Mr. Hardy set up another meeting with you and with the athletic director after that in December;

is that accurate?

A.   It was late December.

Q.   Okay.   And the athletic director is Bobby Valentine?

A.   Yes.

Q.   And you met with Mr. Hardy and Bobby Valentine?

A.   And Brad Hurlbut.

Q.   Brad was there, too?

A.   Oh, no, excuse me, sorry, that was a meeting with just Mr. Valentine and Mr. Hardy and myself.

Q.   And what did you discuss in that meeting?

A.   We discussed more of the same issues that I raised in the letter.  I don't remember the specifics.

Q.   And the results of that meeting was that your pay was increased; is that fair to say?

A.   No.

Q.   Okay.

A.   There was another, another meeting.

Q.   Okay.

A.   And that was in January.

        (Defendant's Exhibit 12,

        increase in pay letter,

        marked for identification)

BY MR. STERLING:

Q.   Okay.  I'm going to show you Defendant's

Exhibit 12.  Are you familiar with this letter?

A.  Yes.

Q.  Okay.  So it appears that effective January 1, 2016, you received an increase in pay to $20,000; is that true?

A.  Yes.

Q.  And what were you making previously?

A.  About $13,800.

Q.  Okay.  And you also became eligible to receive certain fringe benefits from the university?

A.  Yes.

Q.  And what were those, if you remember?

A.  They were part-time health benefits, health benefits that were available to part-time employees. They were part-time, all the different, you know, 401(k), we have a 524 plan, you know, retirement.  And I was, in a year, I would be eligible to take a class if I was able to be able to, if I wanted to take a class at the university, I could take a certain amount of credits based on my status.

Q.  Without paying for it?

A.  Without paying for it.

Q.  Okay.  So I think it referred to another meeting that kind of led to this decision in early 2016; is that true?

A.   Yeah.

Q.   There was a meeting with yourself, Bobby Valentine, Rob Hardy, Brad Hurlbut, and Julia Nofri?

A.   Yes.

Q.   Was anyone else there?

A.   Not that I know of.

Q.   Can you tell me what was discussed in that meeting?

A.   One of the discussion points was how I was being evaluated and how that would go forward.  Another point of discussion in that meeting was they had given me, that's where I saw a copy of my job description. Not the one that you guys showed me previously, but one that's similar to that with a lot of responsibility on it.  And we had again discussed the situation.  And I would say the meeting was difficult because it was myself and four people -- excuse me, three people, four people, excuse me.  And it was, the result of the meeting, which I didn't necessarily agree with, was what you see, what you see here.

Q.   And when you, just so --

A.   Oh, yes, Exhibit 12.

Q.   Okay.  So the increase in pay and the allotment of benefits were the result of the meeting?

Q.   What was the response from Mr. Guastelle to Exhibit 13?

A.   He didn't respond.

Q.   Okay.

(Defendant's Exhibit 14,

letter dated July 30, 2016,

marked for identification)

THE WITNESS:   That I'm aware of.

BY MR. STERLING:

Q.   Do you recognize the document that has been marked as Defendant's Exhibit 14?

A.   Yes.

Q.   And I see it's a letter to Rob Hardy dated July 30, 2016?

A.   Yes.

Q.   Was this the next time after Exhibit 13 that you had raised an issue about your pay to Sacred Heart?

A.   Can you repeat that?

Q.   Sure.

A.   I'm sorry, I missed the date.

Q.   When we looked at Exhibit 13, which is your note to Mike Guastelle talking about your pay and benefits, after that was, was Exhibit 14 the next time you raised an issue to anyone at Sacred Heart about your pay and benefits?

(Lunch recess from 12:59 p.m. to 1:42 p.m.)

THE VIDEOGRAPHER: We are back on record. This marks the beginning of media number three, 1:42 p.m.

MR. STERLING: Okay. Back on the record.

BY MR. STERLING:

Q. Mr. Gagliardi, in the summer of 2016, you continued to work at Sacred Heart University, you had some responsibilities with respect to coaching; correct?

A. Yes.

Q. And did you have other jobs that you did that summer?

A. Yes.

Q. And what were those jobs?

A. I was teaching, running a tennis camp at Sacred Heart for four weeks, and I was running tennis tournaments on the weekends, and teaching tennis as a self employed tennis instructor.

Q. Okay. The camp that you ran at Sacred Heart University, was that affiliated in any way with the company Nike?

A. Yes.

Q. Okay. What was, was Nike a sponsor?

A. They were the sponsor. U.S. Sports Camps was

the operator.

Q.   Was it a sleepover camp?

A.   One week was a sleepover.

Q.   And how old were the students?

A.   They were between the ages of 8 and 17.

Q.   Okay.  So it was a youth camp?

A.   Yes.

Q.   Okay.  And had you done that in the past, that same camp?

A.   Yes.

Q.   Were there any other Sacred Heart University employees involved in that camp?

A.   No.

Q.   Do you know the dates of the camp?

A.   Oh, excuse me.  Sorry, yes.  We had, the trainers would be involved in the camp.

Q.   And was that an all day camp?

A.   It was three weeks of day camp from 9:00 a.m. to 3:30 p.m. and one week of overnight which was Monday through Friday.

Q.   Okay.  Were you there while the camp was in session or generally most of the time?

A.   Yes.

Q.   Were you the head of the camp?

A.   Yes.

the court.  And I would, if I would speculate on the amount of time, it would be 30 hours a week.

Q.  Okay.  Did you go on vacation that summer 2016?

A.  Yes.

Q.  Where did you go?

A.  I went to Cape Cod.

Q.  With your family?

A.  Mm-hmm.  Yes.

Q.  For how long?

A.  A week.

Q.  Any other vacations?

A.  I went on a cruise in August.

Q.  Where was that to?

A.  That was to the, somewhere in the Caribbean.

Q.  With your family members?

A.  Yes.

Q.  Okay.  How long was the cruise?

A.  It was a week.

Q.  You went to Cape Cod in July?

A.  Yes.

Q.  Would you be able to say based on those vacations when the camp was?

A.  I was running the camp during the week that I was in -- I was not physically present during that week of the camp.  I had an assistant director that ran it

for a week.

Q.  And that was the Cape Cod week or the --

A.  The Cape Cod week.

Q.  Okay.  So was that in July?

A.  That was in July.

Q.  Okay.  And Sacred Heart didn't pay you, you received your payment from the organization that ran the camp?

A.  Yes.

Q.  So when the students returned to school in September or late August of 2016, you resumed your coaching duties; correct?

A.  Yes.

Q.  Did you continue to have discussions with anyone at the university about your pay or making it a full-time position?

A.  Yes.

Q.  And did that include Rob Hardy?

MR. HEISER:  What time frame?

MR. STERLING:  After the students returned.

MR. HEISER:  Okay.

BY MR. STERLING:

Q.  In 2016 fall.

A.  Yes.

Q.  Did you have a meeting with Rob in early

September of 2016?

A.  Yes.

(Defendant's Exhibit 15,

September 2016 emails,

marked for identification)

MR. HEISER:  15; right?

THE REPORTER:  Yes.

MR. STERLING:  Yes.

BY MR. STERLING:

Q.  Okay.  Mr. Gagliardi, do you recognize Exhibit 15 here, which is some emails from September of 2016?

A.  Yes.

Q.  Okay.  And if you look at the second page, it appears that you wrote an email to Bobby Valentine, Mike Guastelle, and Brad Hurlbut.  Is that an email you sent to them in September of 2016?

A.  Yes.

Q.  Okay.  It looks like Rob Hardy received that email.  And if you look at the first page, he references a meeting with you on September 7th to address your concerns.  Do you see that?

A.  Yes.

Q.  Do you agree that there was a meeting with Rob on or about September 7, 2016 about your issues?

A.    I believe so.

Q.    Can you tell me about that meeting?

A.    The meeting was in response to ongoing concerns that my hours were not being tracked.  And I had also stated to Rob that if I'm going to be classified as part-time, then I'm going to, I would have to be limited in my part-time hours.  This was in response to the document that I sent over to him in the summer. And that was the gist of the conversation in terms of if I'm part-time, then I'm going to work part-time hours, and how that was going to play out.

There was also an ongoing discussion of my evaluation wasn't complete because I didn't sign it because I didn't agree with it.  So I asked him what I should do.  And he told me I should just sign it even though I don't agree with it.  And that was, that was what I remember about the meeting.

Q.    Okay.  Now you -- and after that, you wrote a note to the athletic director, your supervisor, and the deputy athletic director telling them that Rob Hardy had blamed the athletic department for all of the HR problems?

A.    I, and this was just a feeling, not that I know that, knew that, I had the sense that when I would go to talk to athletics, they would tell me that I have to

go to talk to human resources.  And when I would go to human resources, they would claim that they have no idea what I'm doing, they didn't know if I was working any -- this was Rob's words, Rob said to me that he, there is no way that he could know if I worked two hours in my job, how would he have knowledge of that.

And so I just felt as though I was just being pushed back.  This is just a feeling now, not necessarily the factual, I don't know this for sure. But they had said, they would tell me one thing, and I would go there, and they would tell me, "talk to them." So I was being pushed back and forth between departments.

Q.  And you stated in your email to Mr. Valentine, Mr. Guastelle, and Mr. Hurlbut -- well, you refer to "reindeer games on a macroscopic scale."  Do you see that?

A.  Yes.

Q.  Okay.  So is it fair to say at this point, you were being less respectful of the HR department?

MR. HEISER:  Objection.  You can answer.

THE WITNESS:  Could you restate that again?

BY MR. STERLING:

Q.  We'll move on.

You currently work at Emmett O'Brien High School;

is that right?

A.  Yes.

Q.  Okay.  And what town is that in?

A.  Ansonia.

Q.  Ansonia.  And you've worked there since the beginning of the 2016-2017 school year?

A.  Yes.

Q.  Okay.  So when did you learn that you had obtained that position?

A.  August of 2016.

Q.  And you're a math teacher?

A.  Yes.

Q.  Do you teach physics at all?

A.  No.

Q.  And this is a full-time position and has been since you first started the job?

A.  Yes.

Q.  Okay.  When did you tell someone at Sacred Heart that you had obtained another full-time job?

A.  I was in communication with my supervisor every year that I'm looking for, it was understood that I would be working outside of Sacred Heart.

Q.  Okay.  So Mike Guastelle, when you say your supervisor, that's who you're referring to?

A.  Yes.  And I can't quite, I can't remember if in any of these meetings -- well, I'm sure at some point I said in some of these other meetings that I'm trying to find a job that would be compatible with the current situation for the men's tennis program.

Q.  When you told folks at Sacred Heart that you had obtained this full-time teaching job at a high school, what was the reaction?

A.  There was no reaction.

Q.  Did you feel you would be able to coach a Division I team and do your teaching job full-time?

A.  I felt as though there would be the similar issues that would come up year to year with this position.  There would be conflicts.

(Defendant's Exhibit 16,

email, marked for identification)

BY MR. STERLING:

Q.  Just marking an email here.  Do you recognize this email?

A.  Yes.

Q.  Okay.  And this is something you received from Mike Guastelle in September of 2016?

A.  Yes.

Q.  Okay.  It refers to a meeting the following day.  Did that meeting actually happen?

and an office that they would call their own.

Q.   Okay.  Are you sure about that?

A.   I am not 100 percent positive about that.

Q.   Okay.  At some point, your employment at Sacred Heart University ended; correct?

A.   That is correct.

Q.   And when did you learn that your employment had ended or would be ending?

A.   Oh, I believe it was on, around September 28th, I think.

Q.   Okay.

A.   And I was called down to HR.

Q.   Okay.  And was that meeting with Rob Hardy, Jim Barquinero, Bobby Valentine, Brad Hurlbut, Mike Guastelle, and Julia -- oh, no, I'm sorry, strike that.

That meeting was with Brad Hurlbut and Mike Guastelle, and Ms. Nofri; right, it was the four of you, Nofri, Hurlbut, Guastelle, and you?

A.   I believe Valentine, Guastelle, Hurlbut, and Nofri.

Q.   Okay.  And you were informed that your employment was being terminated?

A.   Yes.

Q.   Was this the first time you had a knowledge of

only one or one of two head coaches who were not

designated as a full-time employee.  Do you see that?

A.  Mm-hmm.

Q.  "Yes"?

A.  Yes.

Q.  Okay.  How do you know that?

A.  A lot of the information is public information
that's reported to the NCAA every year which you can
access through the educational, Department of Education
website for their reporting.  And the other part of
that would be with having discussions with people that
I work with, and they said that they were full-time.

Q.  How about the women's golf coach, is that
person a full-time or part-time employee?

A.  As of when I left, I believe the coach of the
women's golf team was not full-time.

Q.  Okay.  How about the coach of the men's golf
team?

A.  That's the same person.

Q.  Okay.  How about men's volleyball?

A.  I don't know the answer to that.

Q.  What NCAA document have you looked at to tell
you who was full-time and who wasn't?

A.  There is a, there's a reporting system where
they have to report every year who's, what the coaches

between the men's and women's for a particular sport?

A.   Golf.

Q.   Okay.  Cross country?

A.   I'm not sure.

Q.   Outdoor track?

A.   I'm not sure of that.

Q.   Indoor track?

A.   I'm not sure how they positioned all their employees.  They had a big staff.  I'm not sure what their responsibilities were.

Q.   Fencing?

A.   I'm not even sure if he had an assistant at times.

                (Defendant's Exhibit 19,

                listing of recruiting budgets,

                marked for identification)

BY MR. STERLING:

Q.   I'm going to show you Defendant's Exhibit 19. This is something that we turned over in discovery. Have you seen this?

A.   No.

Q.   You've never seen this before.  Okay.  It's a listing of recruiting budgets by sports for the financial year 2016.  And my question is whether you have any reason to believe that these numbers are not

accurate?

A.  I don't know.  I only know my budget.

Q.  Okay.  So you don't know the other team's budgets?

A.  Whatever discussions that I had with other coaches, that's, or administrators, that would be, they would relate secondhand information on what the -- I was never given a list of all the recruiting budgets.

Q.  Have you spoken to all the other sports coaches about their recruiting budgets?

A.  No.

Q.  I see that this lists a $750 recruiting budget for women's tennis.  Do you have any reason to believe that's not accurate?

A.  I'm not aware of why it would -- that's what reported.  Mike did the budget.  So I don't know.

Q.  Okay.

A.  You would have to ask him.

Q.  Okay.  I'm just seeing if you had any information about the budget that is contrary to this Exhibit 19.

Okay.

          (Defendant's Exhibit 20,

          2016 equipment budget,

          marked for identification)

(Defendant's Exhibit 21,

team fundraising document,

marked for identification)

BY MR. STERLING:

Q.   Okay.   And we'll start with Exhibit 20.   I'm going to hand that to you.   This is another document we produced in discovery, financial year 2016 equipment budgets.   And I'm, my question is whether or not you have seen this document before?

A.   Not -- no.

Q.   Do you have any information to suggest that the numbers in this document are inaccurate?

A.   No.

Q.   Okay.   You allege in paragraph 27 that while you were head coach, the men's tennis team had equipment and general budgets significantly below the women's teams coached by females.   Which sports were you referring to.

A.   Rugby, lacrosse, soccer, softball, field hockey, equestrian, rowing, bowling.

Q.   Okay.   The Men's and women's tennis are both listed as having a $3,000 budget.   Do you have any information to suggest that's not accurate?

A.   Can you restate the question?

Q.   Sure.   The equipment budgets listed for men's

tennis and for women's tennis are both $3,000.  Do you have any reason to believe that's not accurate?

A.  No.

Q.  Okay.  So the recruiting budget that we looked at in Exhibit 19, did you use the whole recruiting budget every year?

A.  I'm not -- I can't remember how I allotted my recruiting, but I'm pretty certain that I did.

Q.  You think you used the whole recruiting --

A.  Yes.

Q.  -- budget every year?

A.  I believe I did.

Q.  Who would have that knowledge at Sacred Heart? Who would know if you used your whole budget?

A.  The accountant for student affairs.

Q.  And Exhibit 21, I'll give to you.  And this talks about team fundraising.  So talk to me about how fundraising works for Division I athletics at Sacred Heart?

A.  So one of my goals or objectives that they gave me was to fundraise for the team so that we could recruit, operate the team.

Q.  So are you given a -- do you know whether the numbers that appear on here for your team reflect what you were able to fundraise or budgets that you were

given for fundraising?  In other words, were these your results or your expectations?

A.  Well, I had a, I had a goal in my evaluation that I was supposed to fundraise.  I was not given a number to fundraise.

Q.  Okay.  Do you have any information that the fundraising numbers in this document are accurate or inaccurate?

A.  They're not fully, they're not fully accurate. And I say that in terms of at times I would have to come out of pocket for certain expenses, which I did not put into the budget or -- so you could call that fundraising if I had to drive to see a recruit.  But I didn't have it in my budget to put that in.  So I didn't want to be over budget.  So I may have not reported every single expense that I had because I felt as though that we didn't have that in the budget.

Q.  And as far as Sacred Heart knew, these numbers are accurate, as far as you know?

A.  Actually, no.

Q.  Okay.

A.  I had sent them information that I was coming out of pocket for a lot of stuff.  And it wasn't until later that I just started to not do that as much and just make a donation to the school myself so that it

would be accounted for and then spend the money on tennis balls.

Q.   Paragraph number 30 in your complaint alleges "Gagliardi led Sacred Heart University's team to two NCAA Division I championships."  Is that true?

A.   Division I championship tournaments, not winning the -- yeah, that's, that is we did not win the national championship.

Q.   Okay.

A.   We made it to the, we lost to the national champion in the first round.  So that should be amended.

MR. HEISER:  Yeah, let me plead poor writing on my part on that one.

BY MR. STERLING:

Q.   Okay.  So this, when you say you led the team, that's referring to making it to the tournament?

A.   Making it to the tournament.

Q.   Paragraph 32 says "The men's tennis team plays approximately 35 match dates per year.  The women's team plays approximately 30."  Isn't there an NCAA rule that prohibits more than 25 days of competition per a school year?

A.   That is correct.

Q.   Okay.  You're in violation of that rule?

Q. Was that because of your conflicting responsibilities for your other jobs?

A. That could be because of that, or if I was sick or extenuating circumstances. It could be because, it depends on what you're describing as a match. Like, we would have multiple tournament dates where we were, on the same day they were playing in two different locations. So I was at one, and my assistant was at another.

Q. Okay.

A. So, yeah, I missed that, the one that I wasn't at. So that is possible.

Q. Were there any matches you missed that weren't due to you being at one event for your team and there being another event scheduled at the same time?

A. That is, that's possible.

Q. What's the UConn Men's Invitational?

A. That is a three-day tournament.

Q. And when does that take place?

A. It takes place in the fall.

Q. Did Sacred Heart participate in that tournament in 2016?

A. Yes.

Q. Did you attend that tournament?

A. Not the first day.

Q.  Why did you miss the first day?

A.  I had just started a new job in teaching.  And I didn't want to go into my first couple weeks of teaching and take a sick day or a personal day for another job, considering that information was publicly available on the Sacred Heart website.  And so I felt that would not be a good idea.  And also I have stated in the summertime and in the fall that I was not going to exceed 25 hours of work as a coach.  And I felt as though that if we had, if I went on Friday and on Saturday and on Sunday, which we didn't, we didn't make it to Sunday, then I would be way above being part-time.  And I made that readily apparent to the admin -- to Mike.  And I said "Hey, you know, you're going to have to find someone to go to this day."

Q.  Was that the first match of the year?

A.  That, I'm not sure.

Q.  Possible?

A.  No, I don't think so.

Q.  Okay.  Did you miss any other matches in 2016 -- I'm sorry, in the fall of 2016?

A.  I don't remember.

Q.  Did you, were you late to any matches in the fall of 2016?

A.  Yes.

Q.  Which ones?

A.  We played the Yale Invitational or the Connecticut Championship, I forgot the exact terminology, but it was at Yale.  And so on the Friday, I did work at school, and my assistant went to the meet.  And I met them at 3:00.

Q.  And when did it start?

A.  It started at 10:00.

Q.  Any other times you were late for matches in that fall?

A.  Not, not that I'm aware of.

Q.  Did you miss any practices that fall?

A.  Yes.

Q.  How many?

A.  I can't remember how many.

Q.  More than five?

A.  I don't think so.

Q.  Possible?

A.  No, I don't think that's possible.

Q.  Did you miss more than one?

A.  Yes.

Q.  Did you miss more than two?

A.  Possible.

Q.  Somewhere between two and five; is that fair?

A.  Yes.

Q. Were you late to any practices?

A. Yes.

Q. How many? And I'm just talking about the fall of 2016.

A. I was late to all of them because we have a very small window to practice in from, the kids are out of classes from 3:30 to 5:30. So I had to start our practices at 3:00, but I couldn't get there until 3:30. If I knew that the kids didn't have class, I would have scheduled practice at 3:30 so that I would be there on time. But we could not start practice that late because then they wouldn't have enough time to practice.

Q. So you would finish in Ansonia and drive to campus?

A. Yeah.

Q. And you would usually get there about 3:30?

A. Yes.

Q. Okay.

A. So the official start of a practice is when I arrived. But I would tell them to arrive at 3:00 so they can get warmed up and be ready to go for my arrival.

Q. When did practice end?

A. Practice ends, ended between 5:30 and 6:00.

But people would leave, if someone had class, they would leave. And we would continue practice without them.

Q. What was your overall record at Sacred Heart, approximately, if you don't know exactly?

A. I would say we were averaging 40, 40 to 50 percent wins. I think that's a little low -- I mean a little high. Anywhere between 40 percent and 50 percent win and loss.

Q. If I told you 89 wins and 126 losses, would you disagree with me?

A. I think that's accurate.

Q. How many winning seasons did the team have while you were there?

A. We had three seasons, maybe four.

Q. Of how many seasons of you coaching there?

A. Nine.

Q. Do you know whether the other New England Conference men's tennis teams have full-time or part-time coaches?

MR. HEISER: Northeast.

MR. STERLING: What did I say?

MR. HEISER: New England.

MR. STERLING: Oh, I'm sorry, yes.

THE WITNESS: I am not fully aware. I

school system?

A.  At the time that I left, no.  But previously, yes.

Q.  Who?

A.  There was the, I believe there was the men's volleyball coach way, when I first started.

Q.  And he worked as a teacher where?

A.  I don't know.

Q.  Are you sure he was a full-time teacher in a public school system?

A.  I don't know.

Q.  What's his name?

A.  I don't remember.

Q.  Do you know who replaced you in your job?

A.  Yes.

Q.  Who?

A.  William Beauregard.

Q.  And did Mike Guastelle take over temporarily when your employment ended?

A.  Yes.

Q.  Okay.  So when was Mr. Beauregard hired?

A.  September.

Q.  Of 20 --

A.  Of 2017.

Q.  Okay.  I know this is self-evident, but

Mr. Beauregard is a male; correct?

A.  Yes.

Q.  Mr. Guastelle is a male; correct?

A.  Yes.

Q.  Mr. Valentine?

A.  Yes.

Q.  Mr. Hurlbut?

A.  Yes.

Q.  Mr. Hardy?

A.  Yes.

(Defendant's Exhibit 22,
letter to Connecticut Department of Labor,
marked for identification)

BY MR. STERLING:

Q.  Let me show you Exhibit 22.  Is this a letter that you wrote to the Connecticut Department of Labor about your employment at Sacred Heart?

A.  Yes.

Q.  Okay.  And that's your signature?

A.  Yes.

Q.  Okay.  I see in the first paragraph, it says about halfway down, "My job consisted of 1,600 hours a year."  Did you write that?

A.  Yes.

Q.  Okay.  Well, we've looked at documents earlier

3/16/2018                     Paul Gagliardi                     Page: 133

amount of time.

Q.   So the 1,600 hours you refer to in your letter, which years did you work 1,600 hours?

A.   So there were ranges, there's a range of hours.

Q.   What's the range?

A.   Well, I believe I said it at the beginning, from 1,400 to 1,600 hours.  And that was the range.

Q.   And would you be able to tell me which years?

A.   Off the top of my head, no.

Q.   Okay.  If I were to show you Sacred Heart University's employee policy handbook, would you recognize it, do you think?

A.   Yes.

Q.   Okay.

          (Defendant's Exhibit 23,

          employee policy handbook,

          marked for identification)

BY MR. STERLING:

Q.   Okay.  I'm going to present you with Exhibit 23.  It's a document entitled Sacred Heart University's employee policy handbook dated July 2015.  Does this appear to you to be the employee policy handbook as of that time?

A.   It looks, it looks familiar.

Q.   Okay.  Did you read the handbook while you were

break?  I'm almost done.

THE VIDEOGRAPHER:  This concludes media number 3.  Going off record 3:03 p.m.

(Recess from 3:03 p.m. to 3:10 p.m.)

THE VIDEOGRAPHER:  We're back on record. This marks the beginning of media number 4, 3:10 p.m.

BY MR. STERLING:

Q.  Okay.  Mr. Gagliardi, do you have any evidence that Brad Hurlbut is prejudiced against men?

A.  No.

Q.  Do you have any evidence that Robert Hardy is prejudiced against men?

A.  No.

Q.  How about Bobby Valentine?

A.  No.

Q.  How about Julia Nofri?

A.  No.

Q.  Do you have any reason to believe that Julia Nofri is dishonest?

A.  No.

Q.  How about Bobby Valentine?

A.  No.

Q.  How about Robert Hardy?

A.  No.

Q.  How about Brad Hurlbut?

leave the university and go for multiple days, that is possible. If I was doing a fundraising tournament at Sacred Heart, which I may have done in 2016, I may have put those hours in. Because the funds were going to the university, a lot of the funds were going to the university. And also if I was running an event at Sacred Heart that was bringing in high school players to Sacred Heart to a big national tournament, I would count that as recruiting as well because I would be, while executing the tournament, I would be able to see the up and coming players. So I may have put in hours for a tournament that was at Sacred Heart as a --

Q. Did you -- I'm sorry.

A. -- as a work related hourly situation.

Q. Did you discuss with Mr. Guastelle or anyone else that you would be doing that, that you would be, some of the time that you spent at a tournament that you were running, would be entering that as Sacred Heart time into Kronos?

A. Well, none of my, none of my hours were approved by the university. So the discussion that I had with Mike is that I was, we were at the coaches convention, he said this "We should do this. This will be a good opportunity for the university." And it would be understood in other universities or other

situations that doing this event would be part of my responsibilities as a coach in terms of increasing the awareness for the program, recruiting, and fundraising, all of which were my goals that were set for me.

Q.   So you were being paid by another entity to run that tournament?

A.   Yes.

Q.   And you were also entering the time that you spent at that tournament in Kronos as time working for Sacred Heart; is that accurate?

A.   There were other people that were running the event as well.  This was a big event.

Q.   Okay.

A.   And so the hours were commingled for sure.

Q.   Okay.  Did you, in the fall of 2016, was there ever a time where you waited to the last minute to tell Mike Guastelle that you were not going to be present for one of the matches?

A.   Yes.

Q.   And which one was that?

A.   The UConn Invitational.  I waited until that week.  However, I did tell him previously months in advance that I would not be able to do everything if I was going to be considered part-time.  So there was a general understanding that I wasn't going to do this,

CERTIFICATE OF REPORTER

I, Sheryl L. Yeske, a Notary Public within and for the State of Connecticut, do hereby certify there came before me, on the 16th day of March, 2018, the following named person, to wit:   PAUL GAGLIARDI, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and affixed my seal this 28th day of March, 2018.

*Sheryl L. Yeske*

_____
Sheryl L. Yeske, CSR #28

My commission expires:   October 31, 2018