# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No. 3:17-cv-00857-VAB

- - - - - - - - - - - - - - - - - -X
PAUL GAGLIARDI,                     :
                  Plaintiff         :
                                    :
                                    :
VS                                  :
                                    :
SACRED HEART UNIVERSITY,            :
                  Defendant         :
- - - - - - - - - - - - - - - - - -X

CONFIDENTIAL

        Deposition of MICHAEL GUASTELLE taken at
the offices of Sullivan Heiser, LLC, 116 East Main
Street, #1, Clinton, Connecticut  06413, before
Clifford Edwards, LSR, Connecticut License No.
SHR.407, a Professional Shorthand Reporter and
Notary Public, in and for the State of Connecticut
on June 21, 2018, at 10:15 a.m.

EDWARDS COURT REPORTERS, LLC

10 Turkey Hill Road

Chester, Connecticut  06412

860.604.1175

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

THEODORE W. HEISER, ESQ.
SULLIVAN HEISER, LLC
116 East Main Street, #1
Clinton, Connecticut   06413
twh@sullivanheiser.com


ON BEHALF OF THE DEFENDANT:

JONATHAN STERLING, ESQ.
CARLTON FIELDS
One State Street, Suite 1800
Hartford, Connecticut   06103
jsterling@carltonfields.com

Q    And how long have you been with the university?

A    Twenty-four years.

Q    And in what position are you presently employed?

A    I'm a senior associate athletic director.

Q    And how long have you held that position?

A    I would say 19 years.

Q    And do you hold any other current positions?

A    No.

Q    Now, I understand you were for a time the women's head tennis coach?

A    Yes.

Q    And how long were you in that position?

A    Twenty-three years.

Q    And what was your first position at Sacred Heart?

A    I was coordinator of athletic communications and men's and women's tennis coach.

Q    Okay.  I'm sorry.  Say that slower.  Coordinator of --

A    Of athletic communications --

Q    Okay.

A    -- and men's and women's tennis coach.

Q    And that would have been approximately what year?

A    1994 to -- coaching the teams was till -- until 19 -- 2005, where I coached both teams.

Q    Okay.

A    My coordinator of athletic communications position changed.

Q    Changed or --

A    It changed.

Q    -- eliminated or --

A    It -- it -- the --

        MR. STERLING:  Mike, just make sure that you let him finish, that you're not talking over him --

        THE WITNESS:  No problem.

        MR. STERLING:   -- for the court reporter.

        THE WITNESS:  No problem.

A    It changed.  I -- I no longer was senior athletic communications.  I believe I was assistant athletic director for operation -- for about five years, probably like 1999.

BY MR. HEISER:

Q    Okay.

A    And I was still coaching both teams.

Q      All right.  So from '94 to 2005, you coached both men's and women's tennis?

A      Correct.

Q      And were those combined teams or were they separate teams?

A      They were separate teams.

Q      Okay.  Did you practice together?

A      No.

Q      Okay.  And from 2005 -- or after 2005, did you continue coaching the women's team?

A      Yes.

Q      And for how long did you continue coaching the women's team?

A      I believe that was 11 years.

Q      So approximately --

A      Yeah.

Q      -- 2016?

A      Yeah.  It was last year summer, so 2017.

Q      Okay.  Summer of 2017?

A      Yes.

Q      Okay.  And going back on the administrative side --

A      Uh-huh.

Q      -- you were the coordinator of athletic communication.  How long did that position stay,

probably was promoted to associate.

Q       Okay.  So around '99, you became assistant athletic director?

A       Yeah.

Q       And then --

A       Associate, I would say 2002.

Q       Okay.  And I'm not going to hold you to these dates.

A       That's all right.

Q       And I understand you're --

A       Yeah.

Q       -- estimating to some degree.  I'm just curious about the general time frames.

A       Sure.

Q       And you are now a senior associate athletic director.  When did you take on the senior title?

A       I believe 2006, 2007.

Q       Okay.  And very briefly -- and we're going to get back into this in some of my other questions in a little more detail --

A       Sure.

Q       -- but just hierarchy-wise within the athletic department, my understanding is that Bobby Valentine is the athletic director.

A       Yeah.  He's the executive director of athletics.

Q       Okay.  Executive.

Is that any different than director of athletics --

A       No.

Q       -- or athletic director?

A       Yeah.  Not a huge difference.  So the next-level person is deputy director of athletics, and that's Brad Hurlbut.

Q       Okay.  And then who's below Brad?

A       Then there's probably about six of us that are senior associate athletic directors in that area.

Q       And what is your area?

A       Internal operations, sport administration.

Q       Give me an idea of what that means.

A       I work with all our coaches in terms of budgeting developing, scheduling, contracts, help them to travel.

And then I have nine -- I think now it's nine coaches that encompass 15 sports, and I'm their sport administrator.  So they work directly with me regarding day-to-day issues they have with their

program.

Q    Okay.  And then under the senior associate athletic directors are there other associate athletic directors?

A    No.  I think it's just -- we're pretty much -- that's the rest of us from the administrative --

Q    Okay.

A    Yeah.

Q    Excellent.

So let's back up a little bit about your personal background.

A    Sure.

Q    Obviously, you've been at Sacred Heart for quite a while.

A    Uh-huh.

Q    Did you hold any other either coaching or administrative positions at other educational facilities before Sacred Heart?

A    Yes.

Q    And are you presently married?

A    Yes.

Q    And what's your wife's name?

A    Karen.

Q    How long have you guys been married?

Sacred Heart is a Division I athletics program; correct?

A    Correct.

Q    And all of the sports at Sacred Heart, other than club sports, are Division I programs?

A    Correct.

Q    And we'll get into some of the teams later, but generally, what are the most prominent or successful of those sports or have been historically at Sacred Heart?

A    Oh --

MR. STERLING:  Objection.

You can answer.

A    I would say women's basketball.

BY MR. HEISER:

Q    Okay.

A    They've been fairly successful.

Women's volleyball.  Women's bowling has been very successful in terms of national recognition.  Those are probably the three that have been pretty good.

Q    Okay.

A    Consistently.

Q    How about on the men's side?

A    On the men's side --

Q    No NCAA appearance?

A    No.

Q    Okay.  And who is coaching the men's tennis team now?

A    William Boe-Wiegaard.

Q    Boe-Wiegaard?

A    Boe-Wiegaard.  Do you want me to spell it?  'Cause it's not -- it's B-o-e, hyphen, Wiegaard, which is W-i-e-g-a-a-r-d.

Q    He's the head coach?

A    Yes.

Q    And is he the only one who's been head coach since Paul was terminated?

A    Myself and our assistant, Matt Cook, co-head coached the team, not this past year, but the year before.

Q    Okay.  So Boe-Wiegaard --

A    Yes.

Q    -- has been head coach for one year?

A    One year.

Q    Okay.  And what's Matt Cook's --

A    Matt's a part-time assistant coach.

Q    Right.

And I know Matt had been a part-time assistant for a number of years for both men's and

women's.

A    For both men's and women's, yes.

Q    And is he still a part-time assistant?

A    Yes.

Q    All right.  And what is just generally Boe-Wiegaard's background?

A    Played at Bates College, was a Division III national champion there as a player, and then he played for about nine or ten years on the pro tour.

Q    And any prior couching experience?

A    College coaching?

Q    Yeah.

A    No.

Q    Personal coaching?

A    Personal.

Q    Yeah.

What is the status of the men's tennis coach today?  Full time?  Part time?

A    It -- the position is now head men's and women's tennis coach.  So he's both.

Q    Okay.  So he's both?

A    Yes.

Q    All right.  And is that a full-time position?

A    Yes.

Were you involved in the decision to terminate Paul's employment?

A    Yes.

Q    And what is your understanding of the reason why Paul was terminated?

A    The -- the reasons for me was I felt over the -- the last two-plus -- the last two years or so, Paul had been really not engaged in the position any longer.  You know, he would come late to practices.  We had issues regarding him being unavailable to coach at matches towards the end.

And -- and overall, I just did not think that the men's team were getting the appropriate, you know, time needed and, you know, I think he became disengaged from the program.

Q    And you said, "The last two years" --

A    Yeah.

Q    -- or so?

A    Yeah.  Two -- two or three years.

Q    So 2016, '15, '14?

A    Uh-huh.

Q    Okay.

MR. STERLING:  You want to say yes.

A    Yes.

THE WITNESS:  I'm sorry.

Do you know why that exempt classification is marked there?

A       I do not.

Q       All right.  Now, during Paul's tenure as the men's head coach -- men's head tennis coach, you were the women's head tennis coach, I think, for the whole time; correct?

A       Yes.

Q       And you were also either a senior associate athletic director or the assistant athletic director?

A       Correct.

Q       Okay.  Did Paul report to you in your position as either the assistant athletic director or the senior associate athletic director?

A       Yes.

Q       And in what capacity did he report to you?

A       I was a sport administrator.

Q       For tennis?

A       For tennis.

Q       And was that both men's and women's?

A       For men's tennis, since I was the coach, so probably women's tennis reported probably to our athletic -- to our athletic director, Don Cook.

Q      Okay.  You didn't have a separate senior associate athletic director that you reported to --

A      No.

Q      -- as the women's tennis coach?

A      I did not.

Q      Okay.  And in terms of tennis at Sacred Heart, you obviously had an administrative role within the athletic department?

A      Yes.

Q      Did you have a different role as the women's head coach than Paul did as the men's head coach?

MR. STERLING:  Objection.

BY MR. HEISER:

Q      Do you understand?

What I want to know is whether your role as women's head coach was any different than Paul's role as men's head coach?

A      I also served as director of tennis.

Q      Okay.

A      So I would handle a lot of administrative roles for both teams.

Q      And tell me what the director of tennis position entailed.

A      It would be handling, you know, some

travel, helping men's tennis with -- you know, set up of travel.

I worked with Paul with scheduling, you know, because of his part-time position, how we would run the program administratively. Fundraising.

Q     Would the other teams at Sacred Heart where there are men's and women's teams --

A     Uh-huh.

Q     -- are there directors of each of those sports as well, like your director of tennis position?

A     No.

Q     Why is that?

A     I think -- the main reason was because of my full-time presence there, I would be able to help Paul, you know, with some of those administrative duties in that position.  Plus, I had experience from 11 years being the men's tennis coach of doing a lot of those duties.

So, you know, my focus was more for Paul to, you know, recruit and really focus on the team, you know, and also assist me with some administrative duties, but I would assist him knowing that, you know, he was not necessarily

available all the time to do that.

So it was a team effort.

Q    Okay.  Give me a sense.  I mean, obviously you're not -- I doubt you're doing a time sheet every day that's breaking down this phone call is as tennis coach, this one as --

A    Right.

Q    -- assistant director, et cetera?

A    Sure.

MR. STERLING:  Give him a chance to finish the question.

THE WITNESS:  Sure.

BY MR. HEISER:

Q    Let's just use 2015.  That's the last full year that Paul was --

A    Correct.

Q    -- employer there.  How much -- withdrawn.

You're a 12-month-a-year employee?

A    Correct.

Q    Full time?

A    Full time.

Q    Salary?  Exempt?

A    Salary.

Q    And during any given week, how much

time -- and I'm looking for an average.  Obviously, there's going to be spikes here or there.

A      Sure.

Q      But on average, how much of your time was spent doing women's head tennis coach work?

MR. STERLING:  Objection.

This is 2015?

MR. HEISER:  Yeah.

MR. STERLING:  Okay.

MR. HEISER:  Yeah.

A      Of my -- of my -- of my duties?

BY MR. HEISER:

Q      Of your duties.

A      I would say I was 70 percent senior associate athletic director and 30 percent women's tennis coach in terms of my time.

Q      Okay.  And that's throughout the year?

A      Throughout the year.

Q      And give me a sense, how many hours would you work during 2015?

A      Just tennis related?

Q      No.  Total.

A      I'd --

Q      How many hours were you --

A      I was probably working 50 to 60.

Probably more like 40 during the summer.

Q    Okay.  And of the other senior associate athletic directors, how many of those are also head coaches?

A    One.

Q    One.  Okay.  And who's that?

A    Elizabeth Luckie.

Q    And what does --

A    She's co-head softball coach.

Q    Co-head softball coach.

And the other four senior athletic directors are all non-coaches?

A    Correct.

Q    Okay.  Other than your stellar attributes, is there a reason why Mike Guastelle is a head coach and a senior athletic -- senior associate athletic director at Sacred Heart, meaning why aren't all of those positions filled by head coaches?

MR. STERLING:  Objection.

You can answer.

BY MR. HEISER:

Q    I'm wondering why you're able as a head coach to take on that role?

MR. STERLING:  Objection.

consideration.  There's also benchmarking of other institutions and what they are doing in each particular sport.

Q     Financial considerations being what?

A     In terms of salary, how much -- you know, what the -- like I said, in taking a look at different -- you know, different institutions or like institutions and what they're doing in those sports in terms of salary.

So, like I said, it's the -- it's the level of support we're able to give.

Q     Okay.  To the best of your knowledge, is consideration given to Title IX compliance in making decisions about support for different teams?

A     Yes.

Q     And how does that come to pass?  Who's involved in Title IX considerations?

MR. STERLING:  Objection.

You can answer if you know.

A     For the university, it's usually the executive director of athletics is involved in that. We have a Title IX coordinator, also.

BY MR. HEISER:

Q     Okay.  Who's the Title IX coordinator now?

A    It is Leonora Campbell.

Q    Leonora?

A    Leonora.

Q    And how long has she been in that position?

A    I believe three years.  It might be more.

Q    So as we go down this albeit partial list --

A    Uh-huh.

Q    -- we've got a part-time head coach for men's and women's golf and part-time -- well, men's and women's fencing, at least as of this, didn't have a head coach.

Is that still the case?

A    No.

Q    Is there a head coach for men's and women's fencing?

A    Yes.

Q    And is that a dual role?

A    Dual role.

Q    And who is the head coach?

A    Yury Molchan, Y-u-r-y M-o-l-c-h- -- -c-h-o-n [sic].

Q    And is that a full-time or part-time position?

A    That's full-time.

Q    Okay.  So as we go down this list, the only other head coaches that are part-time are men's tennis, Paul Gagliardi, and Greg Walker, the head coach of men's volleyball?

A    That's correct.

Q    I don't know when this was printed.  This is something that was produced to me, I believe, by my client originally and then came back to me --

A    Uh-huh.

Q    -- from your counsel.

Are you aware of, as of today, any other part-time head coaches at Sacred Heart?

A    No.

Q    Did I ask you the -- Boe-Wiegaard is part-time?

A    Well, he's full-time.

Q    He's full-time.  Oh, he's full.  That's right.

A    He coaches men's --

Q    He's full-time.

A    -- men's and women's tennis.

Q    Right.  Right.  Right.  We did talk about that.  That's right.  My bad.

So is Matthew McGreevy still the men's

than I do, but -- so I think -- correct me if I'm wrong, but I think that may be a full list of -- I'm not giving that to you for what's on there.

A       No, no, no.  That's fine.

Q       I'm just showing it to you as a list.

A       Sure.

During my time at Sacred Heart, we did have part-time positions in equestrian, rowing, bowling.  Women's golf still is.  Women's -- no, that was full-time.

I'm trying to think which ones -- women's fencing was.  I think that's it.

Q       So equestrian, rowing, bowling, fencing?

A       Is it coached by women?

Q       Yeah.

A       Or is it coached by --

Q       Female coaches.

A       Female -- just female coaches, okay.

Q       Right.

A       So fencing wouldn't have been one.

Q       Okay.

A       We had a -- we had a male coach.

Q       Okay.  So equestrian, rowing, and bowling?

A       Equestrian, rowing, bowling, yes.  They

were at one point part-time female head coaches.

Q    And all of those positions are now full-time positions?

A    Correct.

Q    Do you know why the equestrian position was changed from part-time to full-time?

A    I believe it was a decision made by the university.

Q    Do you know why the university made that decision?

A    It was, I believe, because of a Title IX concern.

Q    And what's your understanding of what the Title IX concern would have been?

A    I -- I don't really have any understanding of it.

Q    Okay.  Do you know why the rowing position was made full-time?

A    I believe the same reason as well, as the roster is pretty large.  It's 40 or 50 kids involved in the program.  That's my understanding.

Q    And how about bowling?

A    I believe the same reason.  I think it was a Title IX concern, but I don't have knowledge of the final decision why.

A        Basketball -- I thought it was 15.

Q        Oh, I know what it is.  You've got two football on here.  You've got golf --

A        Yeah.  'Cause one's for a golf tournament --

Q        Right.

A        -- and one's -- yeah, this is football. This is, like, all their fundraising stuff, and so --

Q        Okay.  Yeah.

So during the time that you have worked at Sacred Heart, three of the women's programs, equestrian, rowing, and bowling, have gone from part-time head coaches to full-time head coaches; correct?

A        Correct.

Q        During the time you've been at Sacred Heart, have any men's programs gone from part-time head coaches to full-time head coaches?

A        Yes.  Wrestling, I think, is the only one.

Q        And do you know why wrestling went from part-time to full-time?

A        I believe we looked at the benchmarking of what other institutions were doing, and we were

pretty much the last one left, I think, in all of Division I, if I recall correctly.

Q    Where wrestling was a part-time position?

A    Where wrestling was a part-time position.

Q    Tell me what you mean by "benchmarking."

A    We take a look at what other like institutions are doing in that sport in terms of support of head coaches, scholarship money, budget. So we're taking a look at, you know, who our competitors are and what they're doing in those particular sports.

You know, wrestling is one that's not an NEC sports.  So you're -- you're taking -- you're taking a look at different schools.

Q    And when you do the benchmarking for the teams that are in the NEC, are you generally looking at the other NEC schools primarily?

A    Yes, as well as similar conferences that are -- so the -- the Metro Atlantic Conference, the America East, those are probably the two in which we're most similar to.

Q    In terms of -- withdrawn.

How many programs at -- within the NEC -- I'm sorry.  I'm saying that completely wrong. Withdrawn.

How many schools within the NEC have men's tennis programs?

A    Right now, seven.

Q    Okay.  Of those seven schools with men's tennis programs, do you know how many of those coaches are full-time?

A    Full-time --

THE WITNESS:  Can I ask a question?

MR. STERLING:  Yeah, you can ask a question to clarify.

A    Full-time exclusively coaching men's tennis?

BY MR. HEISER:

Q    Well, that's a fair clarification.

A    Okay.

Q    So of those seven teams --

A    Correct.

Q    -- in men's tennis, do you know how many of those are coached -- of those coaches solely coach men's tennis, as opposed to coaching both --

A    Yeah.

Q    -- men's and women's?

A    I'm just trying to think off of the top of my head everybody on the men's side.

Three.

Sorry.

Q      That's okay.  Three are solely --

A      Solely where they just coach the men, not the women.

Q      And do you know, with respect to those three, whether they are full-time or part-time?

A      One of the positions, I'm not sure.

Q      Okay.

A      The other two, one's a graduate assistant position, and the other one is part-time, my -- my understanding.

Q      Okay.  Can you tell me which schools those are?

A      The three schools are Bryant, which I'm not quite sure how that's set up.  Wagner has a graduate assistant.  St. Francis New York, I'm -- I'm pretty sure that's part-time.

Q      Okay.

A      It is part-time now.  Now that I think about it, it is.

Q      And the other four coaches who coach both men and women?

A      Yes.  So they have a combination position.  So Mount St. Mary's, Sacred Heart.  Who else?  St. Francis PA, they coach both.

CONFIDENTIAL
EDWARDS COURT REPORTERS, LLC
edwardscourterporters@comcast.net

Bryant has a director of tennis, women's tennis coach, and I believe that position is full-time.

Q    Okay.

A    I'm trying to think if I'm missing anybody.

Q    Now, on the women's side in the NEC --

A    Sure.

Q    -- how many teams have solely -- a head coach who solely coaches women's tennis?

A    LIU, they don't have a men's program.  So that person just coaches that.

Bryant's got that director or tennis women's.  She does not coach the men's program.

Three of the schools have -- they're full-time head coach for both programs.  Wagner, graduate assistant.  St. Francis New York, part-time head coach.

Q    For women's?

A    For women's.

Q    Okay.  So Wagner has part-time?

A    Yeah, they have part time.  St. Francis has got part-time.

Q    Okay.

A    And there's eight on the women's.  LIU

A    You know, the general things going on in the athletic department, the -- maybe, you know, deadlines for certain things we needed to get done. It was a little bit of professional development.

It was an hour-and-a-half meeting once a month.

Q    Okay.  And who runs that meeting?

A    Brad Hurlbut primarily.  Bobby Valentine, also.  But primarily Brad runs -- runs the meeting.

Q    Okay.  Going back to the individual teams, if we go down the list of teams -- and we can do this really fast.

Men's baseball has a full-time head coach?

A    Correct.

Q    Men's football, full-time?

A    Yes.

Q    Men's Lacrosse, full-time?

A    Yes.

Q    Ice hockey, full-time?

A    Yes.

Q    Wrestling, full-time?

A    Right.

Q    Golf, part-time?

A    Part-time.

Q    Cross country?

A    Yeah.  Track and field, full-time.

Q    Right.

A    Coaches both teams.

Q    Volleyball?

A    Part-time.

Q    Part-time.

     Tennis, part-time?

A    Part-time.

Q    Fencing?

A    It was full-time, coaches both.

Q    Lacrosse, football -- soccer?

A    Full-time.

Q    Full-time.

     Women's softball, full-time?

A    She's a full-time employee.  She's sort of similar to me.

Q    Right.  She's the senior --

A    Yeah.  She's senior associate.  She actually co-heads softball coach.

Q    Okay.

A    But she's a full-time employee.

Q    Who's the other co-head?

A    Pam London.

Q    Pam London?

Q    His next sentence says, "Many full-time coaches also have full-time assistants."

That, in fact, is true; correct?

A    Yes.

Q    Okay.  And if we go through the list of teams on Exhibit 3, starting with the men's teams, men's baseball has a full-time assistant?

A    Yes.  One.

Q    And a part-time assistant?

A    Yes.

Q    Men's football obviously has --

A    Numerous, yeah.

Q    -- numerous assistants.

Men's lacrosse has a full-time assistant?

A    Yes.

Q    Ice hockey?

A    Yes.

Q    Men's wrestling?

A    Yes.

Q    Men's golf, we already talked about.

Cross country?

A    They have one, and they coach both.

Q    Right.  Okay.

A    It's in that capacity.

Q    Does fencing have an assistant?

A    They do.

Q    Is it --

A    I believe it's part-time.

Q    Okay.  Men's basketball?

A    Full-time.

Q    Men's soccer?

A    Full-time.

Q    Okay.

A    It's combination position actually, men's soccer.  They also work in external relations.  It's a dual position, I believe.

Q    Okay.  Going down the women's team, women's softball obviously has co-head coaches?

A    Yes.  Some.

Q    And then is the --

A    Part-time.  The pitching coach is part-time.

Q    Part-time.

Women's soccer?

A    Full-time, one.

Q    Women's volleyball?

A    Yes.

Q    Women's basketball?

A    Uh-huh.

MR. STERLING:  Say yes.

CONFIDENTIAL
EDWARDS COURT REPORTERS, LLC
edwardscourterporters@comcast.net

A    Yes.

Sorry.

BY MR. HEISER:

Q    Equestrian?

A    Yes.  I believe so.

Q    Women's rowing?

A    No.

Q    Field hockey?

A    Yes.

Q    Lacrosse?

A    Yes.

Q    Cross country, we talked about.

Women's tennis, we know.

Bowling?

A    No.

Q    Swimming?

A    Yes.

Q    Women's ice hockey?

A    Yes.

Q    And women's rugby?

A    I don't believe so.

Q    Okay.  So Paul's statement that many full-time coaches also have full-time assistants is accurate?

A    Yes.

for our coaches in terms of how many kids they have on their team. So, you know, we try to end up -- you know, we're looking at, you know, obviously what other universities are doing in terms of roster sizes, and then we'd want to have our teams around that -- you know, around the appropriate size as well as -- as an enrollment tool.

Q    Okay. Give me a sense -- and I don't know that you'll know these offhand, but some of these programs -- do you know how many players there are on women's rugby?

A    Women's rugby. I want to say -- I don't get to see the actual roster. I'd look online. I want to say 20, 25.

Q    How about women's fencing?

A    Women's fencing, I'll say 15 to 20.

Q    Bowling?

A    Bowling is 20 to 25. I think we're up to that much. We got a lot.

Q    Rowing?

A    Rowing is probably 40 to 50, 40 to 55, somewhere in that range.

Q    Equestrian?

A    Equestrian, 25 to 30.

Q    Okay. And what about men's fencing?

September 10.  And it looks like it was printed --

A    Yeah.  So I would say it was probably September 11th or somewhere in there.

Q    Okay.

A    'Cause I'm writing notes in terms -- I see times, so I must have --

Q    Do you know why you put your notes on here?

A    I -- I believe I was asked by either human resources or Brad, I -- I believe, because -- you know.

Q    Did they tell you why they wanted you to do it?

A    Well, I -- I think in -- I was disputing the hours in which Paul -- I think we all were disputing the hours Paul was putting in for that, especially -- you know, during -- was the first date -- I'm sorry -- July 1st on the top?

Q    Yeah.

A    Okay.  So I think we were disputing the hours that he was putting in that he was working at Sacred Heart.

Q    Okay.  So I know by your own admission your eyesight is not great.

A    That's all right.

Q    Okay.  So let's just back up on the Yale showcase.

What makes you believe he wasn't there for the hours that are listed?

A    Because this -- well, one day is a full day.  The other day is, like, three hours for his -- for men.  They split the showcase, men's and women's, so --

Q    Okay.  That time would generally include travel to and from?

A    Yes.

Q    And --

A    But, I mean, from his house in Branford to Yale is 15 minutes.

Q    Not too far.  Well, I question getting there in 15, but -- fair enough.

A    Well, I'm just saying.

Q    I can't get anywhere in --

A    Right.

Q    -- 15 minutes anymore.

Okay.  And so next week you've got a reference to Nike tennis?

A    Correct.

Q    And that was a tennis camp that was at --

A    At Sacred Heart.  And he's employed by

U.S. Sports Camp, I'm sure, Nike Tennis.  But --

Q    Okay.  And is it possible that he was also doing work on behalf of Sacred Heart at that tournament?

A    Highly unlikely.  But that's why I questioned the hours.

Q    Okay.  July 8th, 9th, and 10th, I think it says, "ITA tournament"?

A    Right.

Q    And then I can't -- oh, "not part of job."

A    Right.

Q    Is that what it says in the --

A    Correct.

Q    Is that the same tournament?

A    No.  That was a -- Paul had approached me about -- the ITA runs -- it's called their summer circuit, which they ask who would be interested in possibly running one of these tournaments at their university, and I believe they get -- I believe they get paid by the ITA.

Q    Okay.

A    So Paul said, Hey, do you mind me running one of these tournaments?

I said, Sure.  It's -- if you can make

some extra money, great.

Q    Okay.  Thursday, July 14th, again it says, Nike tennis camp"?

A    Yeah.  Same thing.

Q    Okay.  There's only two hours entered on that one.  Is it possible that he did two hours of work on a day --

A    At Sacred Heart.

Q    -- with the camp?

A    Yeah.  He was mostly out there with the camp.

Q    Okay.

A    So that's why I was disputing it.

Q    Okay.  Going down to July 25th through the 29th.

A    Yeah.

Q    You say -- or you write, "Cape"?

A    Cape, yes.

Q    What's that referring to?

A    Paul was running a Nike tennis camp that week, in which I had found out -- probably Tuesday that we had went down to go see him, and I said, Where's Paul?

He's actually in the Cape.

I don't think he's running this

tournament. He's running a camp here at the university, that's probably -- you know, I don't know how he's running a camp, putting in hours at Sacred Heart, and he's on vacation with his -- with his family.

So I questioned the hours.

Q Okay. So just so I'm clear, your understanding is Paul was on Cape Cod for vacation?

A Yes. When he was --

Q But there was a camp being run that week --

A That week with his name as the director.

Q Okay. And then you're questioning his having put in time for that?

A Correct.

Q Do you know if he was paid for running that camp?

A I believe so.

Q All right. Was anyone else from Sacred Heart involved in working at or running that camp?

A We probably had one of our former players who graduated. I believe that's who -- 'cause that's -- I believe I spoke with them wondering where Paul was --

Q Okay.

school?

A       Yeah.  At the school.

Q       Okay.

A       I don't remember.

Q       So you have no recall of --

A       I don't recall the meeting.

Q       All right.  Do you remember expressing to Julia -- well, let's withdraw that.

Do you remember ever recommending to anyone that Paul should be terminated?

A       Yes.  I believe probably Brad and Bobby.

Q       Okay.  At what point in time -- and, again, I know you might not know an exact date --

A       Right.

Q       -- but at what point in time did you come to the conclusion that Paul should be terminated?

A       I -- I believe the last-straw type of thing?

Q       Whatever it was.

A       I believe it was a tournament -- because it happened at the 4:30 to 6:30, there was a tournament that was coming up the following weekend, whenever that was -- that would be Friday, the 16th, was -- myself, Matt, our assistant coach and Paul had a conversation in which the men's team had a

tournament at UConn, and we just wanted to make sure we were being able to cover everything.

And Paul had said to us that he was all set to be at the tournament on Friday.  The following week, I believe, I was away with my women's team, and Matt was unavailable.

So we met on that Sunday.  He said he was going to cover the match on that Friday.  He'll be at the tournament.  And then I got a phone call midweek where he told me he could not be there.

And that was sort of the final straw, as you would say.

Q    Did he say why he wasn't going to be able to be there?

A    Well, he was -- he had started his teaching job, but he -- he -- he had told us that Sunday he would be there, so --

Q    And do you know what happened with respect to that UConn tournament?

A    I believe we ended up not playing in the doubles portion of it on Friday, because we had no coach to travel with the team.

Q    And forgive me, but you said, "The 16th." 16th of what month?

A    September.

Q     Okay.

A     Because he was my supervisor.

Q     What was your concern about his -- Paul's continuing raising that issue?

A     Well, one, I didn't think it was true.

My other overall issue was, you know, in the beginning of that year, he was showing up late to practice.  And like I said, we would practice sort of the same time and, you know, I would notice the guys' team down there just sort of hitting balls.  And I remember one time saying to one of the guys, I was like, Where's Gags?

And they're like, I don't know.  He's going to be late again, you know.

So that raised the concern, as well as all the issues that were brought up in the summer.

Q     Okay.  Were you concerned about Paul's continuing to claim that he was working more than 25 hours because he continued to raise it or because you didn't think it was true?

A     I didn't think it was true.

Q     Okay.  Prior to reviewing the Kronos printout that's Exhibit 7 --

A     Okay.

Q     -- had you ever undertaken a review of

A    I have not seen this, but --

Q    Okay.

A    -- I mean, I understand what it is.

Q    So I've got a couple of questions.  The second column on the right --

A    Yup.

Q    -- the FY 16 first contest roster --

A    Yup.

Q    -- can you tell me what that -- what that refers to?

A    For first contest -- right.  So whenever the -- that team has its first actual contest, that is what their roster looks like at that date.

So probably for tennis, I'm assuming it'd be our first tournament in September.  This is a compliance for the roster stuff, so --

Q    And do you personally know, is that first contest roster the figure that's used for Title IX compliance?

A    I believe so.

Q    Okay.  Who sets the recruiting budget for each of the teams?

A    I do.

Q    For all of them, that's --

A    Yes.

Q    Okay.

A    So --

Q    Give me a sense of that process.

A    Sure.

Q    How do you determine that fencing gets a thousand, but --

A    Yeah.

Q    -- golf gets 750?

A    It's not an exact science. We do a lot of benchmarking and take a look at what those sports are doing. So if we're looking at basketball, we're looking at teams in our league, what are they -- and we have a -- the NEC has a survey that share with administration so you have sense of what everybody is doing in the league.

So what I would usually do with our recruiting budget is taking a look at that. And I used to try -- at least with the NEC schools, I would try to take a look and get us kind of like the average in the league is in that sport and try to be there at a minimum, if we could.

Q    At the average for the NEC?

A    At the average.

Q    Okay.

A    Yeah.

Q      So some of these numbers don't surprise me.  I would assume that basketball is going to have a high --

A      Yeah.

Q      -- recruiting budget, hockey, football. A couple of them were a little surprising on how low they were.  For instance, baseball is 4,000.

A      Uh-huh.

Q      Is that typical?

A      Yeah.  It probably was -- when I looked at the benchmark, it probably was the average in the league.

Q      Okay.

A      Baseball, my professional opinion, less you're going to go flying to see recruits in baseball.  It's more or less a drive to that place or this place for baseball.

So, you know -- but -- but, like I said, most of the numbers that I listed are probably close to what the average of the league was.

Q      I noticed that for those programs where there were men's and women's --

A      Uh-huh.

Q      -- the women were either equal to the men or higher.  For instance, softball is double the

Q       You gave me an "uh-huh" to my "yes."

A       Uh-huh twice.  Sorry.

Q       So you've got a soccer recruit -- yeah, a recruiting budget for women that is $6500 and a soccer recruiting budget for men's soccer that's $4500?

A       Uh-huh.

Q       And are you saying to me that one of the reasons for that is because the men's side has football?

A       I'm trying to think how's the best way to explain.

I think -- I think it's just the overall budget, taking a look at what we're doing on the men's side as well as the women's side and taking the fact the benchmarking that we're doing, and that's where we come up with the numbers.  We're taking a look at what we've historically done in those sports in terms of where we're recruiting, also.

Q       Do you specifically know why the women's soccer budget would be $2,000 more than the men's soccer?

A       They might be attending maybe a showcase -- one or two showcases more than our men's

you know, legitimate time being spent by Paul as the men's head tennis coach --

A    Yes.

Q    -- on behalf of --

A    Yes.

Q    -- Sacred Heart?

A    Yes.

Q    All right.  He then says that he volunteered on court at the New Haven Open representing SHU.

Would you consider that to be legitimate time?

A    No.  'Cause I don't know how he would -- how his representation of Sacred Heart there is him representing Sacred Heart.  It's voluntary time.  It wasn't -- nobody had asked him to go do that.  So, you know, that -- that could -- that could have been anybody.

Q    Okay.  The New Haven Open, is that the same --

A    Yeah.  It's the same --

Q    -- as the Connecticut Open?

A    Yeah.  It's the Connecticut Open.

Q    Okay.  It then says, "Then I had a 20-minute conversation with Kevin Blake in admission

second paragraph under that September 20, 2016 meeting, there's -- the point is being made -- now, I understand you don't remember this specific meeting, but I believe you said you talked about this with Bobby and Brad.

You know, it says, "Mike stated that he was concerned that Paul was fabricating hours to make his point."

And if we go down to the -- one, two, three, four -- fifth paragraph where you're recommending or it says you're recommending that Paul's employment be terminated, the primary discussion there is his hours and that he's -- either is or is not working 25 hours a week.

To the best of your knowledge, you don't remember talking to Paul about how he was coming up with these hours; correct?

MR. STERLING:  Objection.

A    We didn't have a specific talking about the hours.  I -- I just felt that they were fabricated in terms of the amount of time he was putting in.

BY MR. HEISER:

Q    You just assumed they were fabricated --

A    Well --

we were paying -- what was a head coach in men's -- you know, part-time men's coaches making, women's golf coaches making.  Same with fencing, same with men's volleyball.

You know, taking a look at what other schools were doing for those part-time positions.

Q    Do you know what Boe-Wiegaard is making?

A    Well, he has both teams.

Q    Right.

A    Around fifty.

Q    Fifty?

A    Fifty, yeah.

Q    Okay.  And Paul's last increase put him at twenty?

A    Correct.

Q    For the 2016 year?

A    Correct.

Q    As you sit here today, do you have any idea what the other tennis coaches in the NEC were making as of 2016?

A    Part-time?

Q    Any of them.

A    It's -- it'd probably be a range, because the way the information we get is part-time, full-time.  So it's combined.  So it could have

was getting there late.

I think it was a -- a general concern by the group in knowing that he would get there late for stuff and those kind of things.

Q    What was the context of this being brought up?

A    I -- the one that I recall was he had spoken with me -- I was running a practice, and I just happened to ask him where Paul was.

And he said, He's not even here yet.

I said, What happened?

And he was, like, He's not going to get here until, like, 3:30, 3:40, and we got to be here at three o'clock.  So we started running practice ourselves, you know.

So, you know, it was like in that context.

Q    Did he seem to be expressing frustration?

A    Yes.

Q    And how many times was this raised?

A    That -- it -- it was raised on and off, you know, throughout the last couple years.

Q    Just by Cory?

A    I think by the -- I would say the team in general.  I would -- unfortunately, I would hear a

I -- I just felt like he -- he didn't have an enthusiasm for the position.  And I -- I felt that, you know, the team deserved that, at least minimally, that he was engaged and enthused to be there.

Q     Okay.  Did you ever hear from any players who said anything to the effect of they think Paul is giving up?

A     I -- I don't remember specifically, but I -- I did hear those type of, you know, Does he want to be here?

Q     From players?

A     Yeah.

Q     Do you remember what players?

A     No.

MR. HEISER:  Let's take a quick break.

(Whereupon, there was a recess taken from 3:17 p.m. to 3:35 p.m.)

(Whereupon, Plaintiff's Exhibit No. 19, Partnering for Performance Summary for Fiscal Year 2016, was marked for identification.)

MR. HEISER:  Nineteen is 2016.

MR. STERLING:  Okay.

BY MR. HEISER:

Q    So feel free again to look at it.

A    Sure.

Q    What I've shown you is Exhibit 19. That's the 2016 Partnering for Performance Summary for Paul.

My understanding from your prior testimony is that Paul did not sign --

A    Correct.

Q    -- this PFP.

A    Correct.

Q    We're not certain, but it looks like this was probably presented to him on or shortly before September 20th of 2016 at the meeting that we referenced earlier today.  And I would note that just at the bottom, the print evaluation footer --

A    Uh-huh.

Q    -- indicates September 19th --

A    Okay.

Q    -- of 2016.

Did you go through this PFP with Paul when you met?

A    I believe so.

Q    Okay.

A    Because he refused to sign.

something that gets sent to him or --

A      I would usually print out a draft of what I had written for the evaluation, give it to Brad to take a look at it.  And would you want to add any comments or your thoughts on it?

Q      Okay.  And would that normally be done just in the office --

A      Yeah.

Q      -- walk down the hall and --

A      Yeah, walk down the hall or send him an e-mail.  There's these five or six evaluations that I wrote.  What do you think?

Q      And is it your standard practice to have him review all of the PFPs you do?

A      Yes.

Q      Could you, with your counsel's blessing, take a look to see if there is an e-mail to Brad of a draft of this?

A      Sure.

Q      Okay.  All right.  With respect to your comment on -- well, it's on page 5, where it starts, Overall."

A      Uh-huh.

Q      It says, "Overall, Paul has become disengaged from the athletic department.  Many

administrators have commented directly to me his lack of response to e-mails and other communications they send requesting information they need from his program."

What administrators had made those comments to you?

A    A lot of our senior associate ADs.  You know, we talked about, you know, getting their input, whether it was compliance or external relations, you know.  All of our other senior associate ADs, they had concerns regarding Paul's lack of communication with them, and they needed something for their areas.

Q    Specifically, who mentioned that?

A    I think that was Meghan Miller.

Q    What did Meghan Miller say?

A    Just -- I -- I don't remember specifically, but I'm just naming the -- the administrators that would have commented.  And, you know, if there was an e-mail concern and Meg had something like -- she would come to speak with me and say, Can you get Paul to respond to my e-mail? Cause I haven't heard from him.

Those type of issues that occurred.

Q    And Meghan was compliance?

A    Yeah.  Senior women's administrator compliance.

Q    And tell me specifically what issues she raised as concerns about --

A    I think it was just her general, you know -- we've -- we've asked our administrators how the communication is with our head coaches with their area.

I didn't get into too many specifics with, Meg, you know, but there were other concerns from other coaching -- from other staff members as well.

Q    What other staff members?

A    Probably external relations, Chris O'Connor.

Q    What did Chris O'Connor say?

A    The same as Meg.  I'm trying to think of specific, but it -- you know, one might have been -- this is speculation from me.

MR. STERLING:  You don't have to speculate.

BY MR. HEISER:

Q    Well --

A    Okay.  Yeah.  That's all.

Q    Do you remember any specific concerns

raised by Chris O'Connor?

A    I don't remember any specific concerns.

Q    Anyone else that you remember raising concerns?

A    No.

Q    So Meghan Miller and Chris O'Connor would be the many administrators that have commented directly?

A    Well, specifically -- I can't remember specific conversations, but I know we had probably concerns with the equipment operation --

Q    Who is --

A    -- which is Chris Velez.

Q    Who?

A    Velez, V-e-l-e-z.  He was our equipment manager.

Q    What was the first name?

A    Chris.

Q    Chris.  And what did Chris --

A    It was probably in terms of ordering equipment in a timely fashion.

Q    All right.  So you're using terms like "probably" --

A    Okay.

Q    -- which gives me the sense --

A    Sure.

Q    -- that you're not certain that that's the case.

Do you remember Chris Velez --

A    I -- I don't remember specifics.

Q    Do you remember Chris Velez raising concerns about Paul?

A    I do.

Q    And do you remember what those concerns were?

A    I believe it was ordering of equipment on time.

Q    And you had said before that that was a problem with other coaches as well?

A    Sure.  Yes.

Q    Were Chris' concerns more significant with respect to Paul than other coaches?

A    No.

Q    What other administrators raised concerns about Paul?

A    Brad had concerns.

Q    Brad Hurlbut?

A    Uh-huh.

Q    Yes?

A    Yes.

Q      And what concerns did Brad have?

A      I think it was many of the things that we had discussed in terms of his dedication, being engaged with the student athletes, what was needed in the terms of his role as head coach, you know, being on time for practices, those types of things.

Q      Anyone else?

A      Trying to think of who else we have.

No.  That's good.

Q      At some point in time did you become aware that Paul filed a wage complaint with the Department of Labor?

A      I got notified by our legal counsel. That was all I knew about it.

MR. STERLING:  And I don't -- just be careful not to disclose any conversations you had other than --

THE WITNESS:  Oh, okay.

BY MR. HEISER:

Q      I don't want to know anything about what your attorneys said to you or the school's attorney said to you.

A      Oh, okay.

Yeah.  I -- that was the only notification I received.

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _____ , 2018.

_____

Clifford Edwards

Notary Public

My commission expires:  9/30/2021