# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


**CONFIDENTIAL**


Civil Action No. 3:17-cv-00857-VAB

- - - - - - - - - - - - - - - - - -X
PAUL GAGLIARDI,                          :
                    Plaintiff           :
                                         :
VS                                       :
                                         :
SACRED HEART UNIVERSITY,                 :
                    Defendant            :
- - - - - - - - - - - - - - - - - -X




        Deposition of ROBERT JOHN VALENTINE taken at the offices of Sacred Heart University, 5151 Park Avenue, Fairfield, Connecticut, before San Edwards, RPR, a Professional Shorthand Reporter and Notary Public, in and for the State of Connecticut on June 22, 2018, at 10:13 a.m.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

THEODORE W. HEISER, ESQ.
SULLIVAN HEISER, LLC
116 East Main Street, #1
Clinton, Connecticut   06413
t:   860-664-4440;  f:   860-664-4422
twh@sullivanheiser.com




ON BEHALF OF THE DEFENDANT:

JONATHAN STERLING, ESQ.
CARLTON FIELDS
One State Street, Suite 1800
Hartford, Connecticut   06103
t:   860-392-5000;  f:   860-392-5058
jsterling@carltonfields.com












ALSO PRESENT:   NICOLE LUONGO

A    I think he dealt with dirt in some way.

Q    Okay.  Any other things that you would include in your continuous involvement in the Paul Gagliardi situation?

A    No.

Q    Were you involved in the decision to terminate --

A    Yes.

Q    -- Paul?

And what was your involvement in that decision?

A    Well, I had the final determination.

Q    Take me through that.  If -- if a -- well, let me back up, actually.

During your tenure as athletic director, how many Division I coaches have been terminated?

A    I --

Q    At Sacred Heart, obviously.

A    Yeah.  Yeah.  I believe one.

Q    Okay.  And that would be Paul?

A    No.

Q    Oh.

A    Other than Paul.

Q    Other than Paul?

A    I believe two.

Q    To you?

A    And it has to be documented.

Q    Okay.  So -- so if --

A    For a reason.  Yeah.

Q    If an actual --

A    Actually, to Jim Barq- -- Barquinero.

Q    Okay.  So who's the --

A    He's the head of the department.

Q    Executive vice president of athletics and something?  Is that what it is?  I can't --

A    Yeah.  Of everything.

Q    Of everything?

A    Yeah.

Q    Okay.

A    Facetiously, he's the vice president in charge of -- in charge of admissions retention, student life, and academics -- and athletics.

Q    Okay.

A    Not academics.

Q    So he is -- he's your boss?

A    That's right.

Q    Okay.  And so would, for instance, Paul Gagliardi's termination have gone to Jim Barquinero to be signed off on?

A    Yeah.

Q    -- about --

A    -- spoke -- okay.  Well, I definitely talked to Mike Guastelle, Brad, Jim.

Q    Jim Barquinero?

A    Barquinero.

I think he likes to say it Barquinero, even though it's -q-u.

Rob Hardy.

Q    Hardy?

A    Some players.

Q    What players?

A    I don't recall.

Q    Do you recall?

A    Yeah.  Yeah.  So, again, the question is:  Specifically remember talking to people about firing him?

Q    That was my question.

A    Yup.

Q    Yeah.

A    I don't think it went outside to the -- the players weren't part of that.

Q    Okay.  Did you speak to players about Paul Gagliardi's performance as a tennis coach?

A    Yes.

Q    And how many players did you speak to, if

you can recall?

A      Four.  Possibly more.

Q      And was that on different occasions or was that in -- on one occasion?

A      It was always in passing.

Q      Okay.  Walking down the sidewalk on campus and --

A      My office is in the lobby.

Q      Okay.

A      I work out in the weight room, and I talk to as many players as I can as often as I can.

Q      And do you recall what any of those players said to you about Paul Gagliardi?

A      Oh, there was mixed reviews.  Yeah.

Q      Give me a sense.  Do you remember anything negative that was said about Paul?

A      Well, just about him not showing up, you know.  Actually, they were asking for other coaches on the team, so -- because their practices were coach-less at times.

Q      And how many students brought that up with you?

A      More than one.

Q      On how many occasions?

A      More than one.

Q       More than one for each of them?

A       It seemed to be a reoccuring theme with the people I talked to.

Q       But you don't remember any of their names -- the students?

A       I don't.

Q       Okay.  Do you know who -- withdrawn.

        Why was Paul Gagliardi terminated?

A       Well, the ultimate reason was he didn't show up for a pretty important match that he assured his administrator he would be at.

Q       And --

A       But that was the -- the final act of being late or not showing up.

Q       Was it --

A       It was a continued -- it -- it was a trend.

Q       By "administrator," you're referring to Mike --

A       Yes.

Q       -- Guastelle?

        And do you know what -- what match it was that he didn't show up for?

A       No.

Q       Do you know if that was a multi-day match

late to practices?

A      Yes.

Q      Do you know how many practices --

A      No.

Q      -- he had been late to?

A      (Witness shakes head.)

Q      Do you know if the student athletes were told by Paul Gagliardi that he was going to be late?

A      No.

Q      Meaning, No, he hadn't told them, or, No, you don't know?

A      No, I don't know.

Q      Okay.  Do you know whether an assistant coach was ever at those practices when Paul was late for those practices?

A      Yes.

Q      And what do you know about that?

A      That we tried to get coverage at all times.

Q      Do you know how late Paul was to any of these particular --

A      No.

Q      -- practices?

       Do you know why Paul was late to these

practices?

A    Because he had a full-time job.

Q    And do you know what that full-time job was?

A    He was a teacher.

Q    And with respect to the reason for Paul's termination, were there any other factors that played into the decision, other than the match that you discussed and his having been late to one or more practices?

        MR. STERLING:  Objection.

A    As I mentioned, it was a continuous problem that was always being addressed.

BY MR. HEISER:

Q    What -- what was the continuous problem?

A    His lack of commitment.

Q    Do you know when that lack of commitment started?

A    Sometime after the first time I heard about it.

Q    Do you remember when the first time you heard about it was?

A    I do not.

Q    Do you remember how you heard about it the first time?

to you by someone.  Correct?

    A     Yes.

    Q     And who was it that actually made that recommendation to you?

    A     The only direct report I have, Brad Hurlbut.

    Q     Okay.  And did you discuss that recommendation from Brad with anyone else?

    A     Yes.

    Q     And -- and who did you discuss that with?

    A     Mike Guastelle, Rob Hardly [sic] -- Hardy, Dave Bike, and Barq- -- Barquinero.

    Q     I'm -- I'm sorry.  Who is Dave?

    A     I mean, that's probab- -- o- -- over lunch.

    Q     Okay.

    A     Yeah.

    Q     But who's Dave?

    A     He's the -- the ex-basketball coach who the court is named for.

    Q     What's his last name?

    A     Bike, B-i-k-e.

    Q     And why would you have discussed it with Dave Bike?

A       He's a former AD here at school, knows all of the inner workings much better than I do, and I've used him at times to give me guidance.

Q       Kind of a sounding board for you?

A       I would call it a sounding board.

Q       Okay.  And of the people that you've mentioned, in coming to your decision on whether to agree to the recommendation that's been made by Brad, whose input did you consider?

A       I like to think I use all input in making any decision I do in life.  So I can't say that there's a person's input.  I gather everything.

Q       The reason I ask the question is:  Do you specifically remember talking to Jim Barquinero before you agreed to the recommendation?

A       I don't specifically remember that.

Q       Okay.  Obviously, you spoke to Brad before?  He brought it to you.  Correct?

I mean, you couldn't have agreed to his recommendation without him having brought it to you.  Is that fair to say?

A       Yeah.

Q       Okay.  I didn't think that was complicated.

Q       -- you know, take -- feel free to take his comment on it.

A       Yeah.  I remember -- kind of remember the situation.

Q       Okay.  Do you know why the equestrian coach was moved from full-time to part-time?

A       Why?

Equestrian's an emerging sport.  We were hoping it to become recognized as a full-time Division I.  In order to do that, we need to recruit better, have a recruiting budget, and have a full-time commitment.

Q       Did Title IX compliance considerations play into that decision at all?

A       It was happening at a similar time.  But that's just been the time I've been here.

They -- the evolving of this Division I department has evolved since I got here.  And the -- that -- I don't know if it was an investigation or whatever it was from Title IX was concurrent to that time that I took the job.

So I don't know which came first, the chicken or the egg.

Q       I -- I'm not sure I -- I understand the question [sic].

there's a lot of reasons it would happen.  Maybe we already had it.

BY MR. HEISER:

Q    But --

A    I have no idea.

Q    Okay.  Fair enough.

Are you aware of a comparative analysis being undertaken with respect to the men's tennis head coach and whether it should be a full-time or a part-time position?

A    I believe every position that I have in my org chart has, one time or another, had that evaluation.

Q    And when those evaluations are completed, do -- is that something that is maintained by the athletic department?

A    The hard copy?

Q    Hard copy, electronic copy.

I mean, if you wanted to go and look at --

A    I probably could.

Q    Okay.  It's not something you discard as a business practice?

MR. STERLING:  Objection.

A    I never have.

compliance would come into play in similar decisions?

MR. STERLING:  Objection.

A    It could.

BY MR. HEISER:

Q    And under what circumstances could it?

MR. STERLING:  Objection.

A    It'd be too hypothetical.

BY MR. HEISER:

Q    Has it with respect to similar decisions?

MR. STERLING:  Objection.

A    Not to my recollection.

BY MR. HEISER:

Q    In making the equestrian coach -- or moving the equestrian coach from part-time to full-time, was Title IX a compliance a consideration?

A    Compliance?  It was part of the discussion.

Q    And what -- what aspect of that discussion was Title IX?

A    That if the -- if equestrian became an official Division I sport and stayed there, and it was a women's sport, that would then add to our

women's rosters' sizes.

Q    And what's the status of equestrian, right now, in terms of Division I status?

A    Today?  It might have changed from yesterday.

Q    As far as you know.

A    As far as I -- I know -- it's in order to have Division I status.  They have to have one national champion.  There's two divisions of the NCAA equestrian world.

Q    Oh, okay.

A    They're not a unified -- they don't have a unified champion.  Without a unified champion, they can't be --

Q    Consol- --

A    -- totally Division I --

Q    Okay.

A    -- according to the people in Indianapolis.  It's moving toward that -- supposedly, that situation of having one national champion.

Q    Okay.  And is that -- is there a -- what -- what's -- is there a division that's considered Division I of equestrian?  Or do we just have two different entities that are slowly

the --

A    Uh-huh.

Q    -- actual term of art?

Does Sacred Heart have any emerging sports teams presently?

A    No.  I don't -- not to my knowledge.

Q    As far as you know, none of the club teams are being treated as an emerging sport?

A    No.

Q    Okay.  Do you, for -- if you know, for Title IX purposes, is equestrian counted on the women's side of the ledger for Sacred Heart right now?

A    I don't know.

Q    Okay.  With respect to the move of the rowing coach from part-time to full-time, was Title IX compliance a consideration in that decision?

A    It was part of the decision.

Q    And what part of the decision was it?

A    That a full-time coach could recruit more members to the team.

Q    So it was only a consideration with respect to the ability to raise the numbers of student athletes?

A    That was the consideration.  It wasn't the only consideration.  That was the consideration referring to Title IX.

Q    And -- thank you.

A    In respect to Title IX.

Q    That -- that -- and my question was poorly worded, 'cause I meant only with respect to Title IX.

So how about with respect to the bowling team and the move from that coach being part-time to full-time?  Same consideration?

A    Not as much, as I recall.

When you say "same" -- I think there is a difference, because we're building a facility with a bowling alley.

Q    That's one of the things that's going in the Valentine --

A    In the Valentine.  So we're going to have six lanes.  And we just -- we felt:  How could we not have a program with a -- without a head coach if we're going to showcase bowling?

Q    And bowling's been a pretty successful sport --

A    They do --

Q    -- for Sacred Heart?

                        C E R T I F I C A T E

        I hereby certify that I am a Notary Public,

in and for the State of Connecticut, duly

commissioned and qualified to administer oaths.

        I further certify that the deponent named in

the foregoing deposition was by me duly sworn, and

thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me

stenographically in the presence of counsel and

reduced to typewriting under my direction, and the

foregoing is a true and accurate transcript of the

testimony.

        I further certify that I am neither of

counsel nor attorney to either of the parties to

said suit, nor am I an employee of either party to

said suit, nor of either counsel in said suit, nor

am I interested in the outcome of said cause.

        Witness my hand and seal as Notary Public

this _____3rd_____ day of _____July_____ , 2018.




                    _San Edwards_____

                            San Edwards

                            Notary Public

My commission expires:  11/30/2021

CONFIDENTIAL
EDWARDS COURT REPORTERS, LLC
edwardscourtreporters@comcast.net