**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PAUL GAGLIARDI, | : Civil Action No. 3:17-cv-00857(VAB) |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| SACRED HEART UNIVERSITY, | : OCTOBER 26, 2018 |
| | : |
| Defendant. | : |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF FACTS

COMES NOW, the plaintiff, Paul Gagliardi, and in support of his Opposition to Motion for Summary Judgment, provides the following statement of facts:

1. SHU's Men's Tennis Team competes at the NCAA Division I level, within the Northeast Conference ("NEC"). (Transcript of Plaintiff's March 16, 2018 deposition, "Pl. Dep.," attached as Exhibit A, p. 27.)

**RESPONSE:** **Admit.**

2. In 2006, SHU hired Plaintiff to be the Head Coach of its Men's Tennis Team. (Pl. Dep. at 18.)

**RESPONSE:** **Admit.**

3. Plaintiff had not previously served as a collegiate head tennis coach. (Pl. Dep. at 14 and Exhibit 1, attached as Exhibit B.)

**RESPONSE:** **Admit.**

4. From 1999 until 2005, Michael J. Guastelle had coached both the Men's and Women's Tennis Teams at SHU. (Transcript of Guastelle's June 21, 2018 deposition, "MG Dep.," attached as Exhibit C, at 7-8.)

**RESPONSE:** **Admit.**

     5.     Mr. Guastelle is male. (Pl. Dep. at 131.)

**RESPONSE:** **Admit.**

     6.     The decision to hire Plaintiff was made by Mr. Guastelle, who at the time was also SHU's Senior Associate Athletic Director and retained his duties as Women's Tennis Coach. (Pl. Dep. at 19; MG Dep. at 8, 10, 33.)

**RESPONSE:** **Admit.**

     7.     Plaintiff agreed to an annual salary of $5,000, which was "part time pay" for what he claims was "full-time hours." (Pl. Dep. at 19.)

**RESPONSE:** **Admit.**

     8.     Throughout his employment with SHU, Plaintiff reported to Mr. Guastelle. (Pl. Dep. at 20; MG Dep. at 33.)

**RESPONSE:** **Admit.**

     9.     Mr. Guastelle's duties as Senior Associate Athletic Director, a position he held along with Women's Tennis Coach throughout Plaintiff's employment, included internal operations and sport administration, which entailed working with SHU's coaches to develop budgets, create schedules, draft contracts and make travel arrangements. (MG Dep. at 11-12, 33.)

**RESPONSE:** **Admit.**

     10.    Mr. Guastelle was a full-time employee. (MG Dep. at 36.)

**RESPONSE:** **Admit.**

11.     Mr. Guastelle's duties as Senior Associate Athletic Director took up approximately seventy percent (70%) of his time and his tennis duties took up approximately thirty percent (30%) of his time. (MG Dep. at 36-37.)

**RESPONSE:     Denied.  That is an inaccurate estimate based on the many overlapping duties of Guastelle and the plaintiff, mandated coach responsibilities and basic review of the team web sites and schedules. (Gagliardi Aff. ¶ 8.)   By Guastelle's own admission, the duties of the Head Tennis Coach, even the plaintiff's alleged part-time position, would exceed 25 hours per week in season and he estimated the maximum hours he worked at 50-60 hours per week and 40 hours during the summer.  (Gagliardi Aff. ¶ 9.)  According to Guastelle, during the periods of active matches the tennis coaches were working approximately 30 hours per week. (MG Dep. at 48.)**

12.     Mr. Guastelle worked approximately 50-60 hours per week during the academic year and approximately 40 hours per week during the summer. (MG Dep. at 37-38.)

**RESPONSE:     Admit.**

13.     Mr. Guastelle has been employed by SHU for approximately twenty-four (24) years. (MG Dep. at 6.)

**RESPONSE:      Admit.**

14.     During Plaintiff's time at SHU, Mr. Guastelle also served as the Director of Tennis with responsibility over SHU's entire tennis program, which entailed significant additional administrative roles for both the Men's and Women's teams such as travel and scheduling. (Pl. Dep. at 20; MG Dep. at 34-35.)

**RESPONSE:** Denied. Guastelle's alleged additional roles cited by the defendant were roles Guastelle already had as the Senior Associate Director Athletics or the Head Coach of the Women's Tennis Team. (Gagliardi Aff. ¶ 4.) Guastelle was responsible for overseeing travel and scheduling for all of the teams under his purview, which includes tennis as well as golf, baseball, men's volleyball and others. (Gagliardi Aff. ¶ 5.) In reality, with the exception of some limited assistance from Guastelle, the plaintiff made the travel arrangements for the Men's Tennis Team and handled the scheduling for the team. (Gagliardi Aff. ¶ 6.)

15. Other sports at SHU do not have an analogous "director" position, but Tennis did because Guastelle's full-time position allowed him to help Plaintiff by freeing up Plaintiff to focus more on recruiting and his team. (MG Dep. at 35-36.)

**RESPONSE:** Denied. See Response to ¶ 14.

16. From 2011 to 2016, the Men's Tennis Team at SHU shared equally with the Women's Team an assistant coach, Matt Cook. (Pl. Dep. at 33-34.)

**RESPONSE:** Admit.

17. During Plaintiff's employment at SHU, the Men's and Women's Golf Teams shared a part-time assistant. (RH Dep. at 55; Pl. Dep. at 111.)

**RESPONSE:** Admit.

18. During Plaintiff's employment at SHU, Women's Rowing, Bowling, and Rugby had no assistant coach. (MG Dep. at 104-106.)

**RESPONSE:** Denied. While the plaintiff was tennis coach, Women's Rugby and Rowing had a full-time assistant coach and Bowling had at least a part-time assistant coach. (Gagliardi Aff. ¶ 61-63.)

19. In the 2007-2008 academic year, in addition to coaching at SHU, Plaintiff held a full-time teaching position in the Branford Public School District. (Pl. Dep. at 30.)

**RESPONSE:** **Admit.**

20. For the 2011-2012 academic year, Plaintiff held a ".8" teaching position with the Fairfield Public School District, meaning that it was 80% of a full-time position. (Pl. Dep. at 30-31.)

**RESPONSE:** **Admit.**

21. Plaintiff also held, for some time, a full-time position with the United States Tennis Association ("USTA") while employed at SHU. (Pl. Dep. at 30.)

**RESPONSE:** **Admit.**

22. Plaintiff's teaching contract with Branford was non-renewed, in part, because he was not able to perform his full-time teaching duties due to his coaching responsibilities at SHU. (Pl. Dep. at 31-32.)

**RESPONSE:** **Admit.**

23. Plaintiff assumes that his non-renewal by Fairfield was also for this reason. (Pl. Dep. at 56-57.)

**RESPONSE:** **Admit.**

24. At SHU full-time employment is considered 35 hours per week or more, for 40 or more weeks per year. (Transcript of Hardy's June 25, 2018 deposition, "RH Dep." attached as Exhibit D, at 38; Employee Handbook, relevant pages attached as Exhibit E, p. 82.)

**RESPONSE:** **Admit.**

25. SHU's part-time with benefits classification requires working 20 or more hours per week. (RH Dep. at 39; Exhibit E, p. 82.)

**RESPONSE:** **Admit.**

26. Decisions at SHU about whether coaches are part-time or full-time are based upon financial considerations, benchmarking against other institutions, as well as Title IX compliance. (MG Dep. at 42; Transcript of Valentine's June 22, 2018 deposition, "RV Dep.," attached as Exhibit F, at 98.)

**RESPONSE:** **Admit.**

27. SHU's primary benchmarking focus is to make sure that SHU is treating positions similar to other NEC schools. (MG Dep. at 66.)

**RESPONSE:** **Admit.**

28. During Plaintiff's employment at SHU, SHU employed several full time male head coaches, for the sports of Men's: Football, Lacrosse, Ice Hockey, Wrestling, Cross Country, and Track and Field. (MG Dep. at 77-78.)

**RESPONSE:** **Admit.**

29. SHU had a single coach for both the men's and women's teams for the following sports: Golf, Fencing, and, currently, Tennis. (MG Dep. at 43, 44.)

**RESPONSE:** **Admit.**

30. Shortly after his employment with SHU began in 2006, Plaintiff began asking for raises and that his job be changed to full-time. (Pl. Dep. at 62-63.)

**RESPONSE:** **Admit.**

31. Sometime between 2013 and 2014, Plaintiff wrote a "proposal" in which he asked to be moved to full-time status and estimated that he was "currently logging 1400 total hours a year." (Pl. Dep. at 63-65, Exhibit 7 attached as Exhibit G.)

**RESPONSE:** **Admit.**

32. In May 2014, Plaintiff e-mailed Julia Nofri, SHU's Human Resources Director, stating that he had recently spoken to Guastelle about increasing his position to full-time, but there was "no resolution." (Pl. Dep. at 67-68, Exhibit 9 attached as Exhibit H.)

**RESPONSE:** **Admit.**

33. In that e-mail, Plaintiff estimated his annual hours worked to "1,450 hours plus." Id.

**RESPONSE:** **Denied that the email provided the explicit estimate of 1,450 hours. That figure was hand-written on the email. (Ex. H.)[1]**

34. At his deposition, Plaintiff estimated that he worked between 1,400 and 1,600 hours a year at SHU. (Pl. Dep. at 133.)

**RESPONSE:** **Admit.**

35. In Plaintiff's June 2014 evaluation, Guastelle rated Plaintiff's performance as either "solid performance" or "above expectation" in each category rated. (Pl. Dep. at 65-66, Exhibit 8 attached as Exhibit I.)

**RESPONSE:** **Admit.**

---

[1] Letter Exhibits, unless otherwise indicated, refer to the exhibits attached to the defendant's Local Rule 56(a)(1) Statement.

36. In the "employee comments" section of his June 2014 evaluation, Plaintiff raised a concern about being a part-time employee evaluated "on the same scale as a full time employee." (Exhibit I, p. 4.)

**RESPONSE:** **Admit.**

37. Plaintiff's July 2015 evaluation, performed by Mr. Guastelle, rated Plaintiff's performance lower. (Pl. Dep. at 72, Exhibit 10 attached as Exhibit J.)

**RESPONSE:** **Admit.**

38. Mr. Guastelle wrote the following comment on the evaluation:

> As the program's administrator, my main concern with Paul is his overall attitude towards the head coaching position being a part-time position. Being a part-time head coach is difficult and definitely has its challenges, however, this cannot be the reason for a lack of enthusiasm and commitment needed in order for the program to improve from its current state. He is an excellent coach and teacher of the game and I look forward to helping him any way so I can to make the program better competitively, administratively, etc. this upcoming year.

(Exhibit J.)

**RESPONSE:** **Admit.**

39. Plaintiff's employee comments on the 2015 evaluation again made a request for full-time employment. Id.

**RESPONSE:** **Admit.**

40. Brad Hurlbut, SHU's Deputy Director of Athletics, reviewed and signed the evaluation as the "next level supervisor" and included the following comments:

> I agree with Mike's assessment of Paul being a part-time coach has its drawbacks…. Paul needs to embrace the program and be more positive as the position will not be made full-time in the

near future. We do not have the resources at this time to do so unfortunately.

(Pl. Dep. at 40, 72-73, Exhibit J.)

**RESPONSE:** **Admit.**

41.     On October 20, 2015, Plaintiff submitted a letter to SHU's Human Resources Department in which he claimed that he had been denied full-time status and "ancillary resources" as a result of "discrimination" based on his gender. (Pl. Dep. at 74-75, Exhibit 11, attached as Exhibit K.)

**RESPONSE:** **Admit.**

42.     On or about November 10, 2015, SHU's Vice President for Human Resources, Robert Hardy, met with Plaintiff to address his concerns. (Pl. Dep. at 76, 77.)

**RESPONSE:** **Admit.**

43.     During their discussion, Mr. Hardy asked Plaintiff to clarify whether his claim was that he was being discriminated against because of his own gender or because of the gender of the athletes he coached, and Plaintiff clarified it was because of his own gender. (Pl. Dep. at 78.)

**RESPONSE:** **Admit.**

44.     Thereafter, Mr. Hardy spoke with Messrs. Hurlbut and Guastelle, who both stated that the position did not merit full-time status. (RH Dep. at 42-43.)

**RESPONSE:** **Admit.**

45.     Mr. Hardy set-up another meeting to discuss the issues in late December 2015 with Plaintiff and Robert Valentine, SHU's Director of Athletics. (Pl. Dep. at 78-79.)

**RESPONSE:** **Admit.**

46. On January 19, 2016, Mr. Hurlburt wrote to Hardy, Valentine and Nofri explaining that he had received a draft of the NEC's annual salary survey and that it contained information from all schools in the conference, especially the salaries of the coaches of the men's tennis teams of the seven (7) schools. (E-mail attached as Exhibit L; see RH Dep. at 46.)

**RESPONSE:** **Admit.**

47. Comparative analyses were commonly used by SHU in evaluating how to compensate positions within the athletic department. (RV Dep. at 98.)

**RESPONSE:** **Admit.**

48. Hurlbut's January 19, 2016 e-mail reported that:

> Of 7 teams in NEC, 4 are reporting as full-time. The highest that has no additional duties is $27,377. There is one at $43k and another at $30k, but both have duties as head women's coach as well.

> Other 3 in NEC are: $18K for a full-time, 10K for a PT, and 2K for a GA. I feel strongly we stick with what we are paying other PT Head Coaches: $20k.

(Exhibit L; see also relevant portions of 2015-15 NEC Athletic Department Survey – SHU, attached as Exhibit M; MG Dep. at 67-69.)

**RESPONSE:** **Admit.**

49. As a result of Plaintiff's complaint, SHU's internal discussions and assessment, effective January 1, 2016, Plaintiff's annual salary was increased to $20,000 (from $13,800), and he became eligible to receive standard fringe benefits from SHU. (Pl. Dep. at 79-81, Exhibit 12, attached as Exhibit N; RH Dep. at 53.)

**RESPONSE:** **Admit except to the extent that SHU contends that the plaintiff "became eligible to receive standard fringe benefits." The plaintiff should already have been benefits**

**eligible based on his hours worked. Part-time employees are benefits eligible if they work twenty hours or more a week. (RH Dep. at 38-39.)[2]**

50.     Plaintiff told Mr. Hardy that he was satisfied with this outcome. (RH Dep. at 54.)

**RESPONSE:     Denied. The plaintiff told Hardy specifically that he was not satisfied with the increase in pay or the benefits because there was no resolution of the issue the plaintiff raised concerning his evaluation as a full-time coach, while working full-time hours, but being paid as and labeled as a part-time employee. (Gagliardi Aff. ¶¶ 18-19.)**

51.     Plaintiff was told not to exceed working 25 hours per week. (RH Dep. at 59.)

**RESPONSE:     Admit.**

52.     On July 30, 2016, Plaintiff wrote to Mr. Hardy, copying James M. Barquinero, Vice President for Enrollment Planning and Student Affairs. (Pl. Dep. at 86, Exhibit 14, attached as Exhibit O.)

**RESPONSE:     Admit.**

53.     In the letter, Plaintiff made claims that he was being discriminated against because of his gender due to his part-time status "because of a Title IX issue." (Exhibit O.)

**RESPONSE:     Admit.**

54.     Plaintiff stated that he would "strictly adhere to" a 25 hours per week schedule, under which "the team may not function in a way it has in the past." (Exhibit O.)

**RESPONSE:     Admit.**

---

[2] Deposition transcripts are attached hereto at Ex. 2 (Michael Guastelle ("MG"), June 21, 2018), Ex. 3 (Robert Hardy ("RH"), June 25, 2018), Ex. 4 (Paul Gagliardi ("PG"), March 16, 2018), and Ex. 11 (Robert Valentine ("RV"), June 22, 2018).

55.  He continued: "[s]o there may not be a coach to take the players to most matches or tournaments, practice appropriately, fundraise and recruit…." (Exhibit O.)

**RESPONSE:** **Admit.**

56.  For the 2016-17 academic year, Plaintiff took a full-time public high school teaching job in Ansonia. (Pl. Dep. at 103-04.)

**RESPONSE:** **Admit.**

57.  Plaintiff understood that, as had been the case with his past full-time teaching jobs, there would be conflicts with his coaching job. (Pl. Dep. at 105.)

**RESPONSE:** **Admit.**

58.  In summer 2016, Plaintiff refused to sign his 2015-2016 performance review. (MG Dep. at 214-15, Exhibit 19, attached as Exhibit P.)

**RESPONSE:** **Admit.**

59.  The review had noted that Plaintiff had become disengaged from the Athletic Department and that his attitude needed to change to promote a positive environment for student athletes in the Tennis Program. (Exhibit P; MG Dep. at 225-30.)

**RESPONSE:** **Admit.**

60.  On September 7, 2016, Plaintiff met with Hardy to discuss his part-time status and hours worked, as well as his annual evaluation. (Pl. Dep. at 101-02.)

**RESPONSE:** **Admit.**

61.  On September 16, 2016, Plaintiff wrote an e-mail to Messrs. Valentine, Guastelle and Hurlbut stating that he had met with Mr. Hardy and that Mr. Hardy:

> places blame on the athletic department admin for all his Hr [sic]
> problem response and in your defense I stated all this baton

passing seems inappropriate. Despite all these reindeer games on a macroscopic scale, I appreciate all the positive changes in the athletic department.

(Pl. Dep. at 101, Exhibit 15, attached as Exhibit Q.)

**RESPONSE:**   **Admit.**

62.     Mr. Hardy considered, based upon this content, that Plaintiff had become disruptive. (RH Dep. at 67.)

**RESPONSE:**   **Admit.**

63.     Mr. Hardy responded to Plaintiff's September 16, 2016 email:

I was disappointed to see this e-mail as I thought when we met on September 7 you wanted to have me /HR address your concerns. I am uncertain how you drew these conclusions when I hadn't even met with [Messrs. Valentine, Hurlbut or Guastelle] to address your concerns. Nonetheless, I am meeting with Mike Guastelle tomorrow morning to get his perspective on your issues.

(Exhibit Q.)

**RESPONSE:**   **Admit.**

64.     Mr. Hardy discussed with Guastelle the hours that Plaintiff had entered into SHU's Kronos timekeeping system. (RH Dep. at 33-34, 57, Exhibit 8, attached as Exhibit R, p. 2.).

**RESPONSE:**   **Admit.**

65.     Mr. Guastelle believed that Plaintiff was fabricating his hours to exceed 25 per week. (MG Dep. at 171.)

**RESPONSE:**   **Admit that Guastelle "felt" that the hours were being fabricated.  Denied that he testified that the alleged fabrication was intended "to exceed 25 per week."  (MG Dep. at 171-72.)**

66.     In summer 2016, Plaintiff ran a youth tennis camp at SHU that was sponsored by Nike. (Pl. Dep. at 96-97.)

**RESPONSE:     Admit.**

67.     Plaintiff was not paid by SHU for this private camp. (Pl. Dep. at 100.)

**RESPONSE:     Admit.**

68.     That summer, he went on vacation to Cape Cod for a week in July and went on a Caribbean cruise in August. (Pl. Dep. At 99.)

**RESPONSE:     Admit.**

69.     Mr. Guastelle disputed the hours that Plaintiff had entered when he was on vacation and working at the private camp. (MG Dep. at 113, 115-118, Exhibit 7, attached as Exhibit S.)

**RESPONSE:     Admit.**

70.     Mr. Guastelle also took issue with time that Plaintiff attributed to his work at SHU based on his claim that he attended a professional tennis tournament "representing" SHU. (MG. Dep. at 165.)

**RESPONSE:     Admit.**

71.     Plaintiff "commingled" hours in Kronos between his SHU work and his non-SHU work, such as for private tournaments he organized. (Pl. Dep. at 152-53.)

**RESPONSE:     Admit.**

72.     As the Fall 2016 season began, Plaintiff had been arriving late to practice, and Guastelle received complaints from players that they were forced to start running the practices themselves. (MG Dep. at 127, 184.)

**RESPONSE:** **Objection.  The referenced alleged complaints are hearsay, inadmissible, and should not be considered by the Court.  Denied as to the allegation that "Plaintiff had been arriving late to practice."  In the Fall of 2016, the plaintiff made the schedule for the Men's Tennis Team practices with his full-time teaching job in mind.  (Gagliardi Aff. ¶ 44.) He knew there would be occasions when he would be late to practice. (Gagliardi Aff. ¶ 45.)  For those occasions, he told the team members to warm up at the courts for the first half hour. (Gagliardi Aff. ¶ 46.) He would then arrive and have formal practice for another two and a half hours with the team.  (Gagliardi Aff. ¶ 47.) This was not a surprise to SHU as he had advised Hardy that he would have to be late to some practices.  (Gagliardi Aff. ¶ 48.)**

73.    Players also mentioned to Valentine that Plaintiff was missing time from practices. (RV Dep. at 61-62.)

**RESPONSE:** **Objection.  The referenced alleged complaints are hearsay, inadmissible, and should not be considered by the Court.**

74.    Plaintiff was late to every practice by at least a half hour because of conflicts with his teaching job. (Pl. Dep. at 127.)

**RESPONSE:** **Denied.  The plaintiff was able to arrive at practice at 3:30 pm from his teaching job in Ansonia.  That was the "official start of practice."  However, he told the players to arrive at 3:00 pm so that they could warm up and be ready for his arrival. (Gagliardi Dep. at 127.)**

75.    Plaintiff also missed between two and five practices. (Pl. Dep. at 126.)

**RESPONSE:** **Denied.  There were also occasions where the plaintiff missed practice. (Gagliardi Aff. ¶ 51.) On those occasions, the part-time assistant, Matt Cook, covered the**

practices. (Gagliardi Aff. ¶ 52.) Cook also covered practices for Mike Guastelle for the Women's Tennis Team. (Gagliardi Aff. ¶ 53.)

76. In Fall 2016, Plaintiff was late to a tournament at Yale University, arriving at 3:00 PM on a Friday while the matches began at 10:00 AM. (Pl. Dep. at 126.)

**RESPONSE: Admit.**

77. On Sunday, September 11, 2016, Guastelle met with Plaintiff and Coach Cook and discussed a tournament at the University of Connecticut that was beginning the following Friday, September 16, 2016. (MG Dep. at 123-24.)

**RESPONSE: Denied. That meeting did not occur as contended by Guastelle; in fact, the plaintiff was at a tennis tournament in Branford on September 11, 2016, and was not on campus at SHU. (Gagliardi Aff. ¶ 37.)**

78. The reason for the meeting was because Guastelle wanted to make sure that all the matches at the tournament had a coach covering them, given that Guastelle would be away with the Women's Team and Coach Cook was unavailable. (MG Dep. at 123-24.)

**RESPONSE: Denied. The plaintiff did have discussions with Guastelle regarding the fact that he would not be able to attend the Friday portion of the UConn tournament taking place that weekend and needed Cook to attend. (Gagliardi Aff. ¶ 38.)**

79. Plaintiff assured Guastelle that he would be at the tournament on Friday. (MG Dep. at 124.)

**RESPONSE: Denied. Guastelle also had a conflict and needed Cook to cover a match at Quinnipiac the same day. (Gagliardi Aff. ¶¶ 38-39.)**

16

80. Mid-way through the week, Plaintiff called Guastelle and stated he would not be at the Friday matches because of a conflict with his new full-time teaching job. (MG Dep. at 124; Pl. Dep. at 125.)

**RESPONSE: Denied. The plaintiff spoke to Guastelle on Tuesday or Wednesday that week and was surprised to learn that he had already slotted Cook to cover for him. They worked out the situation and it was agreed that Cook would cover for the plainitff on Friday at UConn. Unfortunately, Cook broke his ankle in the interim and was not able to cover for the plainitff on Friday. (Gagliardi Aff ¶¶ 40-42.)**

81. Plaintiff did not attend the first day of the tournament. (Pl. Dep. at 124.)

**RESPONSE: Admit.**

82. Plaintiff "waited until the last minute" to provide Mr. Guastelle with notice. (Pl. Dep. at 153.)

**RESPONSE: Admit that the phrase "waited until the last minute" was used in the deposition. However, the plaintiff testified that he "waited until that week" and further stated that he had previously told Guastelle that he "would not be able to do everything if [he] was going to be considered part-time." (Gagliardi Dep. at 153.) The discussion occurred on Tuesday or Wednesday of that week. (Gagliardi Aff. ¶ 40.)**

83. As a result of Plaintiff's absence, the team was unable to compete in the doubles portion of the tournament. (MG Dep. at 124.)

**RESPONSE: Denied. Friday night was to be covered by Cook. However, after he broke his ankle, that portion of the tournament could not be covered. (Gagliardi Aff. ¶¶ 40-41.)**

17

84. In a meeting on September 28, 2016, Plaintiff was informed that his employment was being terminated. (Pl. Dep. at 107.)

**RESPONSE:** **Admit.**

85. Plaintiff's employment was terminated because he had become disengaged from his job, including being late to practices and unavailable to coach at matches. (MG Dep. at 29; RV Dep. at 63, 65-66.)

**RESPONSE:** **Denied. Guastelle made the recommendation to terminate the plaintiff on or before September 20, 2016, in a meeting with Human Resources representatives. At that time, there was no mention of tardiness or missing matches as a basis for the recommendation to terminate. (Ex. R.) Guastelle met with Hardy and Julia Nofri from the Human Resources Department on September 20, 2016, to discuss the plaintiff and his requests concerning the part-time status of his position. (RH Dep. p. 71.) At that meeting, Guastelle recommended to the plaintiff be terminated. (Ex. R.) Hardy's notes from the meeting make no mention of the plaintiff's alleged tardiness to practice or the missing of matches as a basis for the recommended termination. Missing practices and matches was not discussed at that meeting as the basis for the recommended termination. (RH Dep. at 71.) In a September 21, 2016, email to Julia Nofri, Hardy and cc'd to Valentine and Hurlburt, Guastelle states that he "would like to get together with Brad [Hurlburt] and/or Bobby [Valentine] to discuss Paul's further employment with the University." (Ex. 5.) The email makes no mention of the plaintiff's alleged tardiness to practice or the missing of matches as a basis for the need to discuss the plaintiff's further employment. (Ex. 5.) Valentine testified that the reason for Gagliardi's termination was that he failed to show up for a tennis match.**

**(RV Dep. at 63.) Hardy understood the reason for termination was the plaintiff missing practices and matches. (RH Dep. at 71.) Hardy met with Guastelle and Nofri on September 20, 2016, at which time he agreed with Guastelle's recommendation to terminate the plaintiff. (RH Dep. at 71.) Exhibit 19 is the PFP presented to the plaintiff on or about September 20, 2016; it makes no mention of his tardiness or missing any practices or matches. (MG Dep. at 215-16.) This was the "final straw" in a continuing problem, which was his lack of commitment. (RV Dep. at 66.) Plaintiff's promised attendance at, and subsequent absence from, the UCONN tournament, was the "last straw" that led Guastelle to recommend that Plaintiff's employment be terminated. (MG Dep. at 123; RV Dep. at 63.)**

86. Plaintiff's promises attendance at, and subsequent absence from, the UCONN tournament, was the "last straw" that lead Mr. Guastelle to recommend that Plaintiff's employment be terminated. (MG Dep. at 123; RV Dep. at 63.)

**RESPONSE: Admit as to the Valentine testimony. Denied as to Guastelle. See Response to ¶ 85.**

87. Mr. Hurlbut brought that recommendation to Mr. Valentine, who made the final decision, which was approved by Mr. Barquinero. (RV Dep. at 30, 41, 69.)

**RESPONSE: Admit.**

88. Mr. Hardy was also involved in the termination decision. (RH Dep. at 19; RV Dep. at 61, 68.)

**RESPONSE: Admit.**

89. Each of the decision-makers in Plaintiff's termination are males. (Pl. Dep. at 131.)

**RESPONSE: Admit.**

90. After plaintiff's termination, for the remainder of the 2016-2017 academic year, Mr. Guastelle assumed coaching duties for the Men's Tennis Team, in addition to his duties as Women's Tennis Coach, Senior Associate Athletic Director, and Tennis Director. (Pl. Dep. at 130.)

**RESPONSE:** **Admit.**

91. Beginning in September 2017, Men's and Women's Tennis teams are now coached by William Boe-Wiegaard, a male. (MG Dep. at 26-27; Pl. Dep. at 130-31.)

**RESPONSE:** **Admit.**

92. The combined position is a full-time position. (MG Dep. at 27, 44.)

**RESPONSE:** **Admit.**

93. Mr. Boe-Wiegaard's salary is approximately $50,000. (MG Dep. at 176.)

**RESPONSE:** **Admit.**

94. Plaintiff does not know who at SHU discriminated against him. (Pl. Dep. at 75.)

**RESPONSE:** **Admit.**

95. Plaintiff has no evidence of any anti-male comments being made against him. (Pl. Dep. at 76.)

**RESPONSE:** **Admit.**

96. Plaintiff testified that he does not have any evidence that Messrs. Hurlbut, Valentine or Hardy or Nofri are prejudiced against men. (Pl. Dep. at 150.)

**RESPONSE:** **Admit.**

97. The soccer teams at SHU have full-time coaches for both the men's and women's teams, which are coached by a male and a female. (See MG Dep. at 78.)

**RESPONSE:** **Admit.**

98. There are only Women's teams, and not Men's teams, for Equestrian, Rowing, Bowling, Field Hockey and Rugby. (See Affidavit of Hurlbut and attachments, attached as Exhibit T.)

**RESPONSE:** **Admit.**

99. The Equestrian, Rowing and Bowling head coach positions were previously part-time but became full-time. (MG Dep. at 61-62.)

**RESPONSE:** **Admit.**

100. Equestrian is an "emerging" sport, and SHU has been attempting to have its program recognized as a full-time NCAA Division I sport, which was based in part upon concerns about complying with the gender equity requirements of Title IX. (MG Dep. at 62; RV Dep. at 80, 112-13.)

**RESPONSE:** **Admit.**

101. In order to make the Equestrian program successful, SHU needed to have a fulltime head coach so it could devote resources to recruiting. (RV Dep. at 80.)

**RESPONSE:** **Admit.**

102. The Equestrian team is large, comprised of between 25 and 30 athletes. (MG Dep. at 108.)

**RESPONSE:** **Admit.**

103. With respect to Rowing, Title IX gender equity was also a consideration in converting the position, to full-time, to allow more intense recruiting efforts. (MG Dep. at 62; RV Dep. at 115-16.)

**RESPONSE:**   **Admit.**

104.   Recruiting is particularly important for Rowing, because the team has a large roster that must be filled: between 40 and 50 athletes. (MG Dep. at 62.)

**RESPONSE:**   **Denied.  Guastelle testified that the position was made full-time due in part to the size of the roster.  He did not testify regarding the importance of recruiting.  (MG Dep. p. 62.)**

105.   With respect to Bowling, SHU's program has been nationally recognized for its success and SHU has been in the process of building a facility to showcase that sport. (MG Dep. at 18; RV Dep. at 116.)

**RESPONSE:**   **Admit.**

106.   Plaintiff did not lead SHU's team to two NCAA Division I team championships; rather the team qualified for the NCAA tournament twice. (Pl. Dep. at 120.)

**RESPONSE:**   **Admit.**

107.   Plaintiff's overall record as head coach was 89 wins and 126 losses. (Pl. Dep. at 128.)

**RESPONSE:**   **Admit.**

108.   Title IX gender equity compliance also had a role in devoting resources to SHU's Bowling program. (MG Dep. at 62; RV Dep. at 116.)

**RESPONSE:**   **Admit.**

109.   SHU's Bowling Team has a significantly larger roster, between 20-25 athletes, as compared with the Men's Tennis Team. (MG Dep. at 108.)

**RESPONSE:** **Denied. Guastelle testified that the Women's Bowling team had a roster of between twenty and twenty-five members. (MG Dep. at 108.) The 2018-2019 SHU Women's Bowling team has a roster totaling fourteen players. (www.sacredheartpioneers.com/sports attached hereto at Ex. 9.)**

110. Due to benchmarking of similar institutions, Men's Wrestling was converted from part-time to full-time. (MG Dep. at 65-66.)

**RESPONSE:** **Admit.**

111. SHU sets annual budgets for each of its teams for recruiting, equipment and fundraising. (Affidavit of Hurlbut and attachments, attached as Exhibit T.)

**RESPONSE:** **Admit.**

112. For the 2016 fiscal year, Men's and Women's Tennis had equivalent recruiting budgets, which exceed the recruiting budgets of the Women's Equestrian and Women's Rowing teams and equaled the budgets of the Women's Swimming and Men's and Women's Golf tea(Exhibit T.)

**RESPONSE:** **Admit.**

113. Mr. Guastelle set the recruiting budgets based on benchmarking with other NEC schools, and comparing overall budgets between men's and women's programs to ensure equity, and also considered the costs associated with the geographic areas where the recruiting is taking place. (MG Dep. at 151-53, 157.)

**RESPONSE:** **Admit.**

114.     The 2016 equipment budgets for the Men's and Women's Tennis Teams were equivalent, and exceeded the equipment budgets of several other sports on a per student athlete basis. (Exhibit T.)

**RESPONSE:     Admit.**

115.     With respect to fundraising budgets, the Men's and Women's Tennis teams had nearly the same amount for the five years preceding 2016, which was near the median of the amounts raised by other teams. (Exhibit T.)

**RESPONSE:     Admit.**

116.     Other schools within SHU's conference, the NEC, either classify their Men's Tennis Coach as a part-time position, or have a single coach for both the Men's and Women's program (which SHU now does as well). (Exhibits L, M.)

**RESPONSE:     Admit.**


### ADDITIONAL MATERIAL FACTS

1.     As a result of passage of the Affordable Care Act, SHU was required to track the hours of its employees more closely than it had in the past. (Gagliardi Aff. ¶ 10.)

2.     The plaintiff was told explicitly by Roberty Hardy and Sally Schettino in Human Resources that he was required to input my hours into the Kronos system used by the university. (Gagliardi Aff. ¶ 11.)

3.     However, other coaches did not use the Kronos system other than to track their vacation time, if at all.  (Gagliardi Aff. ¶ 12.)

4.     The plaintiff had discussed his frustration with the Head Tennis Coach position being designated part-time for several years. (Gagliardi Aff. ¶ 13.)

5. The plaintiff saw that he was working as much if not more than other coaches who were designated as full-time or whose positions transitioned from part-time to full-time during the period from approximately 2013 until his termination. (Gagliardi Aff. ¶ 14.)

6. In 2014, the plaintiff formally raised his continuing concerns with the position being part-time with Human Resources and also in his comments on his annual review. (Gagliardi Aff. ¶ 15.)

7. The plaintiff continued to raise the issue with his supervisor, Mike Guastelle, and Human resources. (Gagliardi Aff. ¶ 16.)

8. In 2016, as a result of the plaintiff raising the issue, the school raised his salary to $20,000 annually from $13,500 and, for the first time, made his position benefits eligible. (Gagliardi Aff. ¶ 17.)

9. When the plaintiff received the pay increase and became benefits eligible, his hours and duties did not change. (Gagliardi Aff. ¶ 20.)

10. Part-time employees at SHU become benefits eligible when they work 20 hours per week for 52 weeks or 25 hours for forty weeks. (Gagliardi Aff. ¶ 21.)

11. The plaintiff had been working well in excess of 20 hours per week for many years but it was not until January 2016, that the University acknowledged that he was eligible for benefits. (Gagliardi Aff. ¶ 22.)

12. The plaintiff continued to complain that the hours worked more than justified a status change to full-time. (Gagliardi Aff. ¶ 23.)

13. In making those complaints, the plaintiff advised the school that it was discriminating against him based on my gender as well as the fact that he coached a men's program. (Gagliardi Aff. ¶ 24.)

14. Up to 2014, his performance evaluations were positive. (Gagliardi Aff. ¶ 25.)

15. The plaintiff was always rated as either meeting or exceeding expectations. (Gagliardi Aff. ¶ 26.)

16. However, after formally raising his concerns about the part-time status of the job as well as his claims that the school was discriminating against him, the plaintiff's performance evaluations became more critical. (Gagliardi Aff. ¶ 27.)

17. The evaluations began to question his "commitment" to the position. (Gagliardi Aff. ¶ 28.)

18. The criticisms were directly related to the plaintiff's complaints about the status of the job, claims of discrimination, and his refusal to "accept" that the position was going to remain part-time. (Gagliardi Aff. ¶ 29.)

19. Brad Hurlburt, the Deputy Director of Athletics, advised that the school did not have the "resources" to make the position full-time. (Gagliardi Aff. ¶ 30.)

20. That clearly was not true based on the changes and increases made to positions and salaries for other coaches and the fact that the new tennis coach who replaced the plaintiff was hired as a full-time coach at a salary of approximately $50,000 annually. (Gagliardi Aff. ¶ 31.)

21. The plaintiff did not think it was possible under the circumstances while still performing all his duties to work 25 hours or less but told Hardy that he would strictly adhere to the 25 hours per week dictate. (Gagliardi Aff. ¶ 32.)

22. Specifically, in correspondence to Hardy the plaintiff told him that there may be times that he would not be able to attend matches, practices or other activities. (Ex. O.) (Gagliardi Aff. ¶ 33.)

23. After the plaintiff went back to Human Resources to further discuss his feeling that the position should be full-time, he was told by Hurlburt, the Deputy Director of Athletics that Hurlburt was "tired of [his] bullshit." (Gagliardi Aff. ¶ 34.)

24. The plaintiff attended the Saturday portion of the UConn tournament, referenced in the Rule 56(a)(1) Statement, working about twelve hours that day and would have also attended on Sunday if the players had more success on Saturday. (Gagliardi Aff. ¶ 43.)

25. Guastelle testified that he received "complaints" about the plaintiff being late, but only references one player by name. (Gagliardi Aff. ¶ 49.)

26. If Guastelle had brought that complaint to his attention, the plaintiff would have had the opportunity to address the issue. (Gagliardi Aff. ¶ 50.)

27. SHU also notes at paragraph 76 that the plaintiff was late to a tournament at Yale in the Fall of 2016. (Gagliardi Aff. ¶ 54.)

28. The tournament in question was a three-day tournament. (Gagliardi Aff. ¶ 55.)

29. Matt Cook covered the first part of Friday until the plaintiff arrived in the afternoon. (Gagliardi Aff. ¶ 56.)

30. The plaintiff was on-site for the remainder of the tournament on Saturday and Sunday from approximately 9:00 a.m. to 6:00 p.m. (Gagliardi Aff. ¶ 57.)

31. This was not unusual as Guastelle had Matt Cook cover matches or tournaments for him as the Head Women's Tennis Coach, including sending Cook as the sole coach on a trip to Dartmouth in October of 2015. (Gagliardi Aff. ¶ 58.)

32. In addition, there were numerous occasions where Guastelle, despite being a full-time employee, had Cook cover practices for him or simply cancelled practices for the Women's Tennis Team. (Gagliardi Aff. ¶ 59.)

33. Robert Valentine, the Executive Director of Athletics, testified at his deposition that he spoke to the plaintiff about my alleged punctuality issues. (Gagliardi Aff. ¶ 60.)

34. That is false; Valentine never spoke to the plaintiff about issues of his punctuality or anything else related to his job performance. (Gagliardi Aff. ¶ 61.)

35. During the plaintiff's tenure as Head Coach, SHU made several additions to the women's teams coaching staffs. (Gagliardi Aff. ¶ 65.)

36. SHU hired the following personnel for women's teams: a full-time rugby coach; full-time assistant coaches for lacrosse, swimming, track and field, rowing, equestrian and rugby; a graduate assistant for lacrosse; a part-time diving coach for swimming; an equipment manager for ice hockey; and changed the status of assistant coaches for volleyball and fencing from part-time to full-time. (Gagliardi Aff. ¶ 66.)

37. During the same period, the University conducted a review of coaching salaries and upgraded the women's coaching salaries without taking the same steps with respect to men's coaching salaries. (Gagliardi Aff. ¶ 67.)

38. Exhibit A to the Gagliardi Affidavit is a September 5, 2017, letter from the U.S. Department of Education Office of Civil Rights ("OCR") concerning that offices audit of the defendant's Title IX compliance. (Gagliardi Aff. ¶ 68.)

39. SHU's athletic program decisions clearly favored women's teams. (Gagliardi Aff. ¶ 69.)

40. For instance, paragraph 105 of the Rule 56(a)(1) Statement notes that the Women's Bowling "program has been nationally recognized for its success and SHU has been in the process of building a facility to showcase that sport." (Gagliardi Aff. ¶ 70.)

41. For the 2015-2016 season, the plaintiff's last at SHU, the Women's Bowling Team was ranked #42 in the country by collegebowling.com. (Gagliardi Aff. ¶ 71.)

42. At the time, there were only 34 Division I teams in the country so the team was actually ranked below Division II and III teams. (Gagliardi Aff. ¶ 72.)

43. In addition, the recruiting for several of the women's teams, despite having significantly higher budgets was easier than for men's teams. (Gagliardi Aff. ¶ 73)

44. For instance, many of the members of the Rowing Team and Rugby Team have not competed in the sport prior to attending SHU and are recruited on campus after arriving. (Gagliardi Aff. ¶ 74.)

45. Guastelle testified that the Women's Fencing team had a roster of between fifteen and twenty members. (MG Dep. p. 108.)

46. The 2018-2019 SHU Women's Fencing team has a roster totaling eleven players. (www.sacredheartpioneers.com/sports, Ex. 7.)

47. Guastelle testified that the Women's Rugby team had a roster of approximately twenty or twenty-five members. (MG Dep. p. 108.)

48. The 2018-2019 SHU Women's Rugby team has a roster totaling eighteen players. (www.sacredheartpioneers.com/sports, Ex. 8.)

49. Guastelle testified that the Women's Rowing team had a roster of between forty and fifty-five members. (MG Dep. p. 108.)

50. The 2018-2019 SHU Women's Rowing team has a roster totaling thirty-nine players. (www.sacredheartpioneers.com/sports, Ex. 9.)

51. Valentine testified that Gagliardi missed a match after telling Guastelle that he would be there. (RV Dep. at 64.)

52. During Valentine's tenure as Athletic Director the only other Head Coach fired was the wrestling coach who basically stopped participating in the school program. (RV Dep. pp. 32-35; MG Dep. pp. 177.)

53. Valentine could not identify any players who complained about the plaintiff. (RV Dep. p. 62.)

54. Valentine was not aware that the plaintiff had asked to become a full-time employee. (RV Dep. p. 75.)

55. All women's teams have at least a part-time assistant coach. (RV Dep. p. 83-84.)

56. There are no part-time head coaches of any women's teams. (RV Dep. p. 84.)

57. Valentine made the decision to terminate because the plaintiff did not "show up" for a match. (RV Dep. at 63.)

58.     Missing the match was the "final straw" in a "continuing problem" that Valentine described as a lack of commitment. (RV Dep. 63, 66.)

59.     Valentine never discussed the plaintiff's "continuing problem" with the plaintiff, although he had regular conversations with him.  (RV Dep. at 162-63.)

60.     SHU has no part-time female head coaches and all women's teams have at least a part-time assistant coach.  (RV Dep. 83-85.)

61.     Valentine does not know if coaches are supposed to use Kronos.  (RV Dep. at 126.)

62.     Guastelle believed that Kronos was only used to track vacation hours.  (MG Dep. at 71.)

63.     In emails concerning the plaintiff's use of Kronos, Hurlburt refers to the plaintiff as a "liar".  (MG Dep. at 88; Ex. 10 at 1.)

64.     Valentine recalls that the plaintiff's use of Kronos was "part of the conversation" related to the plaintiff's termination.  (RV Dep. at 130.)

65.     Coaches were instructed to enter their time into the Kronos system and Hardy believed that the coaches were tracking their hours in the Kronos system.  (RH Dep. at 34-36.)

66.     The Affordable Care Act required that the hours be tracked to ensure that employees are meeting the hours to be benefits eligible. (RH Dep. at 37.)

67.     Employees need to work twenty hours per week to be benefits eligible. (RH Dep. at 39.)

68. Valentine does not generally review performance evaluations ("PFP") of coaches unless one of the administrators noted either a continuing problem or an immediate problem that needed his attention. (RV Dep. at 133.)

69. Valentine has reviewed PFP's for coaches close to twenty times. (Id.)

70. Valentine did not and was never asked to review the plaintiff's PFP. (Id.)

71. Valentine asked Hurlburt to check the student surveys, which are part of the PFP process to determine whether the players complained about the plaintiff not being at practice. (RV Dep. at 135.)

72. Hurlburt indicated to Valentine that there was no reference to complaints about tardiness or missing practices in the student surveys. (Id.)

73. With respect to the UConn match, Valentine understood that the team was at the match without a coach present. (RV Dep. at 140.)

74. Valentine felt in his "humble opinion" that the plaintiff going to Human Resources and bypassing the athletic department hierarchy to discuss his part-time status concerns was "inappropriate" and "wrong." (RV Dep. at 149.)

75. Hardy testified that it was not inappropriate for the plaintiff to go to Human Resources with his concerns. (RH Dep. at 27.)

76. It was obvious to Hardy that the plaintiff was working more than twenty-five hours per week. (RH Dep. at 59.)

77. Guastelle had no complaints about the plaintiff as to his coaching. (MG Dep. at 23.)

78.     Cook worked approximately five hours per week split between the men's and women's tea (MG Dep. at 28.)

79.     Wrestling was the only men's sport where the coach was moved from part-time to full-time; SHU was the last Division I school to have a part-time wrestling coach.  (MG Dep. at 65-66.)

80.     Prior to September 16, 2016, Guastelle had never discussed the plaintiff's claim that he working more than 25 hours and had never reviewed the plaintiff's hours entered into Kronos.   (MG Dep. at 128-29.)

81.     Guastelle questioned the plaintiff's time entries, which he felt were fabricated, but never discussed the hours with the plaintiff.  (MG Dep. at 170-71.)

82.     The only other terminated head coach was the wrestling coach who failed to show up for seven weeks.  (MG Dep. at 177.)

83.     Exhibit J is the 2015 PFP, which first raised the issue of the plaintiff's engagement and attitude towards the program and his complaints about being a part-time coach.  (MG Dep. at 210-13.)

PLAINTIFF,
PAUL GAGLIARDI

BY:   __ct23807_____
Theodore W. Heiser
ct23807
Sullivan Heiser
116 East Main Street
Clinton, Connecticut 06413
Telephone: (860) 664-4440
Facsimile: (860) 664-4422 (fax)
twh@sullivanheiser.com
His attorney

**CERTIFICATION OF SERVICE**

I HEREBY CERTIFY that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

__ct23807_____
Theodore W. Heiser, Esq.