# Ex. 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PAUL GAGLIARDI, | : Civil Action No.  3:17-cv-00857(VAB) |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| SACRED HEART UNIVERSITY, | : OCTOBER 24, 2018 |
| | : |
| Defendant. | : |

## AFFIDAVIT OF PAUL GAGLIARDI

Paul Gagliardi, being duly sworn and according to law, deposes and says:

1.      I am the plaintiff in the above matter and provide this Affidavit in support of my opposition to the defendant's Motion for Summary Judgment.

2.      Mike Guastelle served as the Women's Tennis Head Coach, the Director of Tennis, and a Senior Associate Director of Athletics.

3.      The defendant alleges that the Director of Tennis position "entailed significant additional roles for both the Men's and Women's teams such as travel and scheduling." (Rule 56(a)(1) ¶ 14.)

4.      In fact, the alleged additional roles cited by the defendant were roles Mr. Guastelle already had as the Senior Associate Director Athletics or the Head Coach of the Women's Tennis Team.

5.      Mr. Guastelle was responsible for overseeing travel and scheduling for all of the teams under his purview, which includes Tennis as well as golf, baseball, men's volleyball and others.

1

6.    In reality, with the exception of some limited assistance from Mr. Guastelle, I made the travel arrangements for the Men's Tennis Team and handled the scheduling for the team.

7.    The defendant alleges that Mr. Guastelle's time was split 70% on Senior Associate Athletic Director duties and 30% on his tennis duties.

8.    I believe this to be an inaccurate estimate based on our many overlapping duties, mandated coach responsibilities and basic review of the team web sites and schedules..

9.    By Mr. Guastelle's own admission, the duties of the Head Tennis Coach, even my alleged part-time position, would exceed 25 hours per week in season and he estimate the maximum hours he worked at 50-60 hours per week and 40 hours during the summer.

10.    As a result of passage of the Affordable Care Act, SHU was required to track the hours of its employees more closely than it had in the past.

11.    I was told explicitly by Roberty Hardy and Sally Schettino in Human Resources that I was required to input my hours into the Kronos system used by the university.

12.    However, other coaches did not use the Kronos system other than to track their vacation time, if at all.

13.    I had discussed my frustration with the Head Tennis Coach position being designated part-time for several years.

14.    I saw that I was working as much if not more than other coaches who were designated as full-time or whose positions transitioned from part-time to full-time during the period from approximately 2013 until my termination.

15.    In 2014, I formally raised my continuing concerns with the position being part-time with Human Resources and also in my comments on my annual review.

2

16.    I continued to raise the issue with my supervisor, Mike Guastelle, and human resources.

17.    In 2016, as a result of my raising the issue, the school raised my salary to $20,000 annually from $13,500 and, for the first time, made my position benefits eligible.

18.    Rob Hardy testified at his deposition that I was satisfied with that resolution.

19.    In fact, I told Mr. Hardy specifically that I was not satisfied with the increase in pay or the benefits because there was no resolution of the issue I raised concerning my evaluation as a full-time coach, while working full-time hours, but being paid as and labeled as a part-time employee.

20.    When I received the pay increase and became benefits eligible, my hours and duties did not change.

21.    Part-time employees at SHU become benefits eligible when they work 20 hours per week for 52 weeks or 25 hours for forty weeks.

22.    I had been working well in excess of 20 hours per week for many years but it was not until January 2016, that the University acknowledged that I was eligible for benefits.

23.    I continued to complain that the hours worked more than justified a status change to full-time.

24.    In making those complaints, I advised the school that it was discriminating against me based on my gender as well as the fact that I coached a men's program.

25.    Up to 2014, my performance evaluations were positive.

26.    I was always rated as either meeting or exceeding expectations.

3

27.    However, after formally raising my concerns about the part-time status of the job as well as my claims that the school was discriminating against me, my performance evaluations became more critical.

28.    The evaluations began to question my "commitment" to the position.

29.    The criticisms were directly related to my complaints about the status of the job, claims of discrimination, and my refusal to "accept" that the position was going to remain part-time.

30.    Brad Hurlburt, the Deputy Director of Athletics, advised that the school did not have the "resources" to make my position full-time.

31.    That clearly was not true based on the changes and increases made to positions and salaries for other coaches and the fact that the new tennis coach who replaced me was hired as a full-time coach at a salary of approximately $50,000 annually.

32.    I did not think it was possible under the circumstances while still performing all my duties to work twenty-five hours or less but told Mr. Hardy that I would strictly adhere to the 25 hours per week dictate.

33.    Specifically, in correspondence to Mr. Hardy I told him that there may be times that I would not be able to attend matches, practices or other activities.  (Ex. O.)

34.    After I went back to Human Resources to further discuss my feeling that the position should be full-time, I was told by Mr. Hurlburt, the Deputy Director of Athletics that he was "tired of [my] bullshit."

35.    SHU references my failure to attend a tournament at UConn as the "final straw" leading to my termination.

36. Paragraph 77 references a meeting that allegedly occurred on September 11, 2016, involving Mr. Guastelle, Mr. Cook and me.

37. That meeting did not occur as contended by Mr. Guastelle; in fact, I was at a tennis tournament in Branford on September 11, 2016, and was not on campus at SHU.

38. I did have discussions with Mr. Guastelle regarding the fact that I would not be able to attend the Friday portion of the UConn tournament taking place that weekend and needed Mr. Cook to attend.

39. Mr. Guastelle also had a conflict and needed Mr. Cook to cover a match at Quinnipiac the same day.

40. I spoke to Mr. Guastelle on Tuesday or Wednesday that week and was surprised to learn that he had already slotted Mr. Cook to cover for him.

41. We worked out the situation and it was agreed that Mr. Cook would cover for me on Friday at UConn.

42. Unfortunately, Mr. Cook broke his ankle in the interim and was not able to cover for me on Friday.

43. I attended the Saturday portion of the tournament working about twelve hours that day and would have also attended on Sunday if the players had more success on Saturday.

44. In the Fall of 2016, I made the schedule for the Men's Tennis Team practices with my full-time teaching job in mind.

45. I knew there would be occasions when I would be late to practice.

46. For those occasions, I told the team members to warm up at the courts for the first half hour.

47.    I would then arrive and have formal practice for another two and a half hours with the team.

48.    This was not a surprise to SHU as I had advised Mr. Hardy that I would have to be late to some practices.

49.    Mr. Guastelle testified that he received "complaints" about my being late, but only references one player by name.

50.    If Mr. Guastelle had brought that complaint to my attention, I would have had the opportunity to address the issue.

51.    There were also occasions where I missed practice as noted at paragraph 75 of the Rule 56(a)(1) Statement.

52.    On those occasions, the part-time assistant, Matt Cook, covered the practices.

53.    Matt Cook also covered practices for Mike Guastelle for the Women's Tennis Team.

54.    SHU also notes at paragraph 76 that I was late to a tournament at Yale in the Fall of 2016.

55.    The tournament in question was a three-day tournament.

56.    Matt Cook covered the first part of Friday until I arrived in the afternoon.

57.    I was on-site for the remainder of the tournament on Saturday and Sunday from approximately 9:00 a.m. to 6:00 p.m.

58.    This was not unusual as Mr. Guastelle had Matt Cook cover matches or tournaments for him as the Head Women's Tennis Coach, including sending Mr. Cook as the sole coach on a trip to Dartmouth in October of 2015.

59.     In addition, there were numerous occasions where Mr. Guastelle, despite being a full-time employee, had Mr. Cook cover practices for him or simply cancelled practices for the Women's Tennis Team.

60.     Robert Valentine, the Executive Director of Athletics, testified at his deposition that he spoke to me about my alleged punctuality issues.

61.     That is false; Mr. Valentine never spoke to me about issues of my punctuality or anything else related to my job performance.

62.     The defendant alleges that "[d]uring Plaintiff's employment at SHU, Women's Rowing, Bowling, and Rugby had no assistant coach."  (Rule 56(a)(1) ¶ 18.)

63.     That is false.  While I was tennis coach, Women's Rugby and Rowing had a full-time assistant coach and Bowling had at least a part-time assistant coach.

64.     The defendant's own documents exhibit that there were assistant coaches for those teams.

65.     During my tenure as Head Coach, SHU made several additions to the women's teams coaching staffs.

66.     SHU hired the following personnel for women's teams: a full-time rugby coach; full-time assistant coaches for lacrosse, swimming, track and field, rowing, equestrian and rugby; a graduate assistant for lacrosse; a part-time diving coach for swimming; an equipment manager for ice hockey; and changed the status of assistant coaches for volleyball and fencing from part-time to full-time.

67.    During the same period, the University conducted a review of coaching salaries and upgraded the women's coaching salaries without taking the same steps with respect to men's coaching salaries.

68.    Attached hereto at Exhibit A is a September 5, 2017, letter from the U.S. Department of Education Office of Civil Rights ("OCR") concerning that offices audit of the defendant's Title IX compliance.

69.    SHU's athletic program decisions clearly favored women's teams.

70.    For instance, paragraph 105 of the Rule 56(a)(1) Statement notes that the Women's Bowling "program has been nationally recognized for its success and SHU has been in the process of building a facility to showcase that sport."

71.    For the 2015-2016 season, my last at SHU, the Women's Bowling Team was ranked #42 in the country by collegebowling.com.

72.    At the time, there were only 34 Division I teams in the country so the team was actually ranked below Division II and III teams.

73.    In addition, the recruiting for several of the women's teams, despite having significantly higher budgets was easier than for men's teams.

74.    For instance, many of the members of the Rowing Team and Rugby Team have not competed in the sport prior to attending SHU and are recruited on campus after arriving.

_____
Paul Gagliardi

10/24/2018

8

# Ex. A



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS, REGION I**
**5 POST OFFICE SQUARE, 8th FLOOR**
**BOSTON, MASSACHUSETTS 02109-3921**


September 5, 2017


Dr. John J. Petillo
President
Office of the President
Sacred Heart University
5151 Park Avenue
Fairfield, Connecticut 06825

Re:   OCR Compliance Review 01-13-6001
      <u>Sacred Heart University</u>

Dear President Petillo:

On June 17, 2013, the U.S. Department of Education, Office for Civil Rights (OCR) notified Sacred Heart University (the University) that it had been selected for a compliance review to examine whether the University discriminates against female students by denying them an equal opportunity to participate in intercollegiate athletics and whether the University discriminates in awarding athletics scholarships or grants-in-aid by not awarding such aid in proportion to the number of students of each sex participating in its intercollegiate athletic program.

Before OCR completed its review and made any compliance determinations, the University agreed to voluntarily resolve the compliance review as set forth in the enclosed Resolution Agreement, consistent with Section 302 of OCR's Case Processing Manual.

OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §1681 et. seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving Federal financial assistance. The Title IX regulation at 34 C.F.R. § 106.71 also incorporates by reference 34 C.F.R. § 100.7(a), which requires and authorizes OCR to conduct periodic proactive compliance reviews to determine compliance with the laws OCR enforces. The University receives Federal financial assistance from the U.S. Department of Education and, therefore, is a recipient subject to the requirements of Title IX.

OCR's compliance review focused on the following legal issues:

- Whether the University provided male and female students an equal opportunity to participate in its intercollegiate athletic program by effectively accommodating their interests and abilities, in accordance with 34 C.F.R. § 106.41(a) and (c)(1).

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

Page 2 – OCR Complaint No. 01-13-6001

- Whether the University provided its athletes with scholarship and financial aid opportunities in proportion to the number of students of each sex participating in intercollegiate athletics, in accordance with 34 C.F.R. § 106.37(c).

**Summary of OCR's Investigation to Date**

The University is located in Fairfield, Connecticut and reports on its website that in the 2016-2017 academic year, its student body was made up of 8,532 total students: 4,794 full-time undergraduate students, 634 part-time undergraduate students, and 3,104 graduate students. Approximately 67% of the University's student body is female. The University has one of the largest athletics programs in the area, offering 31 Division I teams at the time OCR opened the compliance review.

Upon commencing this compliance review in June 2013, OCR requested and reviewed statistical, budgetary, and historical data related to the University's athletic program. OCR received updated information from the University on a rolling basis throughout the compliance review. In April 2014, OCR traveled onsite to the University to meet with General Counsel; the Executive Director of Athletics; Deputy Director of Intercollegiate Athletics; Senior Associate Athletic Director for Compliance; Executive Director for University Financial Assistance; Executive Director for Athletics and Student Affairs Budgets; Executive Director for Human Resources and Title IX Coordinator; Director for Athletic Recruitment; and the Executive Director for Undergraduate Admissions.

In July 2016, OCR again went onsite and conducted interviews with the new University Title IX Coordinator; Executive Director of Athletics; Deputy Director of Athletics; Senior Associate Athletic Director for Compliance and Senior Women's Administrator; Executive Director of Budgets, Student Affairs and Athletics; Head Women's Rugby Coach; Executive Director of University Financial Assistance; and Head Women's and Men's Track & Field Coach. During the July 2016 onsite, OCR also conducted focus groups with women's rugby and track and field athletes. Following the onsite, OCR also interviewed the University's Vice President for Finance. Finally, OCR reviewed additional responsive information the University provided from 2013 through summer 2017.

**Facts and Analysis**

A. Effective Accommodation of Interests and Abilities

The Title IX implementing regulation, at 34 C.F.R. §106.41(a) states that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient [of Federal financial assistance], and no recipient shall provide any such athletics separately on such basis." The regulation, at 34 C.F.R. §106.41(c), in relevant part, requires a recipient to provide equal athletic opportunity for members of both sexes, including the provision of a "selection of sports and levels of competition [to] effectively accommodate the interests and abilities of members of both sexes." As a means of assessing whether an institution is providing an equal opportunity in its intercollegiate athletic program in compliance with Title IX (specifically 34 C.F.R. §§ 106.41(a) and (c)(1)), OCR follows the approach outlined in its guidance document, A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413 issued on December 11,

Page 3 – OCR Complaint No.01-13-6001

1979 (Policy Interpretation). The Policy Interpretation clarifies what is popularly referred to as the "Three-Part Test" to assess whether a recipient is providing equal opportunities for male and female student-athletes in its intercollegiate athletic program.

The Three-Part Test considers the following inquiries:

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of that sex; or

3. Where members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

If a recipient meets any one of the three parts of the Three-Part Test, the institution is providing equal opportunity to compete to its male and female student-athletes.

OCR's preliminary analysis of the University's compliance with each part of the Three-Part Test is discussed immediately below.

*__Part One__: Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments.*

The Policy Interpretation defines athletic participants as those athletes: "(a) [w]ho are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and (b) [w]ho are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and (c) [w]ho are listed on the eligibility or squad lists maintained for each sport; or (d) [w]ho, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability."

During OCR's preliminary investigation of this issue, OCR reviewed various data from the University for a period encompassing 2010 through 2017, and also reviewed historical data collected by the U.S. Department of Education pursuant to the Equity in Athletics Disclosure Act (EADA). This data included enrollment data, team roster data, NCAA squad lists, financial budgets, strategic plans, and other data that shed light on the number of students attending the University and the percentage of those students who were athletes, as defined by OCR guidance. OCR also interviewed two head coaches, a group of athletes, and University administrators involved in the enrollment of students, financial aid, and the athletic program.

At the time OCR requested the University's initial data response, and based on a review of squad lists, OCR preliminarily found a significant disparity of 17.3% between women enrolled at the University and women participating in intercollegiate sports. This disparity represented approximately 389 participation opportunities for female athletes that would need to be added to

Page 4 – OCR Complaint No. 01-13-6001

achieve proportionality. Throughout OCR's investigation, the University has steadily increased the opportunities available to female athletes, resulting in smaller disparities: as of 2015-2016, the disparity had dropped to 8%, which represents approximately 203 participation opportunities for female athletes that would need to be added to achieve proportionality.

While OCR's compliance review preliminarily identified concerns regarding the above disparity rates, OCR credits the University's efforts to address this disparity during the course of OCR's investigation. Specifically, OCR found that most of the University's recent success in significantly lowering female student-athletes' participation disparities can be traced to the University's addition of women's rugby as a varsity sport in 2015, after elevating it from club status; and expanding several of its successful women's athletic programs, such as track and field.

OCR closely examined the University's addition of women's rugby, which the University added in an effort to work towards part one compliance. In interviews with rugby student-athletes, rugby coaching staff, and high-level athletics administrators, OCR confirmed that the University was offering meaningful athletic opportunities to female student-athletes through rugby, and that the University will continue to support and expand this emerging sport as outlined in the Resolution Agreement.

OCR also closely examined the University's expansion of its women's track and field program. OCR found that the University's track and field participation figures were substantially higher than the NCAA average; therefore, OCR scrutinized those figures to ensure that they represented real athletic opportunities for women and were not a result of roster manipulation. OCR's July 2016 interviews with the track and field coach, and OCR's focus groups with several track and field student-athletes, indicate that these teams' rosters appear to reflect genuine athletic opportunities consistent with Title IX.

The University has entered into the attached Resolution Agreement to achieve part one compliance, thereby satisfying the Three-Part test.

***Part Two****: Where members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of that sex.*

In considering whether past actions of an institution have expanded participation opportunities for the underrepresented sex in a manner that was demonstrably responsive to their developing interests and abilities, OCR examines an institution's record of adding intercollegiate teams, or upgrading club or intramural teams, for the underrepresented sex; its record of increasing participation numbers for the underrepresented sex; and its affirmative responses to student requests for the addition or elevation of sports. OCR will not find a history and continuing practice of program expansion where an institution increased the proportional participation opportunities for the underrepresented sex by reducing the opportunities for the overrepresented sex alone or by reducing the participation opportunities for the overrepresented sex to a

Page 5 – OCR Complaint No. 01-13-6001

proportionately greater degree than the underrepresented sex. OCR also examines current practices that support continued expansion.

OCR found that the University is a member of the National Collegiate Athletic Association (NCAA) and all of its teams compete at the Division I level. The only Division I sports sanctioned by the NCAA (excluding emerging sports such as rugby) not offered by the University at the start of OCR's review were gymnastics, rifle, skiing, and water polo. The University participates in different conferences depending on the sport and recruits both nationally and internationally. The chart below lists the teams currently offered and the years these sports originated at the University.

### SPORT-BY-SPORT INCEPTION

| MEN'S TEAM | FIRST YEAR OF COMPETITION | WOMEN'S TEAM | FIRST YEAR OF COMPETITION |
|---|---|---|---|
| Basketball | 1965 | Volleyball | 1972 |
| Soccer | 1965 | Basketball | 1974 |
| Baseball | 1966 | Softball | 1980 |
| Volleyball | 1984 | Soccer | 1980 |
| Football | 1991 | Cross-Country | 1991 |
| Lacrosse | 1991 | Lacrosse | 1992 |
| Cross-Country | 1992 | Field Hockey | 1993 |
| Golf | 1992 | Tennis | 1993 |
| Ice Hockey | 1993 | Bowling | 1993 |
| Tennis | 1993 | Golf | 1994 |
| ~~Bowling[1]~~ | ~~1993~~ | Indoor Track & Field | 1994 |
| ~~Rowing~~ | ~~1994~~ | Outdoor Track & Field | 1994 |
| Indoor Track & Field | 1994 | Equestrian | 1994 |
| Outdoor Track & Field | 1994 | Rowing | 1994 |

---

[1] The University previously sponsored men's rowing and bowling, but these sports were eliminated when the University moved to the Division I level in 1999.

Page 6 – OCR Complaint No. 01-13-6001

| Men's Team | First Year of Competition | Women's Team | First Year of Competition |
|---|---|---|---|
| Wrestling | 1998 | Ice Hockey | 1995 |
| Fencing | 1999 | Swimming | 1998 |
| | | Fencing | 1999 |
| | | Rugby | 2015 |

As illustrated by this chart, the University experienced its largest growth in its athletic program between 1991 and 1994, adding 20 sports teams total – 10 for men and 10 for women.[2] There were no additional sports added since 1999 until the University added women's varsity rugby in 2015 as a result of OCR's compliance review. There was also no indication from staff interviews that the University had ever cut a women's team that had competed at the intercollegiate level.

OCR notes that while there were periods of time in the University's history where the University increased participation opportunities for women, there was simultaneous expansion of the men's program which had the effect of minimizing the women's relative growth. In other words, because the University was adding men's teams (albeit fewer of them) when it was adding women's teams, this expansion limited the impact that the new women's teams had in addressing the overall disparity of female opportunities. Furthermore, OCR's compliance review preliminarily suggests that the University may not have a practice or policy of adding new sports. As the chart illustrates, and as interviews with University staff corroborate, there have been virtually no additional sports added since 1999, beyond the addition of women's rugby in 2015. As noted above, the University has entered into a Resolution Agreement to achieve part one compliance, thereby satisfying the Three-Part Test.

***Part Three:*** *Where members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.*

Even when an institution cannot demonstrate compliance with either part one or two, OCR may find the institution in compliance through part three of the Three-Part Test if it can be shown that the underrepresented sex's interests and abilities are met by the current athletic program. To make this determination, OCR will consider assessments of unmet interest and ability, if an institution has a practice of conducting such assessments. OCR also typically looks to an institution's club and/or intramural program as indicators of possible interest and ability to participate in intercollegiate sports, and considers other indicators of possible interest and ability

---

[2] This notable growth may be attributed to the University's transition at this time from a commuter school to a residential university.

Page 7 – OCR Complaint No.01-13-6001

such as developing sports on a nation-wide level and/or the sports offered in the areas from which the University draws its students.

As explained above, OCR found that the University offers nearly every Division I sport sanctioned by the NCAA. Similarly, the University appears to offer an expansive club athletic program. Notably, upon OCR's opening of this compliance review, the University reviewed its club offerings and decided to elevate its women's rugby club team to varsity status.

OCR's review raised preliminary concerns as to whether, pre-dating OCR's compliance review, the University was surveying its students for unmet interest; however, OCR notes that the University represented to OCR that it conducted a survey in 2013. As noted above, the University has entered into a Resolution Agreement to achieve part one compliance, thereby satisfying the Three-Part Test.

### B. Athletic Financial Assistance

OCR also looked at whether the University provided its athletes scholarship opportunities in proportion to the number of students of each sex participating in intercollegiate athletics. The regulation implementing Title IX also addresses athletic financial aid in 34 C.F.R. §106.37(c), stating that "to the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate programs."

Under the Policy Interpretation, OCR conducts a "financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs." The Policy Interpretation goes on to state that "[i]nstitutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors." The Policy Interpretation specifically states that OCR "will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results." The Policy Interpretation also states that "[i]nstitutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors."

A disparity in awarding athletic financial assistance (AFA) refers to the difference between the aggregate amount of money athletes of one sex in fact received and the amount they would have received if their share of the entire budget for athletic scholarships had been awarded in proportion to their participation rates. In other words, this section does not require a proportionate number of scholarships for men and women (e.g., seven scholarships for male lacrosse players does not necessitate seven scholarships for female lacrosse players) or individual scholarships of equal dollar value (e.g., if a male soccer player receives $7,000, a female soccer player does not also have to receive $7,000); however, it does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their overall participation rates.

Institutions can be found in compliance with the requirements of Title IX even in the absence of substantially proportionate rates of scholarship aid, if an identified disparity can be explained by

Page 8 – OCR Complaint No. 01-13-6001

legitimate, nondiscriminatory factors. Disparities that exceed a mere percentage point (after controlling for all legitimate, nondiscriminatory reasons) may create a presumption of non-compliance because a recipient has direct control over the allocation of financial aid to its athletic program, and such decisions are sex-based (i.e. aid is expressly allocated among sex-segregated teams and therefore any resulting disparities cannot generally be a result of chance).

In OCR's preliminary investigation of this aspect of the University's program, OCR reviewed scholarship amounts provided by the University to each team and discussed with relevant administrators the process for providing AFA. At the outset of this review, OCR found that the University may not have underfunded its female athletes: in 2011, it was providing them a larger share of the AFA pool than their relative participation would indicate. However, OCR preliminarily found that the AFA pool allotted to female athletes has since fluctuated, from being equivalent to appearing to be underfunded. Prior to OCR making any compliance determinations with regard to AFA (including examining any legitimate, nondiscriminatory reasons for disparities), the University entered into a Resolution Agreement to achieve AFA compliance.

**Conclusion**

OCR notes that throughout this review, the University has taken proactive steps to move towards providing proportional athletics opportunities for female athletes, including by expanding its women's teams to NCAA averages, expanding its more successful women's programs beyond just the averages and ensuring those opportunities are true opportunities, as well as creating a Division I women's rugby team. These efforts have resulted in over one hundred additional opportunities for women athletes so far. As it has grown its program, the University has increased the scholarships available to women's teams so that it can recruit and retain Division I caliber players. Not only has the University committed to creating additional opportunities for women, but it has demonstrated that it understands and has begun budgeting for the related component spending that it will need to do to provide an equitable opportunity for its women's program. The University hired a full time Title IX coordinator and created a Title IX Committee to monitor these initiatives and has been reporting to OCR throughout the review period.

As of the date of this Resolution Agreement, the University has represented to OCR in reports and interviews that it has spent over $1.2 million on investments in its athletic program geared towards ensuring equity. For example, given the sizable additions to its women's rowing program, the University is reviewing its facilities and acquiring additional competitive vessels, and has already purchased 11 new ergs for indoor rowing practice as well as five new racing shells. The University is also increasing coaching staff for women's teams. The University hired a full-time head coach for rugby; full-time assistant coaches for lacrosse, swimming, track and field, rowing, equestrian, and rugby; a graduate assistant coach for lacrosse; a part-time diving coach; and an equipment person for ice hockey; and increased the assistant coaches for volleyball and fencing from part-time to full-time. Additionally, the University conducted a review of coaching salaries and upgraded women's head coaching salaries to be more competitive, and has committed to continue to monitor these salaries. The University has also hired two strength and conditioning coaches and renovated the weight room.

Page 9 – OCR Complaint No. 01-13-6001

For facilities, the University moved women's ice hockey to a new rink with a locker room and meeting space; moved women's swimming to an improved pool and increased pool rental for diving; built a new turf field; replaced the track running surface and added a throwing circle; renovated lacrosse locker rooms; installed turf and added new padding on the softball field; purchased a golf course; and added additional practice and competition fields for rugby and soccer. The University has also increased travel budgets to ensure equity across teams and genders in terms of rooming and travel expenses.

In undertaking these actions, the University has demonstrated its commitment to meaningfully expand its women's athletic program. Furthermore, although not the subject of OCR's compliance review, the University has also demonstrated its commitment to continuously monitor for equality with regard to the benefits and opportunities in all other aspects of the University's intercollegiate athletic program.

The University has memorialized its commitments in the attached Resolution Agreement, signed on August 25, 2017, which OCR will monitor.

The Resolution Agreement will ensure the following, among other items:

- The University will implement a multi-year strategic plan to create additional opportunities for female athletes, and in doing so provide substantially proportionate intercollegiate participation opportunities for its male and female athletes, in compliance with part one of the Three-Part Test.

- The University agrees to continue to support and develop its women's rugby team by providing funding for all other budgetary items provided to other intercollegiate contact-sport teams, and by providing appropriate AFA to recruit and retain rugby athletes by the 2019-2010 academic year.

- The University agrees to monitor it its club sports for any future growth and development opportunities, and to seek to expand its women's teams to at least up to the NCAA averages.

- The University will ensure that it is providing AFA in substantial proportionality to its male and female athletes' participation rates, including by ensuring a system is in place for the Department of Athletics to work with the Title IX Coordinator to track AFA by team.

- The University will annually monitor its entire athletic program to ensure equality in all components defined by Title IX ("laundry list").

- The University shall maintain a Title IX Committee comprised of specific members charged with Title IX compliance, including in the athletic program.

OCR has determined that the Resolution Agreement is aligned with the issues OCR examined in its compliance review, and is consistent with the laws and regulations OCR enforces.

Page 10 – OCR Complaint No. 01-13-6001

OCR's findings only address the specific allegations and legal issue identified in this matter and do not pertain to the University's compliance with other aspects of Title IX or any other laws enforced by OCR. This letter is a letter of findings issued by OCR to address an individual OCR case. Letters of findings contain fact-specific investigative findings and dispositions of individual cases, are not formal statements of OCR policy, and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

Please also be advised that the University may not harass, coerce, intimidate, or discriminate against any individual because he or she has participated and cooperated with this compliance review. If this happens, the individual may file a complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, OCR will seek to protect all personal information, to the extent provided by law, that, if released, could constitute an unwarranted invasion of privacy.

If you have any questions, please contact Civil Rights Investigator Molly O'Halloran at (617) 289-0058 or Molly.O'Halloran@ed.gov.

Sincerely,

/s/

Meena Morey Chandra *w/p AMM*
Acting Regional Director

cc: Michael Larobina, Esq.