# Ex. 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No. 3:17-cv-00857-VAB

- - - - - - - - - - - - - - - - - -X
PAUL GAGLIARDI,                     :
                    Plaintiff       :
                                    :
                                    :
VS                                  :
                                    :          COPY
                                    :
SACRED HEART UNIVERSITY,            :
                    Defendant       :
- - - - - - - - - - - - - - - - - -X

CONFIDENTIAL

        Deposition of MICHAEL GUASTELLE taken at
the offices of Sullivan Heiser, LLC, 116 East Main
Street, #1, Clinton, Connecticut  06413, before
Clifford Edwards, LSR, Connecticut License No.
SHR.407, a Professional Shorthand Reporter and
Notary Public, in and for the State of Connecticut
on June 21, 2018, at 10:15 a.m.

EDWARDS COURT REPORTERS, LLC

10 Turkey Hill Road

Chester, Connecticut  06412

860.604.1175

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

THEODORE W. HEISER, ESQ.
SULLIVAN HEISER, LLC
116 East Main Street, #1
Clinton, Connecticut   06413
twh@sullivanheiser.com


ON BEHALF OF THE DEFENDANT:

JONATHAN STERLING, ESQ.
CARLTON FIELDS
One State Street, Suite 1800
Hartford, Connecticut   06103
jsterling@carltonfields.com

Q    Players like him?

A    Yeah.  Yes.

Q    Are you aware of any player complaints about Paul during the time he worked there?

A    In terms of his coaching?

Q    Yeah.

A    No.

Q    Okay.  In terms of the success of the men's program, he was the head coach from 2006 until, well, September of 2006, I believe?

A    I'm sorry.  I'm trying to remember when I -- when I left, because we had a year in between me leaving the position.  We had -- a former player of mine coached for a year.

So -- yeah.  So 2006.

Q    Okay.  Until 2016?

A    Yeah.  Correct.

Q    The success of the program during that period of time, better than it was, the same, get worse?

A    Good success early from two thousand -- the -- the first year was tough competitively for Paul, but then the next four seasons were very good. We won two conference championships during that time.

Q    Are there any assistant coaches?

A    Just Matt.

Q    And how many hours does Matt put into the program?

A    Five hours a week if he can.

Q    Okay.  And I know during Paul's tenure, the men's and women's teams were around ten players each, give or take?

A    Correct.

Q    Is that still the case?

A    This year the women had 12, and the guys had eight.

Q    So --

A    Somewhere in there.

Q    -- somewhere around --

A    It's --

Q    -- an average of ten?

A    An average of ten, yeah.

Q    Okay.  Perfect.

            MR. HEISER:  So let's mark that.

            (Whereupon, Plaintiff's Exhibit No.

            1, Position Description, was marked

            for identification's.)

BY MR. HEISER:

Q    So can you just -- well, withdrawn.

May.

Q    Okay.  And during September and October from an hour's standpoint, how different is the coaching for the head coach of the men's program in terms of time?

A    The --

MR. STERLING:  Objection.

BY MR. HEISER:

Q    Sure.

So September and October are the active periods for matches in the fall?

A    Uh-huh.  Correct.

Q    And, again, I'm not holding you to an exact number, but, you know, on average, how many hours would the men's head tennis coach be putting in during September and October during that active match part of the season?

MR. STERLING:  Objection.

THE WITNESS:  Do I answer?

MR. STERLING:  You can answer.

A    Thirty hours a week.

BY MR. HEISER:

Q    And then how about during October, November when there isn't as much competitive tennis going on, I assume there's still coaching going on?

were at one point part-time female head coaches.

Q    And all of those positions are now full-time positions?

A    Correct.

Q    Do you know why the equestrian position was changed from part-time to full-time?

A    I believe it was a decision made by the university.

Q    Do you know why the university made that decision?

A    It was, I believe, because of a Title IX concern.

Q    And what's your understanding of what the Title IX concern would have been?

A    I -- I don't really have any understanding of it.

Q    Okay.  Do you know why the rowing position was made full-time?

A    I believe the same reason as well, as the roster is pretty large.  It's 40 or 50 kids involved in the program.  That's my understanding.

Q    And how about bowling?

A    I believe the same reason.  I think it was a Title IX concern, but I don't have knowledge of the final decision why.

A        Basketball -- I thought it was 15.

Q        Oh, I know what it is.  You've got two football on here.  You've got golf --

A        Yeah.  'Cause one's for a golf tournament --

Q        Right.

A        -- and one's -- yeah, this is football. This is, like, all their fundraising stuff, and so --

Q        Okay.  Yeah.

So during the time that you have worked at Sacred Heart, three of the women's programs, equestrian, rowing, and bowling, have gone from part-time head coaches to full-time head coaches; correct?

A        Correct.

Q        During the time you've been at Sacred Heart, have any men's programs gone from part-time head coaches to full-time head coaches?

A        Yes.  Wrestling, I think, is the only one.

Q        And do you know why wrestling went from part-time to full-time?

A        I believe we looked at the benchmarking of what other institutions were doing, and we were

pretty much the last one left, I think, in all of Division I, if I recall correctly.

Q    Where wrestling was a part-time position?

A    Where wrestling was a part-time position.

Q    Tell me what you mean by "benchmarking."

A    We take a look at what other like institutions are doing in that sport in terms of support of head coaches, scholarship money, budget. So we're taking a look at, you know, who our competitors are and what they're doing in those particular sports.

You know, wrestling is one that's not an NEC sports. So you're -- you're taking -- you're taking a look at different schools.

Q    And when you do the benchmarking for the teams that are in the NEC, are you generally looking at the other NEC schools primarily?

A    Yes, as well as similar conferences that are -- so the -- the Metro Atlantic Conference, the America East, those are probably the two in which we're most similar to.

Q    In terms of -- withdrawn.

How many programs at -- within the NEC -- I'm sorry.  I'm saying that completely wrong. Withdrawn.

utilize, but I believe it's mostly for vacation time, personal time.  I believe you can fill in hours on that.

Q    Were the coaches required to use the Kronos system?

A    To log vacation time, but all of our coaches really don't log hours.

Q    How -- how are the -- withdrawn.

Are the hours of coaches logged in some manner?  Does Sacred Heart track the hours worked by their coaches?

A    I don't believe so.  They're salaried employees.  So mostly, like I said, the Kronos system that we utilize mostly tracks vacation time, you know, bereavement, you know, those types of things.

Q    Do any of the coaches presently, to the best of your knowledge, use Kronos to track their hours?

A    I don't -- no.

Q    Are you aware of any coaches during your tenure who have used Kronos to track their hours?

A    Paul.

Q    And no other coaches?

A    Not to my knowledge.

Q    All right.  So if we go to page 2 --

A    Uh-huh.

Q    -- there's an e-mail -- well, first of all, who is Sally Schettino?

A    She's at human resources.  I think it says project manager.

Q    Okay.  Do you know her?

A    Yes.

Q    If we go to the second page, there's a June 3rd, 2016 e-mail from Sally to Paul Gagliardi.

A    Okay.

Q    And it's obviously in response to a prior e-mail from Paul.  And it says, "Mike has been listed all along.  So I'm not sure why he can't see your timecard."

And then it says, "Also, I am wondering why you have not hours for the fall.  Are you aware that all hours need to be entered for the Affordable Care Act?"

Having read this, it's pretty clear she's referring to entering hours into Kronos; correct?

A    Okay.

Q    Is that --

A    Correct.

Q    Okay.  And she's telling Paul, you're

for our coaches in terms of how many kids they have on their team. So, you know, we try to end up -- you know, we're looking at, you know, obviously what other universities are doing in terms of roster sizes, and then we'd want to have our teams around that -- you know, around the appropriate size as well as -- as an enrollment tool.

Q    Okay. Give me a sense -- and I don't know that you'll know these offhand, but some of these programs -- do you know how many players there are on women's rugby?

A    Women's rugby. I want to say -- I don't get to see the actual roster. I'd look online. I want to say 20, 25.

Q    How about women's fencing?

A    Women's fencing, I'll say 15 to 20.

Q    Bowling?

A    Bowling is 20 to 25. I think we're up to that much. We got a lot.

Q    Rowing?

A    Rowing is probably 40 to 50, 40 to 55, somewhere in that range.

Q    Equestrian?

A    Equestrian, 25 to 30.

Q    Okay. And what about men's fencing?

school?

A    Yeah.  At the school.

Q    Okay.

A    I don't remember.

Q    So you have no recall of --

A    I don't recall the meeting.

Q    All right.  Do you remember expressing to Julia -- well, let's withdraw that.

Do you remember ever recommending to anyone that Paul should be terminated?

A    Yes.  I believe probably Brad and Bobby.

Q    Okay.  At what point in time -- and, again, I know you might not know an exact date --

A    Right.

Q    -- but at what point in time did you come to the conclusion that Paul should be terminated?

A    I -- I believe the last-straw type of thing?

Q    Whatever it was.

A    I believe it was a tournament -- because it happened at the 4:30 to 6:30, there was a tournament that was coming up the following weekend, whenever that was -- that would be Friday, the 16th, was -- myself, Matt, our assistant coach and Paul had a conversation in which the men's team had a

Paul's hours?

A     No.

Q     So prior to sometime after September 10, you hadn't done any kind of examination of Paul's hours to determine whether he was working more than 25 hours?

A     Of -- of July?

Q     No.  I'm looking at the last date on-so the last date on Exhibit 7 where hours are entered.

A     Well, this is probably the first time I saw this.  So that's why.

Q     Yeah.  And I'm not disputing that.  I'm just --

A     Right.

Q     I'm just trying to establish that the last date of hours on here is September 10th.

A     Okay.

Q     So your review of these hours obviously occurred, at the earliest, after these hours were entered on September 10th?

A     Correct.

Q     Fair to say?

A     Yeah.  Fair to say.

Q     Okay.  And just so I'm clear, you don't recall ever doing any other kind of review of Paul's

hours prior to what's shown on Exhibit 7?

A    No.

Q    Okay.

A    Not -- not specifically where we counted up the hours.

Q    Okay.  On prior occasions had you ever discussed -- well, withdrawn.  Let me ask it a different way.

Paul had raised this part-time/full-time issue a long time prior to 2016?

A    Correct.

Q    We know from Exhibit 6 that he was e-mailing HR as early as May of 2014; correct?

A    Correct.

Q    Had anyone at Sacred Heart ever discussed with you -- prior to September of 2016, had they ever discussed with you Paul's contention that he was working more than 25 hours a week?

A    No.

Q    So the first time that question, Was Paul working -- I shouldn't ask it that way.

The first time you were asked to look at his hours to assess how many hours he was working, actually working, was September of 2016?

A    In a formalized -- Paul had asked me --

to break that down.  If you're doing e-mails in the morning, fine, but --

A    I -- I -- we didn't talk specifically.  I just questioned his hours that he was putting in there.

Q    Okay.

A    'cause I knew he wasn't in the office doing it.  I knew he was doing another job out on the tennis court.  So I couldn't really figure out how he was doing all this other stuff that he was claiming.

Q    Well, did you ask him how he was doing all that other stuff?

A    I -- I don't recall.

Q    Do you know if anyone did?

A    I -- I don't know.

Q    Do you know if human resources ever went to Paul and said, Hey, we're a little concerned about these hours you're putting in?

A    I -- I don't know.

Q    If we go back to -- sorry.  I've got too many piles here.

A    That's okay.

Q    But if we go back to Exhibit 8, if we go down to the -- one, two, three -- well, just the

second paragraph under that September 20, 2016 meeting, there's -- the point is being made -- now, I understand you don't remember this specific meeting, but I believe you said you talked about this with Bobby and Brad.

You know, it says, "Mike stated that he was concerned that Paul was fabricating hours to make his point."

And if we go down to the -- one, two, three, four -- fifth paragraph where you're recommending or it says you're recommending that Paul's employment be terminated, the primary discussion there is his hours and that he's -- either is or is not working 25 hours a week.

To the best of your knowledge, you don't remember talking to Paul about how he was coming up with these hours; correct?

MR. STERLING:  Objection.

A    We didn't have a specific talking about the hours.  I -- I just felt that they were fabricated in terms of the amount of time he was putting in.

BY MR. HEISER:

Q    You just assumed they were fabricated --

A    Well --

Q       -- but you didn't ask for an explanation?

A       Well, when some of this stuff that was written in Kronos, you know, caused a red flag for me, especially like when he put in for time when he was in the Cape and he was on vacation.

So, you know, it was -- I -- I just had concerns regarding it 'cause I didn't think he was putting in the hours he was claiming.

Q       But, you know, concerns are different from a recommendation to terminate someone; is that fair to say?

I mean, just because you've got concerns about something you don't automatically fire someone?

A       Well, as I had mentioned, I think, in my PFPs I had done, there were concerns back to 2015 and -- of his engagement to the program as well.

Q       Okay.  But that's not mentioned at least in these notes; correct?

A       Well, the hours are mentioned.

I'm just reading the third paragraph. "Mike mentioned that Paul's -- the annual performance review."

All right.  So those were other areas in which I had concerns about, not just the hours.

probably been as low as seventy -- $7,000 and as high as -- this is coaching both teams -- maybe fifty-five, maybe.

It's sort of convoluted the way they write it.

Q    Okay.  So Boe-Wiegaard is on the higher end of those tennis coaches, even the ones coaching both men's and women's?

A    Yeah.  I think he's -- he's probably -- there's only four of them.  I don't know specifically.  I -- I just don't remember specifically.

Q    Is --

A    I don't think his -- no.  I -- I just don't know off the top of my head.

Q    Do you know if that information is publicly available?

A    I'm not sure.

Q    Okay.  I've seen some of the NCAA breakdowns per coach or, you know, the average --

A    Yes.

Q    -- per coach.

A    So you -- like the -- what's called the EADA.

Q    Yeah.  I don't remember what it said on

(Whereupon, Plaintiff's Exhibit No. 18, Partnering for Performance Summary for Fiscal Year 2018, was marked for identification.)

BY MR. HEISER:

Q      All right.  So Exhibit 18 I've just given you.  That's the 2018 Partnering for Performance Summary.  Under objectives and key responsibilities, you gave him a rating of improvement needed --

A      Uh-huh.

Q      -- for, "Build upon a competitive success of this past year and improve win/loss record and a conference tournament finish."

Why did you give an improvement needed?

A      I think because we dropped -- if I remembered correctly, I don't think we reached the semifinals that year of the conference tournament. I think we had four matches, maybe five.  So our competitiveness had -- had dropped off that year.

So I think that's why I had -- I had put improvement needed.

Q      Okay.  And you also gave a needs improvement on the fundraising initiatives?

A      Correct.

Q      And was that for the same reasons that

you had previously raised?

A    Yes.

Q    Okay.  And under the competency skills, you gave all solid performances other than above expectation for job knowledge?

A    Uh-huh.

Q    Yes?

A    Yes.

I'm sorry.

Q    Okay.  That's all right.

So under the supervisor's evaluation --

A    Uh-huh.

Q    -- the narrative, you do note in the first paragraph that the team played a highly competitive schedule, struggled to just four dual match wins, earning a No. 6 seed out of seven programs in the NEC.

You then go on to say that, "Paul is very knowledgeable about the sport and team commented that they would recommend others to play for Paul."

When you say "team," you're actually referring to the players on the team?

A    Yes.

Q    Did you generally speak to the players about coaches prior to doing an assessment?

A    I wouldn't speak with them directly unless they came to my office or -- we -- we had mentioned we have, like, a student survey. That's anonymous. So we have that.

Q    Okay. So would those comments that you're referencing, would those likely have come from the student surveys?

A    Yeah. That's usually -- you know.

Q    With respect to the student surveys, just generally with respect to Paul, do you remember any significant concerns being raised about Paul over the course of time?

A    The only one that it was sort of the time and the scheduling would be an issue whether it was mentioned in the surveys or mentioned to me. You know, I think the guys knew that Paul was knowledgeable about the sport.

Q    Okay. The second paragraph talks about the academic success of the team, and looks like they did pretty well with the All American or All Academic team --

A    Yeah.

Q    -- placement?

And then the third paragraph, you note that, "My main concern with Paul is his overall

BY MR. HEISER:

Q    So feel free again to look at it.

A    Sure.

Q    What I've shown you is Exhibit 19. That's the 2016 Partnering for Performance Summary for Paul.

My understanding from your prior testimony is that Paul did not sign --

A    Correct.

Q    -- this PFP.

A    Correct.

Q    We're not certain, but it looks like this was probably presented to him on or shortly before September 20th of 2016 at the meeting that we referenced earlier today.  And I would note that just at the bottom, the print evaluation footer --

A    Uh-huh.

Q    -- indicates September 19th --

A    Okay.

Q    -- of 2016.

Did you go through this PFP with Paul when you met?

A    I believe so.

Q    Okay.

A    Because he refused to sign.

attitude towards the head coaching position being a part-time position. Being a part-time head coach is difficult and definitely has its challenge. However, this cannot be the reason for a lack of enthusiasm and commitment needed in order for the program to improve from its current state."

Did you see a decrease in Paul's coaching enthusiasm in the actual on-court coaching of players?

A     The on-court, not so much, but I think it was just his general attitude towards the position and what I had seen from him previously over the previous seven or eight years where, you know, I noticed he just wasn't as engaged as I would -- I had expected him to be.

Q     Explain that. 'Cause you've used that a couple times.

What do you mean by "engaged"?

A     Well, I -- I --

Q     Where was the deficit in his engagement?

A     Well, I feel like he -- you know, his -- the time in which he would interact with the student athletes, from what I would see, you know, there was -- you know, the things I had spoken to early about fundraising, he never really did.

Q    With respect to your supervisor comments, which begin on page 4, do you recall going through those comments specifically with Paul?

A    I don't recall going through them specifically.

Q    Do you recall him commenting at all about your comments?

A    He probably did.  I just don't remember specifically what he said, but he -- he read through it, and he refused to sign it.

Q    Okay.  With respect to the -- well, let's just go through it.  We'll do it the easy way.

A    Sure.

Q    Competitively, you note that the team improved to nine wins, but that it had lost one of its top players after the fall season.

Do you know why they lost a top player?

A    I -- I -- I believe he just transferred.

Q    Okay.  Do you remember who that was?

A    What is his name?  I think it was Anthony Savio.

Q    Okay.  To the best of your knowledge, did that have anything to do with Paul?

A    I don't recall.  I think it was a combination of his academic program --