# Ex. 11

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


**CONFIDENTIAL**


Civil Action No. 3:17-cv-00857-VAB

- - - - - - - - - - - - - - - - - - -X
PAUL GAGLIARDI,                        :
                    Plaintiff          :
                                       :
VS                                     :
                                       :
SACRED HEART UNIVERSITY,               :
                    Defendant          :
- - - - - - - - - - - - - - - - - - -X

COPY


        Deposition of ROBERT JOHN VALENTINE taken
at the offices of Sacred Heart University, 5151 Park
Avenue, Fairfield, Connecticut, before San Edwards,
RPR, a Professional Shorthand Reporter and Notary
Public, in and for the State of Connecticut on June
22, 2018, at 10:13 a.m.

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

THEODORE W. HEISER, ESQ.
SULLIVAN HEISER, LLC
116 East Main Street, #1
Clinton, Connecticut  06413
t:  860-664-4440; f:  860-664-4422
twh@sullivanheiser.com


ON BEHALF OF THE DEFENDANT:

JONATHAN STERLING, ESQ.
CARLTON FIELDS
One State Street, Suite 1800
Hartford, Connecticut  06103
t:  860-392-5000; f:  860-392-5058
jsterling@carltonfields.com


ALSO PRESENT:  NICOLE LUONGO

A    I think he dealt with dirt in some way.

Q    Okay.  Any other things that you would include in your continuous involvement in the Paul Gagliardi situation?

A    No.

Q    Were you involved in the decision to terminate --

A    Yes.

Q    -- Paul?

And what was your involvement in that decision?

A    Well, I had the final determination.

Q    Take me through that.  If -- if a -- well, let me back up, actually.

During your tenure as athletic director, how many Division I coaches have been terminated?

A    I --

Q    At Sacred Heart, obviously.

A    Yeah.  Yeah.  I believe one.

Q    Okay.  And that would be Paul?

A    No.

Q    Oh.

A    Other than Paul.

Q    Other than Paul?

A    I believe two.

that --

BY MR. HEISER:

Q    Okay.

A    -- if he was fired.

Q    So --

A    That's why I would say, if he was fired, that makes three.  But I don't remember that.

Q    Okay.  So Jon's recollection is the same as mine.  I thought that that was 2011, too.

A    Yeah.

Q    So I was a little surprised that you --

A    Yeah.  And you would be adding to my recollection.

Q    Well, I -- honestly, I just figured Mike might have been wrong on the year yesterday.

A    There you go.

Q    But I -- I don't want to -- I want to know what you know.

A    Yeah.

Q    So if the wrestling coach was before your tenure, you've now said that there were two.  Paul Gagliardi being one, who would the other one have been?

A    That would be a lacrosse coach when I first got here.

Q    And was that a "he" --

(Whereupon, this marks the beginning of testimony deemed "Confidential -- Attorneys' Eyes Only.)

A    His name might -- might have been Tom Mariano.  Tom, for sure.

BY MR. HEISER:

Q    And was he a head coach?

A    He was.

Q    Men's lacrosse or women's?

A    Men's.

Q    And we were under the guise of a protective order.  And I -- I don't need a lot of details.

But just, in general, do you know what the -- the circumstances were of -- of Tom's termination?

A    I didn't see him to be fit to coach men at the Division I level.

MR. STERLING:  And I'm going to mark the transcript confidential, because we're getting into the --

MR. HEISER:  Yeah.

MR. STERLING:  -- under the protective order.

MR. HEISER:  It -- it --

THE WITNESS:  Right.

A    It'd be hard for me to say why.

BY MR. HEISER:

Q    Well, I mean, it is -- it is confidential --

A    Uh-huh.

Q    -- and per that order, won't be disclosed --

A    Uh-huh.

Q    -- unless the judge for some reason --

A    Huh.

Q    -- were to decide it would be disclosed in open court.

A    Huh.

MR. STERLING:  Did you --

BY MR. HEISER:

Q    Was -- was it performance-related, meaning, his actual coaching of the players that was a concern?

A    No.

Q    Was it outside activities of Tom outside of the academic institution?

A    No.

Q    Was it behavioral?

A    Yes.

Q    Was it behavioral involving students?

A    Yes.

Q    Did it have to do with his demeanor with students or his actual behavior with students?

A    Both.

MR. STERLING:  Objection.

BY MR. HEISER:

Q    Both.

Were there complaints that had been made about Tom either by students or others?

A    Yes.  Not to me directly.

Q    But to members of the administration or the athletic department?

A    Yes.

Q    Okay.  Was there any kind of an internal investigation undertaken by the school with respect to Tom?

A    School or department?

Q    Either.

A    Okay.  By the --

Q    I mean, I consider you the school, too. But --

A    Well, it's by the department.

Q    Okay.

Q    To you?

A    And it has to be documented.

Q    Okay.  So -- so if --

A    For a reason.  Yeah.

Q    If an actual --

A    Actually, to Jim Barq- -- Barquinero.

Q    Okay.  So who's the --

A    He's the head of the department.

Q    Executive vice president of athletics and something?  Is that what it is?  I can't --

A    Yeah.  Of everything.

Q    Of everything?

A    Yeah.

Q    Okay.

A    Facetiously, he's the vice president in charge of -- in charge of admissions retention, student life, and academics -- and athletics.

Q    Okay.

A    Not academics.

Q    So he is -- he's your boss?

A    That's right.

Q    Okay.  And so would, for instance, Paul Gagliardi's termination have gone to Jim Barquinero to be signed off on?

A    Yeah.

you can recall?

A    Four.  Possibly more.

Q    And was that on different occasions or was that in -- on one occasion?

A    It was always in passing.

Q    Okay.  Walking down the sidewalk on campus and --

A    My office is in the lobby.

Q    Okay.

A    I work out in the weight room, and I talk to as many players as I can as often as I can.

Q    And do you recall what any of those players said to you about Paul Gagliardi?

A    Oh, there was mixed reviews.  Yeah.

Q    Give me a sense.  Do you remember anything negative that was said about Paul?

A    Well, just about him not showing up, you know.  Actually, they were asking for other coaches on the team, so -- because their practices were coach-less at times.

Q    And how many students brought that up with you?

A    More than one.

Q    On how many occasions?

A    More than one.

Q    More than one for each of them?

A    It seemed to be a reoccuring theme with the people I talked to.

Q    But you don't remember any of their names -- the students?

A    I don't.

Q    Okay.  Do you know who -- withdrawn.

Why was Paul Gagliardi terminated?

A    Well, the ultimate reason was he didn't show up for a pretty important match that he assured his administrator he would be at.

Q    And --

A    But that was the -- the final act of being late or not showing up.

Q    Was it --

A    It was a continued -- it -- it was a trend.

Q    By "administrator," you're referring to Mike --

A    Yes.

Q    -- Guastelle?

And do you know what -- what match it was that he didn't show up for?

A    No.

Q    Do you know if that was a multi-day match

or a single-day match?

A    No.

Q    Do you know if he showed up at all for the match?

A    No.

Q    Do you know if any other coaches were there for either the whole match or parts of it?

A    No.

Q    Do you know if any portion of the match had to be canceled?

A    No.

Q    Forfeited?

A    At this time, I can't -- I can't answer any of those questions.

Q    Okay.

A    At that time, all of those questions were answered.

Q    Do you have any idea how often Paul Gagliardi had been late?

A    No.

Q    Do you know if he had been late to any matches, other than this one we just talked about?

A    I believe so.  But I shouldn't say that. I don't know.

Q    Okay.  And do you know if he had been

practices?

A    Because he had a full-time job.

Q    And do you know what that full-time job was?

A    He was a teacher.

Q    And with respect to the reason for Paul's termination, were there any other factors that played into the decision, other than the match that you discussed and his having been late to one or more practices?

MR. STERLING:  Objection.

A    As I mentioned, it was a continuous problem that was always being addressed.

BY MR. HEISER:

Q    What -- what was the continuous problem?

A    His lack of commitment.

Q    Do you know when that lack of commitment started?

A    Sometime after the first time I heard about it.

Q    Do you remember when the first time you heard about it was?

A    I do not.

Q    Do you remember how you heard about it the first time?

A    He's a former AD here at school, knows all of the inner workings much better than I do, and I've used him at times to give me guidance.

Q    Kind of a sounding board for you?

A    I would call it a sounding board.

Q    Okay. And of the people that you've mentioned, in coming to your decision on whether to agree to the recommendation that's been made by Brad, whose input did you consider?

A    I like to think I use all input in making any decision I do in life. So I can't say that there's a person's input. I gather everything.

Q    The reason I ask the question is: Do you specifically remember talking to Jim Barquinero before you agreed to the recommendation?

A    I don't specifically remember that.

Q    Okay. Obviously, you spoke to Brad before? He brought it to you. Correct?

I mean, you couldn't have agreed to his recommendation without him having brought it to you. Is that fair to say?

A    Yeah.

Q    Okay. I didn't think that was complicated.

January of 2016?

A    I'm sure I did, but I don't remember.

Q    And do you remember speaking to Jim Barquinero about Paul getting that raise?

A    I have no idea.

Q    Were you aware, at any time, that Paul had made requests for his position to be changed from part-time to full-time?

A    Salary.  You mean, full-time salary or full-time employment?

Q    Full-time employment.

A    Employment?

Q    (Nods head.)

A    I never remember a conversation of Paul saying he'll -- he would be, you know, in an office as the other coaches -- or most other coaches would be on campus and recruit, did more -- I never had that -- I never remember that conversation --

Q    You --

A    -- about employment.  I remember salary vaguely.  But I didn't -- I never remember him talking about changing what he would do.

Q    I'm -- and I'm -- I'm not just talking about you having a conversation with Paul personally.

A        Right?

Q        -- teams?

A        Yeah.  So you know this better than I do.

Q        Well --

A        And I just -- I don't rip it off the top of my head.

Q        Well, with the exception --

A        But that's it.

Q        -- of coaches --

A        Uh-huh.  Volleyball.  Yup.

Q        -- who are coaching both men's and women's --

A        Uh-huh.

Q        -- those -- those sports where there is a specific coach for the women's team --

A        Yeah.

Q        -- are any of them part-time?

A        It doesn't -- no.

Q        Okay.  Are there any women's teams that do not have at least a part-time assistant coach?

A        No.  I don't -- no.

Q        I -- I didn't --

A        No.

Q        -- was that "I don't know" or "no"?

A       No.   No.

Q       No?

A       Uh-huh.

Q       Are there men's teams that have part-time head coaches?

A       Other than mentioned?   No.

Q       Well, other than mentioned --

A       Golf.

Q       Yup.

A       It's a men's team.   Right.

Q       Volleyball?

A       Oh, men's volleyball has a assistant coach.   Not a head -- did we make him head?

        No.   I think -- yeah.   He's a head coach without an assistant.

Q       And he's part-time?

A       And he's part-time.

Q       Okay.   And the list I've got for -- and this may be outdated at this point -- but men's volleyball is listed as having a head coach, Greg Walker --

A       Yes.

Q       -- who's part-time.   And it's listed as having a part-time assistant coach, Greg -- no; I'm sorry -- Christopher R-u-s-z-something.- It gets cut

off on this.

A    Yeah.  They get changed almost every year.

Q    Yeah.

A    That's a fundraised position, I believe.

Q    Okay.

A    Yeah.

Q    So going back to 2016 when -- well, we'll use '15, because that was the last full year that Paul Gagliardi was here -- do you recall there being any part-time women's team coaches other than golf?

A    Okay.  Again, I -- when '15 is and when '18 is in my mind is -- they mix together.

I don't think so.  But I'm not supposed to say that.

I don't know.

Q    Well, let me --

A    I don't know.

Q    Let me ask it this way, because I --

A    Yeah.

(Whereupon, Previously-marked Plaintiff's Exhibit No. 14, Report, is introduced into this record.)

BY MR. HEISER:

Q    Okay.  Have you directed any of your subordinates, Throw away these -- these comparative analyses?

A    No.

Q    Okay.  Now, there is a -- the -- the head men's tennis coach is now the head men's and women's tennis coach.  Correct?

A    (Witness nods head.)

Q    And his name is -- his last name's Boe-Wiegaard, I believe.

A    I do, too.

Q    Okay.  I forget his first name.

A    William.

Q    William.  Thank you.

     So Mr. Boe-Wiegaard, I understand, has been with Sacred heart for a year -- for one full season at this point?

A    Yes.

Q    And he is being paid somewhere around $50,000?

A    Yes.

Q    And do you know whether, when he was hired, a comparative analysis was undertaken?

A    Do I know that?

Q    Okay.  Do you know if your coaches are required to input their hours into Kronos?

A    No.  I don't know that they're required to.

Q    Do you -- do you know if your coaches do input their hours into Kronos?

A    No.  I don't know that.

Q    Are you aware of any dispute related to Paul Gagliardi and his use or failure to use Kronos?

A    Very vaguely.

Q    What -- what do you know about that issue even very vaguely?

(Whereupon, this marks the beginning of testimony deemed "Confidential -- Attorneys' Eyes Only.)

A    Well, I know that it was referred to -- well, the coach is not here anymore who's a friend of mine, Nick Giaquinto, who -- the school took exception to him logging his hours during the baseball camp that he was making money at, saying that he was double-dipping.

And when you asked about -- reference to Paul in Kronos, it seems as though Paul's actions were related to Nick's actions in

agreed?

     A     No.

     Q     Do you know whether Paul's use or concerns about Kronos were a consideration in either Mike or Brad's recommendation or agreement that Paul should be terminated?

                  MR. STERLING:  Objection.

     A     Ask it again.

BY MR. HEISER:

     Q     Sure.

                  With respect to -- you -- you know -- or you indicated before that Brad recommended the Paul be terminated.  Correct?

     A     Yes.

     Q     Do you know whether Kronos -- Paul's use of or problems with Kronos was a consideration of Brad's in making his recommendation to terminate Paul?

                  MR. STERLING:  Objection.

     A     It was part of the conversation.

BY MR. HEISER:

     Q     Part of the conversation he had with you?

     A     That we had in a room with others.

     Q     Mike Guastelle testified yesterday that

Q    And under what circumstances have you done that?

A    When one of my administrators has thought to see a continuing problem or a -- a problem that needed immediate attention.

Q    Since 2013, how many times has that occurred?

A    Many.

Q    More than five?

A    Yes.

Q    More than 10?

A    Yeah.

Q    More than 20?

A    Probably getting close.

Q    Okay.  Do you recall ever reviewing Paul Gagliardi's PFP?

A    No.

Q    Do you recall ever discussing Paul's PFP with either Brad Hurlbut or Mike Guastelle?

A    Yeah.

Q    And do you recall -- was that with Mike or Brad or both?

A    Might have been both.

Q    Was -- do you recall that being a topic of discussion when you all met regarding Paul's

to see if they were matching up with what?

A    With Paul not being at practice.

Q    And did you get a response to that?  In other words, were you told the PF- -- or the --

A    Yeah.  I -- yeah.

Q    -- surveys --

A    He said it wasn't in the surveys.

Q    And how often are the survey -- and -- and it -- just so I'm clear:  Brad told you that that issue --

A    Yeah.

Q    -- was not in the surveys?

A    That's what he -- his -- his recollection.

Q    Okay.  And did you, at any point in time, review the student survey's --

A    No.

Q    -- with respect to Paul?

No?

A    Not that I can recall.

Q    Okay.  And do you have a recollection -- 'cause I -- I think you weren't sure earlier.  So let me know if anything's been refreshed.

Your conversations with the student athletes about Paul, are you certain one way or the

A    I knew, but I don't know now.  No.

Q    My understanding of the men's tennis program is that the coach drives the team.

A    That would be favorable.

Q    I -- my understanding was that that's how it happened all the time unless it was a dual meet with the women, and they --

A    That would be --

Q    -- might bus to Saint Francis in Pennsylvania.

A    That would a favorable situation that a coach drives.  But we do have some vans that we require the students to take the test for them to drive.

Q    And -- but you don't know whether that was the case with this particular match, that the students drove there without the coach?

A    I could only surmise.

Q    Are you certain that the students were actually at the match?

A    No.  I did not see them.

Q    But was that your understanding at the time that you discussed the decision to terminate Paul?

A    Yes.

"appropriate."

Q      Well --

A      I don't think that it's appropriate, because I think that there's -- should be a way to have a relationship with your direct report.  That gives you the comfort that your needs are being fulfilled.

It's my problem if that line of communication gets clogged up --

Q      Uh-huh.

A      -- or backed up.  And I'm -- I'm sorry if that happened.

(Whereupon, Previously-marked Plaintiff's Exhibit No. 6, E-mail from Paul Gagliardi to Julia Nofri dated May 23, 2014, is introduced into this record.)

BY MR. HEISER:

Q      So I'm showing you Plaintiff's Exhibit 6.  And I'll give you a chance to --

A      Uh-huh.

Q      -- to read that.

A      And that's to Julia, it looks like.  Huh?

Q      That is to Julia.

BY MR. HEISER:

Q     Okay.  Do you think it was an appropriate step on the part of Paul Gagliardi as an employee of Sacred Heart University to go to human resources?

          MR. STERLING:  Objection.

          THE WITNESS:  Okay.  I'm glad you did that, because --

          MR. STERLING:  Yeah.  If -- if you can --

          THE WITNESS:  -- I have a word that wouldn't de- -- that would describe him, and it wouldn't be appropriate.

BY MR. HEISER:

Q     Okay.  What -- what's the word you would use to describe it?

A     I'd rather not.

Q     You raised it.

A     Yeah.  "Inappropriate," maybe, then.

Q     Okay.

A     Maybe "wrong."  It -- it --

Q     Why -- why inappropriate?

A     Because there's two levels of conversation above Mike that should have been reached before he went there, in my humble opinion,

HR that makes the decision to terminate an employee within the athletic department as opposed to the athletic department making that decision?

A    No.

Q    Have you ever had a situation where human resources recommended to you, the athletic department, that one of your employees should be terminated?

A    No.

Q    Okay.  When the continuing problem with Paul Gagliardi was first raised with you and up until the time that he was terminated from Sacred Heart, did you ever discuss the issue with Paul Gagliardi?

A    No.

Q    And why not?

A    It's not my position.

Q    You said that you talked to coaches and --

A    I always --

Q    -- administrators and --

A    -- talk to --

Q    -- why --

A    -- them.  The job to keep him in line is his supervisor's job.

Q    Did you think he was out of line?

A    At times.

Q    With respect to what?

A    Punctuality.

Q    You -- you indicated before that you -- it's a difficult decision anytime you're going to terminate an employee.

Did you, at any point in time, when these issues were -- these concerns about Paul were being raised, particularly when it was being recommended that he be terminated, that you should talk to Paul and get his side of what had been going on?

MR. STERLING:  Objection to form.

A    I was in conversations with Paul about what was going on.

BY MR. HEISER:

Q    What were those conversations?

A    He wanted to get paid more and have the benefits --

Q    And what --

A    -- which means he wanted to be a full-time coach.

Q    And when did you have those direct conversations with Paul?