# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAUL GAGLIARDI,
*Plaintiff*,

v.                                        No. 3:17-cv-857 (VAB)

SACRED HEART UNIVERSITY, INC.
*Defendant*.

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Paul Gagliardi ("Plaintiff"), the head coach of the men's tennis team at Sacred Heart

University ("Sacred Heart" or "Defendant") from 2006 to 2016, claims to have been paid

significantly less and provided fewer resources than female head coaches. Am. Compl. ¶¶ 16–17,

¶¶ 33–48.

After ultimately being fired, Mr. Gagliardi sued Sacred Heart for gender discrimination

under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), *et seq.*,; Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000, *et seq.*; and Title IX of the Education Amendments of 1972, 20 U.S.C.

§1681, *et seq*. Compl., ECF No.1; Am. Compl., ECF No. 7.

Defendant now moves for summary judgment. Def. Mot. for Summ. J., ECF No. 30.

For the reasons discussed below, Defendant's motion for summary judgment, ECF No.

30, is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations

In the fall of 2006, Mike Guastelle, Sacred Heart's senior associate athletic director,

director of tennis, and women's tennis coach, hired Mr. Gagliardi to coach the men's tennis

team. Partial Tr. of Dep. of Paul Gagliardi (Mar. 16, 2018, "Gagliardi Dep."), ECF No. 30-3 at 5. Sacred Heart initially paid Mr. Gagliardi an annual salary of $5,000. *Id.* at 6. His employment that year and in subsequent years was "at will." *Id.*; *see*, *e.g.*, Robert M. Hardy Letter to Paul Gagliardi (Feb. 3, 2016), ECF No. 30-16 ("Your employment at Sacred Heart is employment "at will;" that is, you have the right to terminate at anytime, and the University has the right to terminate you with or without cause at any time.") (emphasis omitted). Each year, his tennis team had about ten athletes. Gagliardi Dep. at 13.

From the start, Mr. Gagliardi viewed the position as "a full-time position with part-time pay," *id.* at 5–6,[1] and began asking for a raise and a full-time appointment. *Id.* at 17.

In 2014, Mr. Gagliardi applied for a full-time head coaching job at Fairfield University, but was not selected. *Id.* at 16. By then, he received an annual salary of $12,500 from Sacred Heart. Paul Gagliardi e-mail to Julia Nofri (May 23, 2014), Def. Mot. for Summ. J., Ex. H, ECF No. 30-10.

In the spring of 2014, Mr. Gagliardi directly raised the issue of his pay and hours with the Human Resources Department. Gagliardi Dep. at 22; Paul Gagliardi e-mail to Julia Nofri (May 23, 2014). A few months later, he received a favorable annual performance review. Gagliardi Dep. at 21 (Q. "And in each of those categories, he either gave you an "S" or he gave you a 3 or a 4, which signified either solid or performs above expectation, is that accurate? . . . . A. Yes[.]"); Sacred Heart University: Partnering for Performance Summ. (June 20, 2014), Def. Mot. for Summ. J., Ex. I, ECF No. 30-11.

---

[1] Throughout most or all of his time at Sacred Heart, Mr. Gagliardi also worked as the United States Tennis Association Coordinator for Connecticut, Paul W. Gagliardi, Resume, ECF No. 30-4, and taught high school on either a part-time or full-time basis. Gagliardi Dep. at 10.

The next year, Mr. Gagliardi again received a positive performance review (i.e., Supervisor Ratings of "Solid Performance" in four categories, "Above Expectation" in one category, and an Overall Performance Rating of "Solid Performance"). Sacred Heart University: Partnering for Performance Summ. (July 23, 2015), Def. Mot. for Summ. J., Ex. J, ECF No. 30-12. In the Reviewer's Comments, Brad Hurlbut, Deputy Director of Athletics, explained to Mr. Gagliardi that his position would "not be made full-time in the near future." Gagliardi Dep. at 25. Mr. Hurlburt advised Mr. Gagliardi to "embrace the program and be more positive." Sacred Heart University: Partnering for Performance Summ. (July 23, 2015).

In October of 2015, Mr. Gagliardi wrote and delivered by hand a letter to Rob Hardy, Director of Human Resources. *Id.* at 27. In that letter, Mr. Gagliardi claimed that his pay was lower than it should be because of gender discrimination. *Id.* By then, he received $13,800 per year. *Id.* at 32. A few weeks later, Mr. Gagliardi met with Mr. Hardy and reiterated that the female coaches were paid and treated better. *Id.* at 30; *see also id.* at 12 (explaining that from 2006 to 2011, Mr. Gagliardi had a volunteer assistant coach, and after that, he had a paid part-time coach, who also worked with the women's tennis team).

In late December of 2015, Mr. Hardy convened a meeting with Mr. Gagliardi, Mr. Hurlbut, and Robert Valentine, the Athletic Director, to discuss Mr. Gagliardi's discrimination claims. *Id.* at 30–31. Around the same time, Mr. Gagliardi also met with Mr. Hurlbut, Mr. Valentine, and Julia Nofri of Human Resources. *Id.* Several days later, Mr. Gagliardi received a raise; effective January 1, 2016, his annual salary increased to $20,000 and he became eligible to receive part-time employee health, retirement, and tuition assistance benefits. *Id.* at 32.

In late July of 2016, Mr. Gagliardi again wrote to Mr. Hardy about his compensation. *Id.* at 34. Around the same time, Mr. Gagliardi received a lower performance review than the year

before (i.e., Supervisor Ratings of "Solid Performance" in two categories, "Needs Improvement" in one category, and an Overall Performance Rating of "Needs Improvement"). Sacred Heart University: Partnering for Performance Summ. (n.d), Def. Mot. for Summ. J., Ex. P ("Final Performance Review"), ECF No. 30-18; Pl. Local Rule 56(a)(2) Statement of Facts, Fact 58 ("In summer 2016, Plaintiff refused to sign his 2015–2016 performance review . . . . Response: Admit.").

That summer, Mr. Gagliardi pursued work outside of Sacred Heart, including "teaching, running a [non-affiliated] tennis camp at Sacred Heart for four weeks . . . running tennis tournaments on the weekends, and teaching tennis as a self employed tennis instructor." Gagliardi Dep. at 35. For one of the weeks of his tennis camp, Mr. Gagliardi had someone else, an assistant director, run the camp because he was vacationing in Cape Cod. Id. at 36–37.

In August of 2016, Mr. Gagliardi started a full-time position at Emmett O'Brien High School in Ansonia. Id. at 41–42. Shortly after starting the job, he sent an e-mail and met with Sacred Heart administrators regarding his coaching hours. Id. at 39 ("And that was the gist of the conversation in terms of if I'm part-time, then I'm going to work part-time hours, and how that was going to play out.").

In roughly the first six weeks of the 2016 season, Mr. Gagliardi arrived late to every practice and missed several practices. Id. at 54–55. He did not attend the first day of the three-day UConn Men's Invitational tournament. Id. at 52–53 ("I had just started a new job in teaching. And I didn't want to go into my first couple weeks of teaching and take a sick day or a personal day for another job, considering that information was publicly available on the Sacred Heart website. And so I felt that would not be a good idea. And also I [had] stated in the summertime and in the fall that I was not going to exceed 25 hours of work as a coach. And I felt

as though that if we had, if I went on Friday and on Saturday and on Sunday, which we didn't, we didn't make it to Sunday, then I would be way above being part-time. And I made that readily apparent to the admin - - to Mike. And I said 'Hey, you know, you're going to have to find someone to go to this day.'"); *id*. at 62 ("Q. [I]n the fall of 2016, was there ever a time where you waited to the last minute to tell Mike Guastelle that you were not going to be present for one of the matches? A. Yes. Q. And which one was that? A. The UConn Invitational. I waited until that week."). He missed most of the first day of the Yale Invitational. *Id*. at 54 (explaining that he had his assistant coach oversee the team from 10:00am to 3:00pm that day).

In late September of 2016, Sacred Heart fired Mr. Gagliardi. *Id*. at 44. Mr. Guastelle assumed his coaching responsibilities for the rest of the season. *Id*. at 57.

In 2017, the head coaching positions for men's and women's tennis were consolidated into a single full-time job with a $50,000 salary. Def. Mem. at 15. William Boe Wiegaard serves as the head coach of both teams. *Id*.

**B.     Procedural History**

On February 22, 2017, Mr. Gagliardi received a "right to sue" letter from the U.S. Equal Employment Opportunity Commission ("EEOC"). U.S. Equal Employment Opportunity Commission Letter to Paul Gagliardi (Feb. 22, 2017), Ex. A, ECF No. 1 at 14.

On May 23, 2017, Mr. Gagliardi sued Sacred Heart for sex discrimination. Compl.

On June 15, 2017, Mr. Gagliardi amended his Complaint against Sacred Heart. Am. Compl.

On August 14, 2017, Sacred Heart filed its Answer to Mr. Gagliardi's Amended Complaint. Answer, ECF No. 11.

On December 4, 2017, Sacred Heart moved to compel Mr. Gagliardi to submit a damages

analysis. Def. Mot. to Compel Damage Analysis, ECF No. 19; Fed. R. Civ. P. 37; D. Conn. L. Civ. R. 37. Sacred Heart also moved to amend its Answer to add an additional affirmative defense. Def. Mot. to Amend Affirmative Defenses, ECF No. 21; Fed. R. Civ. P. 15.

On December 5, 2017, the Court denied Sacred Heart's motion to compel a damages analysis. Order Denying Def.'s Mot. Compel Damage Analysis, ECF No. 23.

On May 21, 2018, the Court granted Sacred Heart's motion to amend its Answer to add an affirmative defense. Order Granting Def. Mot. to Amend Affirmative Defenses, ECF No. 25.

On May 22, 2018, Sacred Heart filed an Amended Answer. Am. Answer & Affirmative Defenses, ECF No. 26.

On September 14, 2018, Sacred Heart moved for summary judgement on all counts. Def.'s Mot. for Summ. J., ECF No. 30.

In support of its motion, Sacred Heart submitted the following: (1) a statement of material facts, Local Rule 56(a)(1) Statement, ECF No. 30-1; (2) a memorandum in support of the motion for summary judgement, Mem. of Law in Supp. of Def. Mot. for Summ. J. ("Def. Mem."), ECF No. 30-2; and (3) various exhibits, including Mr. Gagliardi's resume, excerpts of various deposition transcripts, affidavits, correspondence, both letters and e-mails, and other Sacred Heart documents, including Mr. Gagliardi's performance evaluations and time sheets. Def. Mot. for Summ. J., Ex. A–U, ECF Nos. 30–3–30-23.

On October 26, 2018, Mr. Gagliardi opposed Sacred Heart's motion for summary judgment. Pl.'s Mem. in Opp. to Mot. for Summ. J. ("Pl. Mem."), ECF No. 33.

On November 26, 2018, Sacred Heart replied. Reply Mem. of Law in Further Supp. of Def.'s Mot. for Summ. J. ("Def. Reply"), ECF No. 36.

On July 9, 2019, the Court convened a hearing on the motion to dismiss. Min. Entry, ECF

No. 43.

## II.     STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment).

The court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). Conclusory allegations or denials will not be credited. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor and the moving party is entitled to judgment as a matter of law, the court will grant the summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

## III. DISCUSSION

### A. Equal Pay Act

The Equal Pay Act is violated if an employer whose employees are subject to the Fair Labor Standards Act pays wages

> at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]

*Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir. 1997) (quoting 29 U.S.C. § 206(d)). "A violation occurs when an employer pays lower wages to an employee of one gender than to substantially equivalent employees of the opposite gender in similar circumstances," *id.*, and serves as the start-point for the statute of limitations. *Id.* Equal Pay Act claims "must be commenced within two years of its accrual, or three years if the violation is willful." *Id.*[2]

---

[2] A narrow exception exists for continuing violations, but it typically will not permit the recovery of back pay. *See Pollis,* 132 F.3d at 119 ("We believe that *Acha*'s reasoning is inapplicable to the present case. Seniority rights are not of immediate value, but have determinative effect on the future terms of one's employment, such as work assignments or insulation from layoff. As a consequence, a discriminatory policy that results in a wrongful denial of seniority causes harm not so much at the moment of denial as in the future, and thus only by an award of retroactive seniority can future continuing injury be avoided. A discriminatory pay scale, in contrast, has immediate effect; prospective relief requires nothing more than discontinuance of the unlawful conduct . . . . With this holding, we join

In October 2015, Mr. Gagliardi complained of gender discrimination in a letter to the Director of Human Resources. Gagliardi Dep. at 27; *see also* Paul Gagliardi Letter to Human Resources (Oct. 20, 2015), Def. Mot. for Summ. J., Ex. K, ECF No. 30-13. On February 22, 2017, Mr. Gagliardi received a "right to sue" letter for his Equal Pay Act claims from the U.S. Equal Employment Opportunity Commission. U.S. Equal Employment Opportunity Commission Letter to Paul Gagliardi.

 Since less than two years passed between Mr. Gagliardi's letter to Human Resources and EEOC Complaint, the Court will construe his Equal Pay Act claims as falling within the Act's statute of limitations period. *See Pollis*, 132 F.3d at 115, 117, 119 ("The statute of limitations requires that such claims be brought promptly to protect the defendant against stale or fabricated claims. . . . Her recovery should have been limited to damages incurred within the three-year limitations period for willful or reckless violations.").

For a violation of the Equal Pay Act, a plaintiff must first establish the elements of a *prima facie* case of discrimination. A plaintiff must show that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995)); *see also McCullough v. Xerox Corporation*, No. 12-CV-6405L, 2016 WL 7229134, at *2 (W.D.N.Y. 2016) (noting that three factors must be proven to establish a prima facie claim under the EPA).

"The Act also establishes four exceptions—three specific and one general catchall

---

the other circuits to have considered the issue, which have unanimously adopted the reasoning of *Bazemore* and concluded that back pay cannot be recovered under the Equal Pay Act for salary differentials outside the limitations period.").

provision—where different payment to employees of opposite sexes 'is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); 29 U.S.C. § 206(d)(1). "To successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999) (citing *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526–27 & n.1 (2d Cir.1992).

"Following such proof by the employer, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination. The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Belfi*, 191 F.3d at 136; *see also Chepak v. New York City Health & Hosps. Corp.*, No. 11-CV-9698 KBF, 2015 WL 509279, at *12 (S.D.N.Y. Feb. 5, 2015), *aff'd*, 643 F. App'x 62 (2d Cir. 2016) ("Even if plaintiff had established a prima facie case, summary judgment still would be appropriate because defendant has shown that the challenged wage disparity is justified by a 'factor other than sex,' for which defendant had a legitimate business reason. Specifically, defendant has put forward evidence that the weekend position that plaintiff ultimately filled was created after a male social worker resigned, and the vacancy was converted into a weekend position to meet Metropolitan Hospital's 'immediate service needs.'").

Mr. Gagliardi argues that he was paid significantly less than female head coaches in violation of the Equal Pay Act. Am. Compl. ¶¶ 33–48.

Sacred Heart argues that there are no appropriate comparisons and that Mr. Gagliardi's pay reflected Sacred Heart's legitimate business decision to invest in other sports. Def. Mem. at 21.

The Court agrees.

Mr. Gagliardi has failed to establish a *prima facie* case of unequal pay. *See Belfi*, 191 F.3d at 135 (To establish a prima facie case under the Equal Pay Act, a plaintiff must demonstrate that he or she "perform[ed] equal work on jobs requiring equal skill, effort, and responsibility . . . [and] under similar working conditions.").

As Sacred Heart notes, coaching positions are often unique, *see* Def. Mem. at 21, and courts have been reluctant to find comparator positions across different sports. *See Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 800 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999) (In the comparable Equal Pay Act context, "[c]ourts . . . have been reluctant to find an equality of work between coaches of different sports.").

Some courts have permitted comparisons between coaches of the same sport, such as the men's and women's basketball coaches. *Perdue v. City Univ. of New York*, 13 F. Supp. 2d 326, 336 (E.D.N.Y. 1998) ("[The record is replete with support for the jury's determination that CUNY intentionally discriminated against Perdue on the basis of her gender in violation of Title VII . . . . [and] illustrate[s] the disparate treatment of Perdue as women's basketball coach as compared to the treatment of the men's basketball coach."); *cf. Harker v. Utica Coll. of Syracuse Univ.*, 885 F. Supp. 378, 385 (N.D.N.Y. 1995) ("When asked, at her deposition, to elaborate on the inequities between herself and other coaches which she allegedly raised at this meeting, plaintiff stated that she was only referring to inequities between herself and Ed Jones, the men's

basketball coach . . . . Additionally, plaintiff could not recall what inequities she discussed with defendant Simpson at this meeting.").

But Mr. Gagliardi is not comparing his pay to that of the women's tennis coach. Nor could he. Mr. Guastelle, the women's tennis coach, is not an adequate comparator with respect to salary. As Mr. Gagliardi has acknowledged, Mr. Guastelle then served as the senior associate athletic director, director of tennis, and women's tennis coach. Gagliardi Dep. at 5. Mr. Guastelle also served as Mr. Gagliardi's supervisor, not his peer. *Id*. Finally, Mr. Guastelle is a male colleague, so his unequal treatment could not support a claim of pay discrimination under the Equal Pay Act on the basis of gender.

Mr. Gagliardi also has failed to demonstrate that his work was comparable to any other female coach's work. Indeed, as his counsel rightly conceded at oral argument, Mr. Gagliardi lacks the qualifications to coach any of the women's sports teams to which he seeks to compare himself. *See Mauze v. CBS Corp*., 340 F. Supp. 3d 186, 205 (E.D.N.Y. 2018) ("Additionally, Mauze cannot show that she is 'similarly situated in all material respects to the individuals' she identifies as comparators . . . . Indeed, she admits that she was not qualified for the Director of Broadcast Operations roles because she was 'never [in] broadcast operations' and 'didn't do director of broadcast operations' . . . . As a result, we find that there is no genuine dispute of material fact as to whether Mauze was similarly situated to Burroughs and Dimotheris") (quoting *Graham v. Long Island R.R*., 230 F.3d 34, 39 (2d Cir. 2000)).

In fact, his resume refers to experience with one sport and one sport only: tennis. *See* Resume of Paul Gagliardi, ECF No. 30-4 (listing various tennis coaching roles from 1996 to the present but no experience coaching in any other sports); *see also Mauze*, 340 F. Supp. 3d at 205 ("Indeed, she admits that she was not qualified for the Director of Broadcast Operations roles

because she was 'never [in] broadcast operations' and 'didn't do director of broadcast operations.'"). As a result, there is no genuine issue of material fact as to whether Mr. Gagliardi is performing equal work on jobs requiring equal skill, effort, and responsibility, at least with respect to the various women's sports teams: because there is no evidence in this record that he is qualified to coach any of these other sports teams.

Moreover, the record evidence indicates other significant differences between and among the Sacred Heart's women's sports teams—including bowling, fencing, rugby, and rowing—to which Mr. Gagliardi seeks to compare to the men's tennis team. *See*, *e.g*., Pl. Mem., Women's Teams Rosters, Ex. 6–9, ECF No. 33-6–33-9. While the rosters submitted by Mr. Gagliardi demonstrate that the women's bowling and fencing teams for the 2018–19 season were comparable in size to the teams coached by Mr. Gagliardi (i.e., roughly ten athletes), *id*.; Gagliardi Dep. at 13, the women's rugby and rowing teams enrolled considerably more student athletes. As a result, Mr. Gagliardi has failed to establish a *prima facie* case of discrimination under the Act. 29 U.S.C. § 206(d), *et seq.*

Even if Mr. Gagliardi had met his burden, Sacred Heart has provided a legitimate nondiscriminatory reason for "a differential based on any other factor other than sex," *Corning Glass Works*, 417 U.S. at 196: Sacred Heart invested in other sports. During Mr. Gagliardi's tenure at Sacred Heart, the school developed its women's rowing team, *see* Partial Tr. of Dep. of Michael Guastelle, (June 21, 2018, "Guastelle Dep."), Def. Mot. for Summ. J., ECF No. 30-5 at 25, and had a nationally recognized women's bowling team. *See id*. at 18; Partial Tr. of Director of Athletics Robert John Valentine's June 22, 2018 deposition, (June 22, 2018, "Valentine Dep."), Def. Mot. for Summ. J., Ex. F, ECF No. 30-8 at 18 ("How could we not have a program

with a -- without a head coach if we're going to showcase bowling?"). The women's basketball and volleyball teams also performed well. Guastelle Dep. at 18.

As Mr. Gagliardi has acknowledged, Sacred Heart did not invest heavily in men's tennis. Gagliardi Dep. at 12 (stating that from 2006–11, Mr. Gagliardi had a volunteer assistant coach and then an assistant coach that also worked part time for the women's tennis team); *see also* Sacred Heart University: Partnering for Performance Summ. (July 23, 2014) (in which Brad Hurlbut, Deputy Director of Athletics, wrote to Mr. Gagliardi that his position would "not be made full-time in the near future . . . . [Because Sacred Heart does] not have the resources to do so — unfortunately").

And Mr. Gagliardi has not put forth any record evidence suggesting that his pay (and gender) explained or served as the basis for this underinvestment. *See Corning Glass Works*, 417 U.S. at 196 (1974) (permitting the defense that the "differential [was] based on any other factor other than sex"); *Belfi*, 191 F.3d at 136 ("Following such proof by the employer, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination. The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices."). As a result, Sacred Heart's failure to invest in men's tennis cannot serve as a basis for Mr. Gagliardi's Equal Pay Act claim, at least on this record. *See* 29 U.S.C. § 206(d)(1); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (collecting cases for the proposition that workplace parity laws protect individual plaintiffs).

Accordingly, Mr. Gagliardi's Equal Pay Act claim will be dismissed.

## B. The Title VII Discrimination Claim

Title VII prohibits employers from discriminating on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Title VII claims must typically be "filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5; *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 506–07 (2d Cir. 2006) ("And even after the district court granted summary judgment dismissing the Title VII claims, stating that 'the 180 day limitations period applies,' Bogle–Assegai did not move for reargument on the ground that the applicable period was 300 days or that there was a work-sharing agreement.").[3]

In October 2015, Mr. Gagliardi alleged gender discrimination in a letter to Human Resources. Gagliardi Dep. at 27; *see also* Paul Gagliardi Letter to Human Resources. On February 22, 2017, Mr. Gagliardi received a "right to sue" letter for his Title VII claims. U.S. Equal Employment Opportunity Commission Letter to Paul Gagliardi.

Given these dates, it is unlikely that Mr. Gagliardi timely filed his Title VII claim with the EEOC. 42 U.S.C. § 2000e-5; *Bogle-Assegai*, 470 F.3d at 506–07 ("And even after the district court granted summary judgment dismissing the Title VII claims, stating that 'the 180 day limitations period applies,' Bogle–Assegai did not move for reargument on the ground that the applicable period was 300 days or that there was a work-sharing agreement."). Because the EEOC's "right to sue" letter does not indicate when Mr. Gagliardi filed his EEOC Complaint,

---

[3] A narrow exception exists for continuing violations, and courts apply the continuing violation doctrine similarly, though not identically, in Title VII and Equal Pay Act cases. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–16 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'. . . . Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . . Such claims are based on the cumulative effect of individual acts."); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012) ("Discrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period. This is the conclusion of every circuit to consider the question after *Morgan*.").

however, the Court will address the merits of Mr. Gagliardi's Title VII claims.

Courts apply a three-step burden shifting framework to claims of employment discrimination. *See Roncallo v. Sikorsky Aircraft*, 447 F. App'x 243, 245 (2d Cir. 2011), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "At step one of the *McDonnell Douglas* analysis, the plaintiff must establish a prima facie case of discrimination by showing that: 1) he [or she] belonged to a protected class; 2) he [or she] was qualified for the position; 3) he [or she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Id.* (internal quotations omitted) (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)).

Once a plaintiff has established a *prima facie* case, the burden shifts back to the defendant to demonstrate a valid, non-discriminatory reason for the adverse employment action. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001) ("A defendant meets [its] burden [of rebutting a prima facie case] if [it] presents reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'") (quoting *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) and citing *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000)). If the defendant makes such a showing, "the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).

Mr. Gagliardi argues that he was treated differently from female coaches throughout his tenure at Sacred Heart, Am. Compl.¶¶ 20–21, *et. seq.*, and ultimately fired while they were retained, *id.*¶ 52.

Sacred Heart argues that nearly everyone involved in Mr. Gagliardi's hiring and firing was male, *id.* at 24, that he received continued offers of employment and raises throughout his

time at Sacred Heart, Def. Mem. at 6, 17, and that he was fired for failing to perform his duties as a head tennis coach, *id.* at 14–15. Sacred Heart argues that "[t]here are simply no facts under which an inference of anti-male animus can be drawn, and summary judgment should enter for [Sacred Heart]." *Id*. at 29.

The Court agrees.

Mr. Gagliardi satisfies the first three parts of the *McDonnell Douglas* test: he belongs to a protected class, gender; Sacred Heart does not dispute that he was qualified to coach; and he was terminated, an adverse employment action. *Roncallo*, 447 F. App'x at 245; Paul W. Gagliardi, Resume, ECF No. 30-4; Def. Local Rule 56(a)(1) Statement, ECF No. 30-1, ¶ 85 ("Plaintiff's employment was terminated[.]").

But to prevail under an "unequal pay for equal work" theory, Mr. Gagliardi must satisfy the "demanding standard of the equal work inquiry . . . [which] requir[es] evidence that the jobs compared are substantially equal." *Martinez v. Davis Polk & Wardwell LLP*, 713 F. App'x 53, 55 (2d Cir. 2017) (internal quotation and citation omitted) (applying the Equal Pay Act's standard to Title VII unequal pay claims and finding that "[w]e agree with the district court that Martinez failed to establish a prima facie case of 'unequal pay for equal work' based on her allegations that she and other Hispanic employees received lower salary raises than non-Hispanic employees in her department . . . . But here, Martinez conceded that she does not do 'equal work' in comparison to any of her colleagues—in her brief she admits that she 'holds a unique position and there is no point of comparison.'").

Mr. Gagliardi also must demonstrate that there is a genuine issue of material fact as to whether his termination "occurred under circumstances giving rise to an inference of discriminatory intent." *Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551 (HBP), 2016 WL

4362204, at *10 (S.D.N.Y. Aug. 15, 2016), *on reconsideration*, No. 09 CIV. 8551 (HBP), 2017

WL 4157376 (S.D.N.Y. Sept. 19, 2017) ("The standard is essentially the same standard that

applies under the Equal Pay Act except that intentional discrimination is required and Title

VII.").

As noted above, however, Mr. Gagliardi has not offered a suitable comparator coach or

demonstrated that Sacred Heart's athletics allocations were directed at him on the basis of his

gender. His Title VII unequal pay claim thus fails for lack of a *prima facie* case for the reasons

discussed above.

Even if Mr. Gagliardi had established a *prima facie* case of discrimination, which he has

not, Sacred Heart has proffered a valid, non-discriminatory reason for the adverse employment

action: Mr. Gagliardi's poor job performance in the fall of 2016. *See Abdu-Brisson,* 239 F.3d at

469 ("A defendant meets its burden of rebutting a prima facie case if it presents reasons that,

'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the

adverse action.'").

In the fall of 2016, Mr. Gagliardi arrived late to every practice. Gagliardi Dep at 54–55.

He also missed several practices. *Id*. He arrived five hours late to a tournament at Yale, *id*. at 54,

and missed the first day of the three-day UConn Men's Invitational tournament. *Id*. at 52–53; *see

id*. at 62 ("Q. [I]n the fall of 2016, was there ever a time where you waited to the last minute to

tell Mike Guastelle that you were not going to be present for one of the matches? A. Yes. Q. And

which one was that? A. The UConn Invitational. I waited until that week.").

Because Sacred Heart has provided a legitimate non-discrimination reason for

terminating Mr. Gagliardi, "the burden shifts back to the plaintiff to prove discrimination, for

example, by showing that the employer's proffered reason is pretextual." *Demoret*, 451 F.3d at

151. Mr. Gagliardi, however, fails to create a genuine issue of material facts to support his claim of discrimination on the basis of gender. [4]

Men hired, re-hired, and supervised Mr. Gagliardi. Gagliardi Dep. at 5, Robert M. Hardy Letter to Paul Gagliardi (Feb. 3, 2016), ECF No. 30-16 ("Your employment at Sacred Heart is employment "at will[.]"); Sacred Heart University: Partnering for Performance Summ. (June 20, 2014); Sacred Heart University: Partnering for Performance Summ. (July 23, 2015). When Sacred Heart terminated Mr. Gagliardi, Sacred Heart hired a man, Mr. Guastelle, Gagliardi Dep. at 57, to replace him temporarily and then hired another man to replace him permanently, *id*.

Aside from his claims of unequal pay on the basis of gender, which also have not created a genuine issue of material fact on the issue of discrimination, Mr. Gagliardi has provided no evidence of anti-male *animus* at Sacred Heart. *Id*. at 60. As a result, Mr. Gagliardi has failed to demonstrate that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent," *Roncallo*, 447 F. App'x at 245, on the basis of his gender.

Accordingly, Mr. Gagliardi's Title VII discrimination claim will be dismissed.

### C.       The Title VII Retaliation Claim

Title VII also prohibits an employer from discriminating against an employee because the employee has opposed an employment practice prohibited by Title VII. 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are "analyzed under the McDonnell Douglas burden-shifting test." *Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, 110 (2d Cir. 2010). "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she 'participated in a protected activity,' 'suffered an adverse employment action,'

---

[4] Most of Mr. Gagliardi's discriminatory termination claims stem from Sacred Heart's purported retaliation for his complaints to human resources, *see* Paul Gagliardi e-mail to Julia Nofri (May 23, 2014), which will be discussed below.

and 'that there was a causal connection between her engaging in the protected activity and the adverse employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Gorzynski*, 596 F.3d at 110).

The Second Circuit has held that informal complaints of discrimination constitute "protected activity" under Title VII. *See Matima v. Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.") (internal quotation and citation omitted)); *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001), *as amended* (Apr. 20, 2001) ("Here, Gregory's oral and written complaints about Daly's behavior, as well as her filing of a lawsuit in state court, were undoubtedly forms of protected activity.").

"[A] plaintiff may recover for retaliation by 'show[ing] that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 204 (2d Cir. 2006).

To demonstrate a causal connection, a plaintiff must typically show that the protected activity occurred in temporary proximity to the adverse employment action. *See Gorzynski*, 596 F.3d at 110 ("But the District Court found no evidence of a causal connection between this complaint and her firing. The District Court, however, erroneously stated that the complaint occurred in December 2001, when in fact—as both sides agree—it happened in June 2002,

within a month of Gorzynski's discharge. '[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'") (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001)); *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (recognizing that claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation").

"Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Baldwin v. New York State, State Univ. of New York, Coll. at Buffalo*, 690 F. App'x 694, 697 (2d Cir. 2017) (quoting *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011)).

"After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual." *Baldwin*, 690 F. App'x at 697 (quoting *Papelino*, 633 F.3d at 91–92). "The desire to retaliate must be a 'but-for cause of the challenged employment action.'" *Id.* (quoting *Burrage v. United States*, 571 U.S. 204, 212 (2014)).

Mr. Gagliardi first must establish that he participated in a protected activity. *See Ya-Chen Chen*, 805 F.3d at 70. He correctly argues that his complaints to Sacred Heart administrators constitute protected activity. Am. Compl. ¶¶ 49, 54.

The Second Circuit considers informal "protests of discrimination" and "complaints to management" as protected activity under Title VII. *See Matima*, 228 F.3d at 78–79 (2d Cir. 2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry

or society in general, and expressing support of co-workers who have filed formal charges."). As a result, Mr. Gagliardi satisfies the first element of his *prima facie* case.

Mr. Gagliardi next must demonstrate that he suffered an adverse employment action. *Ya-Chen Chen*, 805 F.3d at 70. He also correctly argues that either his summer 2015 performance evaluation, Final Performance Review, or Sacred Heart's termination of his employment, Am. Compl. ¶ 52, satisfies this element.

While Mr. Gagliardi's summer 2015 performance evaluation may not constitute a materially adverse action that would dissuade a reasonable worker from alleging discrimination, *see Davis-Garett v. Urban Outfitters, Inc*., 921 F.3d 30, 43–44 (2d Cir. 2019),[5] his termination is a quintessential adverse employment action. *See Ya-Chen Chen*, 805 F.3d at 81 ("In light of this record, a reasonable jury could surely infer a retaliatory motive from the failure of defendants to impose a punishment less severe than termination."). As a result, Mr. Gagliardi has demonstrated that he suffered an adverse employment action.

Mr. Gagliardi also must demonstrate a "causal connection between . . . the protected activity and the adverse employment action." *Ya-Chen Chen*, 805 F.3d at 70. He argues that he was "terminated . . . for his having raising the inequity issues with the administration." Am Compl. ¶ 53.

Sacred Heart argues that "the timing of Plaintiff's complaints and his termination defeats his retaliation claim." Def. Mem. at 31.

---

[5] Mr. Gagliardi does not argue that he was demoted, lost pay, had diminished responsibilities, or lost any of his benefits on account of this performance evaluation. *See Burlington N. & Santa Fe Ry. Co*., 548 U.S. at 70 ("[W]e believe that there was a sufficient evidentiary basis to support the jury's verdict on White's retaliation claim . . . . The jury found that two of Burlington's actions amounted to retaliation: the reassignment of White from forklift duty to standard track laborer tasks and the 37-day suspension without pay."). Rather, his 2015 evaluation noted the need for improvement in some areas. Mr. Gagliardi has not argued that a reasonable Sacred Heart employee would consider such an evaluation materially adverse. Additionally, Mr. Gagliardi's termination occurred six to eight weeks and is inarguably an adverse employment action. Both events are too far removed from Mr. Gagliardi's gender discrimination complaint to establish a causal connection, as explained below.

The Court agrees.

Mr. Gagliardi complained about his pay and hours to athletic administrators as early as 2006. Gagliardi Dep. at 5–6. He complained to the Human Resources Department in 2014. *Id.* at 22; Paul Gagliardi e-mail to Julia Nofri (May 23, 2014). It is not clear whether Mr. Gagliardi alleged gender discrimination in these complaints.

On July 23, 2015, Mr. Gagliardi noted that his working conditions were "not equitable." Sacred Heart University: Partnering for Performance Summ. (July 23, 2015). In October 2015, Mr. Gagliardi complained of gender discrimination in a letter to the Director of Human Resources. Gagliardi Dep. at 27; *see also* Paul Gagliardi Letter to Human Resources (Oct. 20, 2015). He also alleged gender discrimination at meetings throughout the school year. Gagliardi Dep. at 30–32. In late July 2016, Mr. Gagliardi again complained of gender discrimination. *Id.* at 34.

In late August or September of 2015, he resumed his coaching duties. Gagliardi Dep. at 13. He was terminated several months later. *Id.* at 44.

Mr. Gagliardi undoubtedly alleged gender discrimination eleven to twelve months before his termination, and possibly before. Even applying the later date, Mr. Gagliardi has not established sufficient temporal proximity to suggest a causal nexus between his gender discrimination complaints and termination. *See Housel*, 6 F. Supp. 3d at 308 ("[C]laims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation."); *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) ("He argues that the protected activity -- the decision to speak to Hearn -- was followed closely by Ulon's adverse employment actions. This argument, however, must fail because Ulon's actions occurred in 2014, almost a year after the meeting with Hearn -- too long a

period of time for a jury to be able to infer a causal connection."); *Harrison v. U.S. Postal Serv.*, 450 F. App'x 38, 41 (2d Cir. 2011) ("In Harrison's case, all of the job vacancies in question closed at least several months (and in most cases considerably longer) after Harrison engaged in protected activity. This evidence, therefore, is insufficient to support the necessary causal connection.").[6] More importantly, after Mr. Gagliardi's gender discrimination complaint, Sacred Heart re-hired him for the 2016–17 school year. Gagliardi Dep. at 13.

Because Mr. Gagliardi has not demonstrated a causal connection between his protected activity and adverse employment action, his retaliation claims are dismissed. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88 ("Respondents correctly note that on summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion. But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.") (citation and quotation marks omitted).

But even if he had established a causal connection between his discrimination complaint and termination, Sacred Heart has submitted evidence that there were "nondiscriminatory reason for its actions," *Baldwin*, 690 F. App'x at 697—his performance. Mr. Gagliardi then must demonstrate that his complaints were the "but-for cause of the challenged employment action." *Id*.

In response to Mr. Gagliardi's October 2015 complaint, Sacred Heart convened meetings to discuss his gender discrimination allegations, Gagliardi Dep. at 30–32, raised his salary by

---

[6] At the July 9, 2019 hearing, Mr. Gagliardi argued that his summer 2016 performance review, *see* Final Performance Review, issued roughly two months before his termination, was retaliation for his gender discrimination complaints. Min. Entry. This argument fails for the same reasons as explained above because it occurred eight to nine months after his October 2015 letter alleging gender discrimination. Pl. Local Rule 56(a)(2) Statement of Facts, Fact 58 ("In summer 2016, Plaintiff refused to sign his 2015–2016 performance review . . . . Response: Admit."); *see Housel*, 6 F. Supp. 3d at 308 (W.D.N.Y. 2014) ("That said, claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation.").

more than forty percent, Paul Gagliardi Email to Julia Nofri (May 23, 2014); Gagliardi Dep. at 32, and made him eligible for part-time benefits. Gagliardi Dep. at 32.

In the fall of 2016, as previously discussed, Mr. Gagliardi arrived late to every practice, missed several practices, *id*. at 54–55, and missed competitions. *Id*. 52–53.

At the July 9, 2019 hearing, Mr. Gagliardi argued that Sacred Heart's reasons for termination were pretextual, Min. Entry, ECF No. 43, and that the Sacred Heart administrators understood he would have to miss practices and would not be available for certain tournaments. *See* Letter from Paul Gagliardi to Rob Hardy ("Until this is resolved the team may not function in a way that it has in the past . . . . So there may not be a coach to take the players to most matches or tournaments[.]"). As a result, in Mr. Gagliardi's view, there is a genuine issue of material fact as to whether his termination for these same reasons is pretextual.

The Court disagrees.

At this stage of the case, there must be admissible evidence in order for there to be a genuine issue of fact for a jury to consider an issue. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted); FED. R. CIV. P. 56(e).

While Mr. Gagliardi's letter to Mr. Hardy may be admissible for the purpose of demonstrating that Mr. Gagliardi believed that "there may not be a coach to take the players to most matches or tournaments," *see* Letter from Paul Gagliardi to Rob Hardy, it is not probative of the material issue for purposes of demonstrating pretext: that Sacred Heart administrators agreed that before the tennis season began, Mr. Gagliardi did not have "to take the players to most matches or tournaments" and then, despite that agreement, fired him for not doing what he

had been expressly permitted to do. If Mr. Gagliardi's testimony alone on his responsibilities was sufficient to create a genuine issue of material fact, the employee would be determining the scope of his or her employment, and not the employer.

Anti-discrimination laws, such as Title VII, however are not an invitation for courts to "'sit as a super-personnel department that reexamines' employers' judgments." *Ya-Chen Chen*, 805 F.3d at 73 (2d Cir. 2015) (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir.2014) (per curiam)); *see Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 280–81 (N.D.N.Y. 2017), *aff'd sub nom. Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 F. App'x 62 (2d Cir. 2018) ("[B]ecause the evidence establishes that Plaintiff did miss work, and Defendant believed the absences to be unauthorized prior to receipt of the umpire's decision . . . . the Court finds that Defendant is entitled to summary judgment on Plaintiff's race discrimination and retaliation claims asserted with respect to the August 2, 2013, NOD."); *see also Stevens v. New York*, No. 09-CV-5237 CM, 2011 WL 3055370, at *7 (S.D.N.Y. July 20, 2011) ("An employee's own assessment of his work performance is insufficient to establish pretext.").

On this material issue, whether any Sacred Heart administrator had agreed that Mr. Gagliardi did not have to appear at practices, matches, or tournaments before the tennis season began, the record is devoid of any such evidence.

Accordingly, his Title VII retaliation claim will be dismissed.

### D. Title IX

"The Second Circuit has not decided whether Title VII preempts private claims for employment discrimination under Title IX." *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97 (D. Conn. 2004). Many courts have declined to find a private right of action for employment discrimination under Title IX. *See id.*; *Maggio v. City Univ. of New York*, 05-CV-4211

(BMC/KAM), 2006 WL 8439324, at *2 (E.D.N.Y. Nov. 14, 2006);[7] *Tringali v. S. Country Cent. Sch. Dist.*, No. 06-cv-3393 (SJF), 2007 WL 9710318, at *19 (E.D.N.Y. July 19, 2007), *report and recommendation adopted*, 06-cv-3393(SJF)(MLO), 2007 WL 9710317 (E.D.N.Y. Sept. 10, 2007); *Towers v. State Univ. of New York at Stony Brook*, No. CV-04-5243 GB TML, 2007 WL 1470152, at *4 (E.D.N.Y. May 21, 2007) ("The Court agrees with those courts that have held that Title IX cannot be used to circumvent the remedial scheme of Title VII. Accordingly, Towers' Title IX claims are dismissed."); *Uyar v. Seli*, No. 3:16-CV-186, 2017 WL 886934, at *6 (D. Conn. Mar. 6, 2017).

Some rulings have suggested, however, that Congress likely intended for Title IX to include employment discrimination claims. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982) (citing legislative history, specifically the testimony of the "sponsor of the language," Senator Birch Bayh of Indiana, as "an authoritative guide to the statute's construction," who said: "[W] e are dealing with three basically different types of discrimination here. We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and discrimination in employment within an institution, as a member of a faculty or whatever. In the area of employment, we permit no exceptions") (internal quotations and citations omitted); *cf. Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001) ("This authority [*North Haven*] is a far cry from

---

[7] In *Maggio*, the court noted that: "[Title IX] cases would presumably allow an educational employee to proceed directly to court without exhausting administrative remedies with the EEOC or local employment discrimination agency; there is no definition in the statute about what remedies might be available to them, so the courts will have to supply such remedies, either by analogy to Title VII or through common law; and the 300-day administrative statute of limitations is not present under Title IX." *Maggio*, 2006 WL 8439324, at *2; *see also Vega v. State Univ. of New York Bd. of Trustees*, No. 97 CIV. 5767 (DLC), 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) ("To hold that Title IX permits a private right of action for employment-related discrimination would be to offer employees of educational institutions receiving federal funds a mechanism for relief that differs significantly from the avenues available for other employees. However, neither the Second Circuit nor the Supreme Court have yet to adopt such reasoning to preclude Title IX suits.").

holding that Title IX also authorized, like Title VII, private causes of action in this court by the employee to remedy such discrimination. For these reasons, the court finds that no private right of action exists for employees of federally funded educational institutions who are the victims of employment discrimination."); *Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 7:10-CV-3168, 2011 WL 1404934, at *11 (S.D.N.Y. Feb. 9, 2011), *amended*, No. 7:10-CV-3168, 2011 WL 2749560 (S.D.N.Y. July 13, 2011), *and abrogated on other grounds by Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130 (2d Cir. 2015) ("This Court's own review of Title IX's legislative history reveals a heavy emphasis on employment discrimination in educational institutions . . . . And, subsequent proposals in Congress to limit Title IX's coverage of employment discrimination have failed.")

Accordingly, some courts have recognized a private cause of action for employment discrimination under Title IX. *See Pejovic,* 2018 WL 3614169, at *4 ("By Defendants' logic, Graham could only have a claim if he were a woman coaching women. Ruling that way would constrict the definition of 'on the basis of sex' unnecessarily. As such, the motion will be granted with respect to any retaliation claim that Graham may raise, but will be denied with respect to his Title IX discrimination claim."); *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864, 883 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.*, 620 F. App'x 215 (5th Cir. 2015) ("Therefore, a male coach who complains of sex discrimination against a women's athletic team may have a private right of action for Title IX discrimination.").

This Court, however, need not resolve this issue because no court has developed a body of law for Title IX employment claims, separate and distinct from Title VII's analytic framework for addressing employment discrimination claims. *See Pejovic*, 2018 WL 3614169, at *3 ("A

party bringing at Title IX sex-discrimination claim must offer the same kind of proof required in a Title VII sex-discrimination claim. In the context of an employment dispute . . . a plaintiff would need to show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that his adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Proof of discriminatory intent is necessary to state a disparate treatment claim under Title VII.") (internal quotations and citations omitted); *Minnis*, 55 F. Supp. 3d at 883–84 ("To establish a prima facie case of Title IX retaliation, a plaintiff must show that he or she participated in activity protected by Title IX and that the defendant took an adverse action against him or her because of that activity. Retaliation claims under Title IX are analyzed using the same burden-shifting framework applicable to Title VII retaliation claims. Accordingly, once a plaintiff makes a prima facie showing of retaliation based on his assertion of a Title IX right, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. Thereafter, the burden shifts back to the plaintiff to present evidence that the defendant's stated non-retaliatory reason is merely pretext for an impermissible motive or unlawful behavior.") (internal quotations and citations omitted).

As a result, even if Mr. Gagliardi has a cause of action under Title IX, the analysis of his claim would not be different from how this Court already has analyzed his Title VII claim. *See Pejovic*, 2018 WL 3614169, at *3;[8] *see also Maggio*, 2006 WL 8439324, at *3 ("For example,

---

[8] *Pejovic* is factually distinguishable from the present case. In *Pejovic*, the male coach of the female tennis team lost his job because the State University of New York at Albany discontinued the women's tennis team. *Pejovic*, 2018 WL 3614169, at *4 ("The Court permitted Mr. Pejovic to sue under Title IX. The Court does not read this case to be one where Graham asserts a claim based on injuries faced only by others. The Court takes Graham's claim to be that he, too, suffered gender discrimination because of the cancellation of the women's tennis program. Graham's argument is that he was a victim of SUNY Albany's sex discrimination, which cost him his job coaching women[.]") (citing favorably *Morris v. Fordham Univ.*, 2004 WL 906248, at *2–3 (S.D.N.Y., Apr. 27, 2004)). Here, Sacred Heart's male tennis team has not been discontinued either before or after Mr. Gagliardi's termination.

those cases would presumably allow an educational employee to proceed directly to court without exhausting administrative remedies with the EEOC or local employment discrimination agency; there is no definition in the statute about what remedies might be available to them, so the courts will have to supply such remedies, either by analogy to Title VII or through common law[.]").[9]

Because, for the reasons discussed above, Mr. Gagliardi's Title VII claim will be dismissed, his Title IX claim will be dismissed as well.

## IV.    CONCLUSION

For the reasons discussed above, the Court now **GRANTS** Defendants' motion for summary judgment, ECF No. 30.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED at Bridgeport, Connecticut, this 16th day of July, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[9] As the court in *Pejovic* noted, Title IX does not permit a coach to sue solely on the basis of gender discrimination against his or her athletes. *See Pejovic*, 2018 WL 3614169, at *4. As a result, Mr. Gagliardi lacks standing to sue under Title IX on behalf of Sacred Heart athletes. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) (explaining that, under Article III standing doctrine, plaintiffs seeking to invoke federal court jurisdiction must show that they have suffered, are suffering, or will be threatened with an injury).