**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PAUL GAGLIARDI, | * | CIVIL ACTION NO. |
| | * | 3:17-cv-00857-VAB |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| SACRED HEART UNIVERSITY, | * | AUGUST 16, 2019 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## <u>PLAINTIFF'S RULE 59(e) MOTION</u>

COMES NOW, the plaintiff Paul Gagliardi, by and through counsel, and files this Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 59(e), and in support thereof, states as follows:

## I.     PRELIMINARY STATEMENT

The present motion first addresses the Court's Ruling and Order on Motion for Summary Judgment (ECF No. 44) ("Ruling") as it applies to the plaintiff's Title VII and Title IX retaliation claims.  The Court granted summary judgment as to the retaliation counts for two reasons.[1]  First, the Court found that the temporal relationship between the plaintiff's protected acts and the adverse employment actions taken against him failed to establish a *prima facie* case of retaliation.  Second, the Court found that even if the plaintiff had established a *prima facie* retaliation claim, the plaintiff did not offer evidence of pretext to rebut the purported legitimate non-discriminatory reason for his

---

[1] The Court's Ruling did not specifically address the Title IX retaliation claim, but indicated that its Title IX and Title VII analysis was the same.

termination.

The Court's reasoning on both grounds is flawed and reached only by an inappropriate and incomplete analysis of the facts presented. As discussed below, the Court overlooked multiple questions of material fact that apply to both the purported legitimate reasons for the plaintiff's termination and his arguments concerning pretext. These questions should not have been answered by the Court and should have been left to the jury. Reasonable inferences could have been drawn by the jury that the Court ignored.

The present motion also addresses the Court's Ruling as it applies to the plaintiff's Equal Pay claim, and Title VII and Title IX discrimination claims, with relation to the Court's consideration of disparate treatment of similarly situated employees. The Court, in discussing plaintiff's Title VII discrimination claim,[2] found the plaintiff had satisfied the first three prongs of the *McDonnell-Douglas* test: (1) he belongs to a protected class: gender; (2) Sacred Heart does not dispute that he was qualified to coach; and (3) he was terminated, an adverse employment action. However, the Court found he failed to satisfy the fourth prong of the test under an "unequal pay for equal work" theory because (1) he failed to offer evidence of a suitable comparator coach,[3] or (2) demonstrate that defendant's athletics allocations were directed at him on the basis of his gender.

The Court, in ruling on each of these, failed to consider that evidence regarding the treatment of similarly situated employees (also known as "comparator evidence") is,

---

[2] The Court's Ruling did not specifically address the Title IX claim, but indicated that its Title IX and Title VII analysis was the same.
[3] Ruling that plaintiff did not establish a *prima facie* case of a violation of the Equal Pay Act, the Court incorrectly focused on plaintiff's experience as a tennis coach and only a tennis coach in finding he failed to demonstrate that his work was comparable to any other female coach's work.

in fact, only one way to establish the fourth element of the *prima facie* case, and that the bar for establishing such similarity is relatively low.  In particular, to be a comparator for purposes of this type of analysis, the other individual need only to have a situation *similar* to the plaintiff's, not identical, to support a minimal inference that the difference of treatment may be attributable to discrimination.  The Court here disregarded all comparator evidence proferred by plaintiff on the simple basis that the plaintiff was qualified to coach only tennis and no other sport.  The Court also inappropriately drew inferences, adverse to the plaintiff (non-movant) and favorable to the defendant (movant), based on the gender of the individuals who hired and fired him, and the fact that he remained employed after he complained, receiving a raise, contrary to established Second Circuit precedent.

As discussed below, the Court overlooked multiple questions of material fact that apply to the proffered evidence of similarly situated employees (*i.e.,* comparator evidence) and failed to draw reasonable inferences of discriminatory intent in favor of the non-movant plaintiff in regards to pretext.  These questions should not have been answered by the Court and should have been left to the jury.  Reasonable inferences could have been drawn by the jury that the Court ignored.

## II.    FACTS ADOPTED BY COURT

In ruling on the defendant's Motion for Summary Judgment, the Court adopted the following facts as true.  *See* Ruling I, A. Factual Allegations.  In the fall of 2006, Mike Guastelle, Sacred Heart's senior associate athletic director, director of tennis, and women's tennis head coach, hired the plaintiff Gagliardi to coach the men's tennis team. Partial Tr. of Dep. of P. Gagliardi (Mar. 16, 2018, "Gagliardi Dep."), ECF No. 30-3 at 5.

Sacred Heart initially paid Gagliardi an annual salary of $5,000. Id. at 6. His employment that year and in subsequent years was "at will." Id.; *see e.g.* Robert M. Hardy Letter to Paul Gagliardi (Feb. 3, 2016), ECF No. 30-16. Each year, his tennis team had about ten athletes. Gagliardi Dep. at 13.

From the start, Gagliardi viewed the position as "a full-time position with part-time pay," Id. at 5-6, and began asking for a raise and a full-time appointment. Id. at 17. In 2014, Gagliardi applied for a full-time head coaching job at Fairfield University, but was not selected. Id. at 16. By then, he received an annual salary of $12,500 from Sacred Heart. Paul Gagliardi e-mail to Julia Nofri (May 23, 2014), Def. Mot. for Summ. J., Ex. H, ECF No. 30-10.

In the spring of 2014, Gagliardi directly raised the issue of his pay and hours with the Human Resources Department. Gagliardi Dep. at 22; Paul Gagliardi e-mail to Julia Nofri (May 23, 2014). A few months later, he received a favorable annual performance review. Gagliardi Dep. at 21; Sacred Heart University: Partnering for Performance Summ. (June 20, 2014), Def. Mot. for Summ. J., Ex. 1, ECF No. 30-11.

The next year, Gagliardi again received a positive performance review (*i.e.,* Supervisor Ratings of "Solid Performance" in four categories, "Above Expectation" in one category, and an Overall Performance Rating of "Solid Performance"). Sacred Heart University: Partnering for Performance Summ. (July 23, 2015), Def. Mot. for Summ. J., Ex. J, ECF No. 30-12. In the Reviewer's Comments, Brad Hurlbut, Deputy Director of Athletics, explained to Gagliardi that his position would "not be made full-time in the near future." Gagliardi Dep. at 25. Hurlburt advised Gagliardi to "embrace the program and be more positive." Sacred Heart University: Partnering Performance

Summ. (July 23, 2015).

In October of 2015, Gagliardi wrote and delivered by hand a letter to Rob Hardy, Director of Human Resources. Id. at 27. In that letter, Gagliardi claimed that his pay was lower than it should be because of gender discrimination. Id. By then, he received $13,800 per year. Id. at 32. A few weeks later, Gagliardi met with Hardy and reiterated that the female coaches were paid and treated better. Id. at 12, 30.

In late December of 2015, Hardy convened a meeting with Gagliardi, Hurlbut, and Robert Valentine, the Athletic Director, to discuss Gagliardi's discrimination claims. Id. at 30-31. Around the same time, Gagliardi also met with Hurlbut, Valentine, and Julia Nofri of Human Resources. Id. Several days later, Gagliardi received a raise; effective January 1, 2016, his annual salary increased to $20,000 and he became eligible to receive employee health, retirement, and tuition assistance benefits. Id. at 32.

In late July of 2016, Gagliardi again wrote to Hardy about his compensation. Id. at 34. Around the same time, Gagliardi received a lower performance review than the year before (i.e., Supervisor Ratings of "Solid Performance" in two categories, "Needs Improvement" in one category, and an Overall Performance Rating of "Needs Improvement"). Sacred Heart University: Partnering for Performance Summ. (n.d), Def. Mot. for Summ. J., Ex. P ("Final Performance Review"), ECF No. 30-18; Pl. Local Rule Statement of Facts, Fact 58 ("In summer 2016, Plaintiff refused to sign his 2015-2016 performance review . . . . Response: Admit.").

That summer, Gagliardi pursued work outside of Sacred Heart, including "teaching, running a [non-affiliated] tennis camp at Sacred Heart for four weeks . . . running tennis tournaments on the weekends, and teaching tennis as a self-employed

tennis instructor." Gagliardi Dep. at 35. For one of the weeks of his tennis camp, Gagliardi had someone else, an assistant director, run the camp because he was vacationing in Cape Cod. Id. at 36-37.

In August of 2016, Gagliardi started a full-time position at Emmett O'Brien High School in Ansonia. Id. at 41-42. Shortly after starting the job, he sent an e-mail and met with Sacred Heart regarding his coaching hours. Id. at 39 ("And that was the gist of the conversation in terms of if I'm part-time, then I'm going to work part-time hours, and how that was going to play out.").

In roughly the first six weeks of the 2016 season, Gagliardi arrived late to every practice and missed several practices. Id. at 54-55. He did not attend the first day of the three day UConn Men's Invitational tournament. Id. at 52-53, 62. He missed most of the first day of the Yale Invitational. Id. at 54.

In late September of 2016, Sacred Heart fired Gagliardi. Id. at 44. Guastelle assumed Gagliardi's coaching responsibilities for the rest of the season. Id. at 57. In 2017, the head coaching positions for men's and women's tennis were consolidated into a single full-time job with a $50,000 salary. Def. Mem. at 15. William Boe Wiegaard serves as the head coach of both teams. Id.

The Court adopted the fact that Gagliardi is a tennis coach and that he lacks qualification to coach any sport other than tennis, stating, "[h]e has experience in one sport and one sport only: tennis. Resume of Paul Gagliardi, ECF No. 30-4." Ruling at 12.

Furthermore, the Court's Ruling found that "Gagliardi's pay reflected Sacred Heart's legitimate business decision to invest in other sports. Def. Mem. at 21." Ruling

at 11. The Court's Ruling highlights evidence of Sacred Heart's investment in women's sports only, but states that there is no record evidence that Gagliardi's gender explained or served as the basis for this investment. Id. at 14. In doing so, the Court effectively accepted as fact Sacred Heart's decision to invest in female sports, which includes the intentional decision to invest in female coaches: decisions that are unequivocally based on gender.

## III.    ARGUMENT

### A.    Standard for Rule 59 Motion

The standard for granting a motion to reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSC Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court." Range Road Music, Inc. v. Music Sales Corp., 90 F.Supp.2d 390,392 (S.D.N.Y. 2000).

A motion for reconsideration is not intended to allow a party to reargue "those issues already considered when a party does not like the way the original motion was resolved." In re Houbigant, Inc., 914 F.Supp. 997, 1001 (S.D.N.Y. 1996). The parties "may not address facts, issues or arguments not previously presented to the Court." U.S. Titan v. Guangzhou Zhen Hua Shipping Co., Ltd., 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (citations omitted).

Local Rule 7(c)(1) states that "[m]otions for reconsideration shall not be routinely filed and shall satisfy the strict standard applicable to such motions. Such motions will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order." L. Civ. R. 7(c)(1).   A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998)), as amended (July 13, 2012).  "A motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made." Lopez v. Smiley, 375 F.Supp.2d 19, 21-22 (D. Conn. 2005) (quotation marks and citation omitted)). The "major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, § 4478 at 790.

## B.    Court Made Inappropriate Factual Determinations

As is well settled, in ruling on a motion for summary judgment, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Kessler v. Westchester County Department of Social Services, 461 F.3d 199, 206 (2d Cir. 2006). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 249 (1986).

The district court cannot undertake a "piecemeal" review of the record. Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). Instead, the Court must "review all the evidence in the record." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). The Court "may not make credibility determinations or weigh the evidence" and all reasonable inferences must be drawn in favor of the non-moving party, in this case, the plaintiff. Id. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge" Id. That is especially true when "contrary inferences might reasonably be drawn." Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009).

### C.      Court Failed to Consider Counter Facts and Reasonable Inferences

Under law, the Court here was required to consider the whole record in the light most favorable to the non-moving party. The Court, instead, accepted the facts offered by the defendant without consideration of the counter facts offered by the plaintiff (non-movant), as well as the reasonable inferences to be drawn therefrom.

Davis-Garrett v. Urban Outfitters, Inc., 921 F.3d 30 (2d. Cir. 2019), is on point and addresses many of the same failures made there as did the Court herein. In that case, the plaintiff offered counter facts to the alleged legitimate non-discriminatory basis for the actions taken against the plaintiff. The Court accepted the defendant's argument that it could not have retaliated against the plaintiff had been promoted after making complaints against her supervisors. Id. at 47. However, in reaching that conclusion, the trial court:

> did not mention (a) that this, according to Garrett, occurred only after she had complained of discrimination, and (b) that in her new position Garrett was given no training and was criticized for being deficient; that the language used may permissibly be viewed as euphemistic disparagement of her age, and she was so criticized daily; and that she was promptly scheduled – more frequently than anyone had been in the past – to do those duties of the position that everyone disliked the most.

Id.

In the same manner, the Court herein adopted the defendant's factual allegations and failed to even consider Gagliardi's counter facts, which were reasonable without even considering the reasonable inferences that could be drawn from those facts.

### 1.   Title VII and Title IX Retaliation Claims

In construing the limited facts stated in Section II above as true, the Court in this matter failed to properly consider the following genuine issues of material fact, and a significant number of material facts supported by record evidence (undisputed by defendant) favorable to Gagliardi (the non-movant) as true.  The Court overlooked the following reasonable and material inferences favorable to Gagliardi that defeat summary judgment in defendant's favor.

### a.   Temporal Proximity

As the Court notes, the plaintiff had raised the issue of his inequitable treatment in pay and hours for many years.  Ruling at 2. However, it was not until an October 20, 2015, letter to human resources that he first used the term "gender discrimination" when addressing his continuing complaints, and the Court accepts this as fact.  Id. at 3.  The plaintiff was terminated from his position on September 28, 2016.  Id. at 5; Def. Rule 56(a) Statement, ¶ 84.  The Court noted that the plaintiff "undoubtedly alleged gender

discrimination eleven to twelve months before his termination (referring to the October 20, 2015 letter), and possibly before." Ruling at 23. The Court then determined that "[e]ven applying the later date" there was not sufficient temporal proximity. Id.

However, in reaching that conclusion, the Court ignored the fact that the plaintiff's protected activity did not end with the October 20, 2015, letter to human resources. As the Court notes in its decision, the plaintiff also "alleged gender discrimination at meetings throughout the [2015-2016] school year. Gagliardi Dep. at 30-32." Id. Most importantly, in a July 30, 2016, letter to Robert Hardy, the plaintiff contended that he was being discriminated against due to his gender and "because of a Title IX issue." Def. Rule 56(a) Statement, Ex. O, ECF No. 30-17. That was protected activity. Thereafter, on September 7, 2016, the plaintiff met with Mr. Hardy to discuss those complaints. Id. at Ex. A, ECF No. 30-3 (Pl. Dep. at 101-02.) That was also protected activity.

Therefore, the record clearly establishes that the plaintiff took part in protected activity on July 30, 2016, and September 7, 2016, and that his termination occurred on September 28, 2016. As such, the termination, which is without question, an adverse action, occurred no more than two months after and as little as three weeks after the protected activity. That temporal proximity is certainly enough to set forth a *prima facie* case or, at a minimum, raise questions of fact that must be addressed by the jury.

b.    **Inferences of Discriminatory Intent**

Next, genuine issues of material fact exist directly relating to defendant's discriminatory intent. First, as the record evidence supports an inference that defendant's lack of support in terms of lower budget, lack of full-time assistant, more

rigorous match schedule, for examples, adversely impacted Gagliardi in terms and conditions of his employment.   Second, despite being a part-time employee, the defendant implicitly expected Gagliardi to work more than part-time hours in order to fulfill his coaching duties. *See* Pl. Rule 56(a) Statement, Ex. 1 (Gagliardi Aff. ¶ 9), ECF No. 33-3 ; *see also* id., Ex. 2 (Guastelle Dep. at 48), ECF No. 33-4.   Sacred Heart's stated "last straw" reason for termination, namely Gagliardi's failure to attend a day of a tournament, which would have caused him to exceed his part-time hours, resulted in an adverse employment action (i.e. termination).  Additional evidence of this is his failure to spend more time working on fundraising was specifically held against him in his reviews and was apparently a consideration by Mr. Guastelle in recommending termination. *See* Def. Rule 56(a) Statement, Ex. P at 5, ECF. No. 30-18.

Next, the Court overlooked that Sacred Heart treated Gagliardi's complaints of gender inequity with disdain.  Mr. Valentine, who rendered the termination, testified that he thought Gagliardi's raising of complaints to Human Resources was "inappropriate" and "wrong". *See* Pl. Rule 56(a) Statement, Ex. 11 (Valentine Dep. at 146), ECF No. 33-13.  Hulburt, who was involved in the decision to deny Gagliardi's request for full-time status based on inequity, referred to Gagliardi as a "liar" and told the plaintiff that he was "tired of [his] bullshit" in reference to Gagliardi's complaints.  *See* id., Ex. 10; (Gagliardi Aff. ¶ 34), ECF No. 33-3.  Inappropriately, the Court failed to draw reasonable inferences of discriminatory intent from such disdain in plaintiff's favor and, as would be appropriate, to leave the assessment of those reasonable inferences to a jury.

**c.    Alleged Non-Discriminatory Basis for Termination**

The Court also granted summary judgment as to the retaliation claims because

the defendant offered evidence of a non-discriminatory reason for its actions. Specifically, the Court noted that "[i]n the fall of 2016 . . . Mr. Gagliardi arrived late to every practice, missed several practices, and missed competitions." (Citations omitted.) Ruling at 18. In response to that evidence, the plaintiff argued that the reasons were pretextual or that, at a minimum, there were questions of material fact about the stated reasons for the termination that must be addressed by the jury. The Court accepted the purported legitimate reasons without consideration of material facts related to the reasons.

The plaintiff admitted that he arrived a half hour after the players arrived for practice at 3:00 p.m., which has been interpreted as his being "late." However, the plaintiff also explained that the "official start of practice" was 3:30 p.m. and that he told the players to arrive at 3:00 p.m. to warm up so that when he arrived they would be ready to practice. *See* Pl. Rule 56(a) Statement, Ex. 1 (Gagliardi Aff. ¶ 46), ECF No. 33-3; *see also* id., Ex. 4 (Gagliardi Dep. at 127), ECF. No. 33-6. Practice would then proceed for two to two and a half hours after his arrival. See id., Ex. 1(Gagliardi Aff. ¶ 47), ECF No. 33-3. At a minimum, there are material questions of fact as to whether the plaintiff's being "late" as explained in the evidence constituted a legitimate reason for his termination.

The Court also accepted that the plaintiff had missed between two and five practices. Again, there are material facts that address this purported reason that the Court failed to consider. Specifically, while the plaintiff admitted that he missed some practices, those practices were covered by Matt Cook, the part-time assistant coach. *See* Pl. Rule 56(a) Statement, Ex. 1 (Gagliardi Aff. ¶ 52), ECF No. 33-3. Cook also

covered practices for Mike Guastelle, the women's tennis coach, when he missed practices. *See* id., Ex. 1 (Gagliardi Aff. ¶ 53), ECF No. 33-3.  The fact that Guastelle also used Cook to cover practices he could not attend raises questions of material fact as to whether the plaintiff doing the same thing was truly a legitimate reason for his termination.

The Court also relied on the fact that the plaintiff "missed competitions."  Ruling at 18.  There is no evidence that the plaintiff "missed competitions."  There is record evidence that the situation with the "missed" tournaments is far from clear and that material facts support the argument that the women's tennis coach, who was also the Director of Tennis, also missed tournaments and was aware that the plaintiff would miss parts of the two tournaments in question.  *See* Pl. Rule 56(a) Statement ¶¶ 77-83, Ex. 1 (Gagliardi Aff. ¶ 40-42), ECF No. 33-3; *see also* id., Ex. 4 (Gagliardi Dep. at 153), ECF No. 33-6.

With respect to the Yale tournament, the plaintiff arrived at 3:00 p.m. when the matches had begun at 10:00 a.m.  *See* Def. Rule 56(a) Statement, Ex. A (Pl. Dep. at 126), ECF. No. 30-3.  The tournament in question was a three-day tournament. *See* Pl. Rule 56(a) Statement, Ex. 1 (Gagliardi Aff. ¶ 55), ECF No. 33-3.  Matt Cook, the part-time assistant, covered the first part of Friday until the plaintiff arrived in the afternoon. *See* id. at Ex. 1 (Gagliardi Aff. ¶ 56).  The plaintiff was on-site for the remainder of the tournament on Saturday and Sunday from approximately 9:00 a.m. to 6:00 p.m. *See* id. at Ex. 1 (Gagliardi Aff. ¶ 57).  This was not unusual, as Guastelle had Cook cover matches or tournaments for him as the head women's tennis coach, including sending Cook as the sole coach on a trip to Dartmouth in October of 2015. *See* id. at Ex. 1

(Gagliardi Aff. ¶ 58). The fact that Guastelle also used Cook to cover matches and tournaments for him as women's coach is a material fact that raises questions for a jury to consider.

The same questions of material fact apply to the University of Connecticut tournament that began on September 16, 2016, that was the alleged "last straw" leading to the plaintiff's termination. The defendant contends that on Sunday, September 11, 2016, Guastelle met with the plaintiff and Cook to discuss the tournament. *See* Def. Rule 56(a) Statement ¶ 77, ECF. No. 30-1. The plaintiff denied that allegation stating that the meeting did not occur as contended by Guastelle. *See* Pl. Rule 56(a) Statement ¶ 77, ECF No. 33-1. In fact, the plaintiff was at a tennis tournament in Branford on September 11, 2016, and was not on campus at SHU. *See* id., Ex. 1 (Gagliardi Aff. ¶ 37). That material fact is, thus, in question.

The defendant contends that "the reason for the meeting was because Guastelle wanted to make sure that all the matches at the tournament had a coach covering them, given that Guastelle would be away with the Women's Team and Coach Cook was unavailable." Def. Rule 56(a) Statement ¶ 78, Ex. C (Guastelle Dep. at 123-24), ECF. No. 30-5. The plaintiff disputed that allegation stating instead that the plaintiff had discussions with Guastelle regarding the fact that the plaintiff would not be able to attend the Friday portion of the UConn tournament and needed Cook to attend. *See* Pl. Rule 56(a) Statement ¶ 78, Ex. 1 (Gagliardi Aff. ¶ 38), ECF No. 30-3. That material fact is in question.

The defendant alleges that the plaintiff "assured Guastelle that he would be at the tournament on Friday." Def. Rule 56(a) Statement ¶ 79, Ex. C (Guastelle Dep. at

124), ECF. No. 30-5. The plaintiff denied that allegation and countered that Guastelle also had a conflict with a tournament that weekend and needed Cook to cover a match at Quinnipiac the same day. *See* Pl. Rule 56(a) Statement ¶ 79, Ex. 1 (Gagliardi Aff. ¶ 38-39), ECF No. 30-3. Those material facts are in question.

The defendant further contends that "[m]id-way through the week, Plaintiff called Guastelle and stated he would not be at the Friday matches because of a conflict with his new full-time teaching job." Def. Rule 56(a) Statement ¶ 80, Ex. C (Guastelle Dep. at 124), ECF. No. 30-5; *see also* id., Ex. A (Gagliardi Dep. at 125), ECF No. 30-3. The plaintiff denied that allegation and stated that he spoke to Guastelle on Tuesday or Wednesday that week and was surprised to learn that he had already slotted Cook to cover for Guastelle. They worked out the situation and it was agreed that Cook would cover for the plaintiff on Friday at UConn. Unfortunately, Cook broke his ankle in the interim and was not able to cover for the plaintiff on Friday. *See* Pl. Rule 56(a) Statement ¶ 80, Ex. 1 (Gagliardi Aff. ¶¶ 40-42).

The defendant characterized this situation as that the plaintiff "waited until the last minute" to provide Guastelle with notice. *See* Def. Rule 56(a) Statement ¶ 82, Ex. A (Gagliardi Dep. at 153), ECF. No. 30-3. The court adopted that position. Ruling at 18. However, the evidence indicates that there was an open discussion about coverage for both the men's and women's tournaments that weekend and that a resolution was reached whereby Cook would cover Friday at the men's tournament. The defendant further contends that it was the plaintiff's absence that prohibited the team from competing in the doubles portion of the tournament. *See* Def. Rule 56(a) Statement ¶ 83, ECF. No. 30-1. However, the reality is that it was Cook's inability to cover the

Friday portion due to his ankle fracture that was prohibitive. *See* Pl. Rule 56(a) Statement ¶ 83, Ex. 1 (Gagliardi Aff. ¶ 40-41), ECF No. 30-3. At a minimum, there are significant questions of material fact regarding the circumstances of the UConn tournament. Those are questions of fact material to the defendant's proffered non-discriminatory basis that a jury needs to address.

### 2.    Discrimination/Equal Pay Claims: Unequal Treatment

Evidence regarding the treatment of similarly situated employees (also known as "comparator evidence") is only one way to establish the fourth element of a *prima facie* case of discrimination. *See* Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467-68 (2d Cir. 2001); Ya-Chen Chen v. City University of New York, 805 F.3d 59, 73 (2d Cir. 2015) (noting "[w]ithout such comparators – or some other evidence suggesting that the college acted on retaliatory motives" – inferences of retaliation may not be drawn). "[S]howing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden." Abdu-Brisson, 239 F.3d. at 467-68. "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Bagley v. Yale University, U.S. District Court, D. Conn., C.A. No. 3:13-cv-01890, 2015 WL 8750901 *3 (D. Conn. 2015)(quoting Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)) .

### a.    Court's Reliance on Lack of Comparators in Misplaced

"The Second Circuit instructs us that an individual is a comparator of a discrimination plaintiff if that other individual and the plaintiff are *similarly situated in all material respects*. To be a comparator for the purpose of this analysis, the other

individual must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuiness v. Hall, 263 F.3d 49, 54 (2d Cir. 2001). Thus the bar is set relatively low. Judge Haight, in 2015, applying these principles the Bagley case, *supra,* stated, "[a]nd one wonders where Bagley is to find such individual comparators, if not in the ranks of the same faculty in which she taught, where colleagues received Yale reappointments at a time when Yale refused to reappoint her." Bagley, 2015 WL 8750901 at *3.

As a preliminary matter, the plaintiff has offered two different types of comparators to be considered. The first is Michael Guastelle, the women's tennis coach. It is true that Guastelle's position was different from Gagliardi's because he also worked as an Assistant Athletic Director. As such, some of his salary was paid to him in consideration for that work. However, Guasatelle did testify that approximately 30% of his time was spent coaching. See Def. Rule 56(a) Statement, Ex. C (Guastelle Dep. at 37), ECF. No. 30-5. As such, his salary for that percentage of his work is available to compare to Gagliardi's. In looking at the facts – that being how much Gagliardi was paid for his allegedly part-time job and how much Mr. Guastelle was paid for 30% of his work – a jury could easily reach an inference that Gagliardi was underpaid for his work compared to Guastelle. The Court ignored that evidence.

In addition, the Court was too strict in its application of the comparator standard in looking at other similarly-situated coaches. For instance, one of the primary arguments the plaintiff makes in this case is that his job remained part-time while all women's coaches were full-time coaches. The Court, in essence, ruled that because he was a men's tennis coach, he could not be compared to other sports coaches. Ruling

at 13. In doing so, the Court has set an impossible standard for coaches to bring an Equal Pay Act, Title VII, Title IX or retaliation claim under these circumstances. Unless a school, for some completely unthinkable reason, would have two men's tennis head `coaches, a coach in Gagliardi's position will never be able to establish that another coach is a fair comparator. That standard is totally unreasonable and unworkable.

During Gagliardi's tenure as head coach, the female coaches of the following teams (and others) were designated full-time, were paid higher wages than Gagliardi, were assigned full-time assistants: rugby, equestrian, soccer, bowling, rowing, and field hockey. See Pl. Rule 56(a) Statement, Ex. As of 2016, the year Gagliardi was terminated, none of the female head coaches at Sacred Heart were designated part-time. *See* Pl. Rule 56(a) Statement at 30 (¶ 30), Ex. 11 (Valentine Dep. at 83-84), ECF. No. 33-13. None of the female first assistant coaches were designated part-time, at the time Gagliardi was terminated either. <u>Id.</u> At the time Gagliardi was terminated in 2016, all of the sports teams at Sacred Heart that were coached by women had at least one full-time assistant coach assigned to the teams. See Def. Rule 56(a) Statement, Ex. C (Guastelle Dep. at 105-06).

However, while Gagliardi was the men's tennis team head coach, the men's tennis team only shared a part-time assistant coach contributing merely five (5) hours of time per week with the women's tennis team. *See* Pl. Rule 56(a) Statement, Ex. 3 (Guastelle Dep. at 28).

The men's tennis recruiting budget was exceptionally low in comparison to the other sports teams, particularly similar women's teams coached by females. *See* <u>id.,</u> Ex. 1 (Gagliardi Aff. ¶ 73). All of the teams at Sacred Heart that are coached by women

had a higher recruiting budget than the men's tennis team. *See* Def. Rule 56(a) Statement, Ex. C (Guastelle Dep. at 153-157). In fact, the budgets for men's sports teams were significantly lower than the budgets for the same sport for female sports teams, coached by female coaches. Id. Decisions regarding these matters as to full-time status and budgets were made by Sacred Heart not based on workload or special, unique skill or qualification of the female coaches. *See* Def. Rule 56(a) Statement, Ex. C (Guastelle Dep. at 62), ECF No. 30-5.

The men's tennis team participated in a more rigorous schedule (35 match dates per year) than women's sports teams. See id., Ex. A (Gagliardi Dep. at 120), ECF No. 30-3.

In 2016, Hardy told Gagliardi to adhere to working only the part-time hours (no more than 25 hours per week). *See* Def. Rule 56(a) Statement ¶ 51, Ex. D (Hardy Dep. at 59, ECF No. 30-6. The duties of the head tennis coach, in season, which is when Gagliardi was fired, required approximately 30 hours per week of work. *See* Pl. Rule 56(a) Statement, Ex. 2 (Guastelle Dep. at 48), ECF No. 33-4.

The tennis team practices that Gagliardi scheduled commenced at 3:30 p.m. and ran for two (2) to two (2) and one-half (1/2) hours (until 5:30- 6:00 p.m.). See id., Ex. 1 Gagliardi Aff. ¶ 47).

Gagliardi brought his inequitable treatment to the attention of Sacred Heart's Athletic Department prior to his termination but the inequitable treatment was never alleviated by Sacred Heart's Athletic Department. Gagliardi was never paid a full-time salary or provided with equal resources, including but not limited to equal access to an assistant coach or travel budget. Instead, Gagliardi was told to embrace the position

and program as it was (fraught with inequity) and he was evaluated poorly for his unwillingness to accept the inequity. *See* Def. Rule 56(a) Statement, Ex. P (2015-16 Performance Eval.), ECF No. 30-18. In fact, after formally presenting the inequities between the salary for his position and that of female coaches and assistant coaches (using the phrase gender discrimination), his supervisors began rating him poorly claiming that he was not engaged and would not accept his part-time status. See id., Ex. J, P, ECF Nos. 30-12, 30-19.

The Court was required to take these facts into consideration and any reasonable inferences that could be drawn from these facts. The Court failed to do so, and, instead, adopted the facts and reasoning presented by the defendant. The Court also limited its analysis of whether the plaintiff was similarly-situated to other coaches to whether he coached any other sport. That standard is too strict and not in comportment with the standards of the Second Circuit, as discussed in Bagley, *supra*, citing Second Circuit precedent. In fact, that standard would mean that no female coach of a particular team without a male counterpart of the same sport (*i.e.,* the coaches of women's rugby, equestrian, and bowling teams at Sacred Heart) would be precluded from making a comparator claim under similar circumstances. That is not the standard applied in prior precedent and should not have been applied in this case.

## IV.    CONCLUSION

WHEREFORE, the plaintiff requests that the hearing on the defendant's Motion for Summary Judgment be continued to a future date at the Court's discretion.

PLAINTIFF,
PAUL GAGLIARDI


BY:   /s/ ct23807
     Theodore Heiser, CT 23807
     Kristi D. Kelly, CT 23970
     Suisman Shapiro
     2 Union Plaza, Suite 200
     New London, Connecticut 06320
     (860) 442-4416 (tel)
     (860) 442-0495 (fax)
     theiser@sswbgg.com

## **CERTIFICATION OF SERVICE**

The undersigned certifies that on the 16th day of August 2019, a copy of the foregoing served by electronic mail to all parties who have appearances as of the time of this filing.

Jonathan Sterling, Esq.
Jillian Orticelli, Esq.
Carlton Fields
One State Street, Suite 1800
Hartford, Connecticut 06103


_____/s/ct 23807_____
Theodore W. Heiser, ct 23807

{!01843447.DOCX; v.}23